UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM
NOW, et al                                          Civil Action No.

                      Plaintiffs,

versus

UNITED STATES OF AMERICA,  et al,

                      Defendants.

-------------------------------------------------------x

## **Plaintiffs List of Exhibits Attached to Complaint**


A - OMB Memo October 7, 2009

B- Affidavit of Brennan Griffin (and attachments)

        Circular A-110 as amended 9.30.09

        September 15, 2006 Texas HUD contract with AI;

        May 1, 2007 Michigan HUD contract with AI:

        May 1, 2007 Arkansas HUD contract with AI;

        May 25, 2007 San Antonio HUD contract with AI;

        June 30, 2008 Cleveland HUD contract with AI;

        September 16, 2008 San Antonio HUD contract with AI;

        October 2, 2009 email from Catherine Patterson (DHS) advising ACORN to discontinue activity;

        October 9, 2009 letter from EPA advising ACORN Institute they are not eligible for funding and their grant proposal would not be reviewed;

C- Bartholow Letter - October 5, 2009 letter from California Association of Food Banks notifying AI that would not renew its contract for food stamp outreach at federal direction;

D- Department of Labor Training and Guidance Letter No 8-09,  Guidance on Section 163 of the Continuing Resolution, October 19,2009, Attachment 2 (listing of organizations)

E - Affidavit of Bertha Lewis

F - Affidavit of Isemene Speliotis





EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

October 7, 2009

M-10-02

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:       Peter R. Orszag
            Director

SUBJECT:    Guidance on section 163 of the Continuing Resolution regarding the Association
            of Community Organizations for Reform Now (ACORN)

     This memorandum provides guidance to Executive Branch agencies regarding the implementation of section 163 of the Continuing Appropriations Resolution, 2010, Division B of Pub. L. No. 111-68 (CR), which states:

> SEC. 163.  None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, or allied organizations.

Your agency must immediately commence all necessary and appropriate steps to comply with section 163.  This includes the following:

- *No future obligations of funds.*  No agency or department should obligate or award any Federal funds to ACORN or any of its affiliates, subsidiaries or allied organizations (collectively "affiliates") during the period of the CR.  To the extent your agency already has determined that funds should be obligated or awarded to ACORN or its affiliates but has not yet entered into any agreement to provide such funds to ACORN or any of its affiliates, your agency should not provide such funds, or enter into any such agreements to do so.  As section 163 makes clear, its prohibition applies not only to the funding that is made available by the CR, but also to the funding that was made available by previously enacted statutes.  In addition, the text of section 163 is sufficiently broad to cover funding that was made available for fiscal year (FY) 2009 and prior fiscal years, as well as funding that is or will be made available for FY10.

- *Suspension of grant and contractual payments*.  If your agency has an existing contract or grant agreement with ACORN or its affiliates, the agency should:  (i) where permissible, immediately suspend performance of any obligations under the contract or agreement, including payment of Federal funds; and (ii) consult promptly with the agency's general counsel and, if necessary, the Office of Management and Budget

(OMB) and the Department of Justice concerning the legal considerations that bear on the performance of such obligations under the existing contract or agreement.

- ***No funding of ACORN and its affiliates through Federal grantees or contractors.*** Your agency should take steps so that no Federal funds are awarded or obligated by your grantees or contractors to ACORN or its affiliates as subgrantees, subcontractors, or other subrecipients. Because section 163 states that "[n]one of the funds . . . may be provided," this prohibition applies not only to a direct recipient of Federal funds but also to a subrecipient (e.g., a subcontractor, subgrantee, or contractor of a grantee). We recommend that your agency:

  - o  notify all Federal grant and contract recipients of the prohibition contained in section 163, and provide them with a copy of this guidance document; and

  - o  advise all Federal grant and contract recipients (a) not to provide Federal funds to ACORN or its affiliates as subgrantees, subcontractors or other subrecipients, consistent with this guidance, and (b) to notify your agency of any existing subgrants, subcontracts or other subrecipient agreements with ACORN or its affiliates and of how the grantee or contractor is planning to comply with the prohibition with respect to those subgrants, subcontracts or subrecipient agreements.

If you have any questions concerning this memorandum, please contact Preeta D. Bansal, OMB General Counsel and Senior Policy Advisor, at OGC@omb.eop.gov.



## Affidavit of Brennan Griffin

Brennan Griffin, being duly sworn, deposes and says:

1. I am the Executive Director of Acorn Institute (AI) and have been in this position since October 2008.

2. Plaintiff ACORN Institute, Inc. (hereafter "AI") is a not-for-profit corporation, incorporated in Louisiana, certified by the Internal Revenue Service as tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

3. AI focuses its work on addressing civil rights, employment, housing, and social service issues in low-income communities. AI applies for federal, state, and local grants, and to foundations for funds which support a wide variety of social service programs, and collaborates with and contracts with ACORN to carry these grants out. AI's offices are located at 2609 Canal Street, New Orleans, Louisiana.

4. AI has a separate corporate existence from ACORN, with a separate board of directors and separate management. There is no overlap between the governing board of directors of AI and ACORN except that one of the members of AI's Board is also an alternate national director of ACORN's board. Only AI's board has the power to hire and fire its Executive Director. In practice, the two

1

organizations collaborate closely and AI gets many grants in collaboration with ACORN or which it contracts with ACORN to carry out.

5.  AI was established as an organization in 2000 and received its Tax Exempt 501c3 status in 2001.

6.  AI has over the past 8 years obtained numerous federal grants. For example, in 2009 AI applied for approximately 25 grants involving monies from the federal government, with about 5 successfully received. To my knowledge, no grant which AI has received and administrated has ever even allegedly involved any misconduct, misappropriation, fraud or other illegal conduct. AI has never been indicted nor convicted of any crime, nor to my knowledge has any AI employee ever been indicted or convicted of a crime in conjunction with any work they have done for AI. AI has never been denied any grant from any federal agency due to fraud or other alleged misconduct.

7.  The cut off of all federal funds pursuant to Section 163 of the Continuing Resolution in the beginning of October 2009 has decimated our organization. As of September 2009 AI employed 20 employees. As of today, a little over a month later, AI has three employees. We have had to layoff 85% of our employees.

8.  As of October 1, 2009 AI had a number of pending applications for federal grants. We were informed in October that we were ineligible for these grants and

that our applications would not be reviewed.   We put considerable time and energy into filing these applications, which but for the Continuing Resolution would have been reviewed.

9.   One set of these applications was to set up public computer centers in five different cities to train poor people on basic computer skills.  The grants were with Department of Commerce and requested approximately 6.2 million dollars over three years.  We were informed in early October that our application would not be reviewed.   Another of those applications was with the Environmental Protection Agency for a three year $780,000 grant to outreach to poor communities to raise awareness of and educate about the lung disease asthma. UCLA was to be the project co-ordinator on that project and the work would have been done by ACORN staff.  We were informed in early October that our application would not be reviewed. See Letter Attached as Exhibit 1

10.  AI also had, as of October 1, 2009 several grant applications for monies that originated with the federal government where we had already been informed by the relevant entity that we were to receive the grant upon the signing of a contract.  Nonetheless, because of the Continuing Resolution, we were informed in early October that we would not be permitted to sign the contract to obtain the grant.  One of these grants was for a United States Department of Agriculture grant to do work in the state of Washington to outreach to poor people to inform people about their eligibility for food stamps and supplemental nutrition

assistance.  For that program, an organization named Reach was the contractor with the government and they subcontracted with AI to do approximately $90,000 worth of work.  AI had been subcontracted to do this work during the past year directly with the State of Washington, and had done the work to the satisfaction of governmental authorities.  Reach, when it became the lead agency in King County Washington, had therefore decided to continue to subcontract with AI to continue this work for the coming year.  They had sent us a contract for this work in late September or early October 2009 and we were about to sign it.  Before we could sign it, however, in early October we were informed by Reach that they would have to cancel their agreement to have AI subcontract to do the work because of the Continuing Resolution.  Because of this cancellation we had to lay off the two AI employees in Washington who would have carried out this work.

11. Similarly, we had an agreement in California to do work that amounted to $150,000 last year on the same type of program.  Again, our performance on the grant utilizing ACORN employees was satisfactory and we were poised to sign a contract with the California Association of Food Banks in California to continue that work for the coming year.  Nonetheless, in the beginning of October 2009 we received a letter from the organization informing us that it could not subcontract with AI for the upcoming year.  See letter from California Association of Food Banks Attached as Exhibit 2

12. In addition, AI had a grant with FEMA to conduct home fire safety assessments in private homes to determine whether the homes were protected, and if not, provide free of charge to poor people living in those homes various devices to ensure that their houses would be safe.  Last year we were awarded $452,000 to do such assessments in five cities.  We did the work to the satisfaction of FEMA, who formally awarded AI $997,000 to continue and expand the work for the coming year.  AI's acceptance of the agreement to do such work and entering into a contract with FEMA to do that work would have been completed by its beginning to draw down on the funds made available under that grant.  AI had been informed on September 4 that it had been awarded that grant.   On October 2, 2009, before AI had a chance to draw down on the funds, we were informed by FEMA that it had suspended the contract and that AI would not be permitted to start the work it agreed to undertake. See Email attached as Exhibit 3  Because of this suspension, AI had to lay off six employees who were engaged in the home fire safety assessments.

13. AI also had a number of grants in which it had an ongoing contract with HUD to perform services for residents of public housing.   Those contracts have been suspended or terminated since early October 2009.   Specifically, AI had six contracts with HUD, totalling approximately $40,000–$60,000 per year. See Contracts Attached as Exhibit 4 The services that we provided for residents of public housing included tax preparation, leadership development, and conducting classes for residents to obtain GED degrees.   We had been operating these

programs to the satisfaction of HUD, and no complaints or allegations of misconduct have ever been lodged concerning our work on these contracts. AI obtains reimbursement on these contracts by first doing the work and then drawing down the funds in the grant by accessing an automated system and putting in its password which allows it to obtain funds to pay workers who have done the work.

14. As of the beginning of October, AI was owed approximately eight to nine thousand dollars for work done on these contracts by ACORN employees with whom it had contracted to do this work. As of that time, AI's access to the automated system for reimbursement was terminated and AI was no longer permitted to have access to the grant funds. Therefore, AI is no longer able to do work pursuant to the lawful contract that it already has signed with HUD. Moreover, AI has not been able to recover the $8,000–$,9000 that was due it for work already performed. AI paid the employees who conducted the work, but AI has not been reimbursed by HUD for those expenditures, nor is there any means by which AI can be reimbursed unless those grant monies are made available to AI.

15. Because of these actions by HUD, AI and ACORN have had to cancel GED classes in the middle of the class and is unable to do any of the work for the poor residents of these public housing programs that AI had already contracted with HUD to undertake.

6

16. I have been informed by leaders of other organizations with which AI and ACORN has worked in collaboration or coalition with in the past on the Volunteer Income Tax Assistance program where non-profits assist low-income people with filing their tax returns free of charge, that they were told by IRS officials that if they continue to work in such coalitions with ACORN or AI that they could be rendered ineligible for further work on the VITA program.

17. In addition to AI's losing federal funds for contracts already awarded, or which were to be awarded pending the signing of a contract, and being deemed ineligible for contracts for work to be conducted over the next few years, AI has also been severely harmed by the Continuing Resolution in its ability to raise funds from private foundations.  Foundations are leery of awarding grants to an organization which has had all of its federal funds cut off.  For example AI has a grant with the Ford Foundation for $270,000 over two years ($135,000 per year) to conduct work involving workers rights issues.  We collaborate and contract doing that work with ACORN.  In June and July this year, when news of the embezzlement of funds by the brother of the former Executive Director of ACORN was publicized in the news media, the Ford Foundation temporarily suspended the grant.  By September 2009, we had discussed the situation with Ford Foundation officials and had apparently resolved it to their satisfaction so that all we needed to continue the work on the grant was to do the paperwork to restart the grant.  However, in late September,

we were informed by Ford Foundation officials that they could not restart that grant at this time.

18. AI is now currently examining its options for the survival of the organization. Unless the total ban on federal funds is immediately ended, AI is likely to either dissolve or declare itself bankrupt.

Further Affiant sayeth naught.

BRENNAN GRIFFIN

Subscribed and sworn to before me this _10th_ day of _November_, 2009.

Notary Public

_Travis_ County, State _of Texas_
My Commission Expires: _9/19/2010_

SCOTTY JO WARREN
My Commission Expires
September 19, 2010

8

# CIRCULAR A-110
# REVISED 11/19/93
# As Further Amended 9/30/99

### TO THE HEADS OF EXECUTIVE DEPARTMENTS AND ESTABLISHMENTS

SUBJECT:     Uniform Administrative Requirements for Grants and
             Agreements With Institutions of Higher Education, Hospitals,
             and Other Non-Profit Organizations

**1. Purpose.** This Circular sets forth standards for obtaining consistency and uniformity among Federal agencies in the administration of grants to and agreements with institutions of higher education, hospitals, and other non-profit organizations.

**2. Authority.** Circular A-110 is issued under the authority of 31 U.S.C. 503 (the Chief Financial Officers Act), 31 U.S.C. 1111, 41 U.S.C. 405 (the Office of Federal Procurement Policy Act), Reorganization Plan No. 2 of 1970, and E.O. 11541 ("Prescribing the Duties of the Office of Management and Budget and the Domestic Policy Council in the Executive Office of the President").

**3. Policy.** Except as provided herein, the standards set forth in this Circular are applicable to all Federal agencies. If any statute specifically prescribes policies or specific requirements that differ from the standards provided herein, the provisions of the statute shall govern.

The provisions of the sections of this Circular shall be applied by Federal agencies to recipients. Recipients shall apply the provisions of this Circular to subrecipients performing substantive work under grants and agreements that are passed through or awarded by the primary recipient, if such subrecipients are organizations described in paragraph 1.

This Circular does not apply to grants, contracts, or other agreements between the Federal Government and units of State or local governments covered by OMB Circular A-102, "Grants and Cooperative Agreements with State and Local Governments," and the Federal agencies' grants management common rule which standardized and codified the administrative requirements Federal agencies impose on State and local grantees. In addition, subawards and contracts to State or local governments are not covered by this Circular. However, this Circular applies to subawards made by State and local governments to organizations covered by this Circular. Federal agencies may apply the provisions of this Circular to commercial organizations, foreign governments, organizations under the jurisdiction of foreign governments, and international organizations.

**4. Definitions**. Definitions of key terms used in this Circular are contained in Section _____.2 in the Attachment.

**5. Required Action**. The specific requirements and responsibilities of Federal agencies and institutions of higher education, hospitals, and other non-profit organizations are set forth in this Circular. Federal agencies responsible for awarding and administering grants to and other agreements with organizations described in paragraph 1 shall adopt the language in the Circular unless different provisions are required by Federal statute or are approved by OMB.

**6. OMB Responsibilities**. OMB will review agency regulations and implementation of this Circular, and will provide interpretations of policy requirements and assistance to insure effective and efficient implementation. Any exceptions will be subject to approval by OMB, as indicated in Section _____.4 in the Attachment. Exceptions will only be made in particular cases where adequate justification is presented.

**7. Information Contact**. Further information concerning this Circular may be obtained by contacting the Office of Federal Financial Management, Office of Management and Budget, Washington, DC 20503, telephone (202) 395-3993.

**8. Termination Review Date**. This Circular will have a policy review three years from date of issuance.

**9. Effective Date**. The standards set forth in this Circular which affect Federal agencies will be effective 30 days after publication of the final revision in the **Federal Register**. Those standards which Federal agencies impose on grantees will be adopted by agencies in codified regulations within six months after publication in the **Federal Register**. Earlier implementation is encouraged.

Attachment

# Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations

## SUBPART A - GENERAL

**Sec.**

_____.1 Purpose.

_____.2 Definitions.

_____.3 Effect on other issuances.

_____.4 Deviations.

___.5 <u>Subawards</u>.

## SUBPART B - PRE-AWARD REQUIREMENTS

___.10 <u>Purpose</u>.

___.11 <u>Pre-award policies</u>.

___.12 <u>Forms for applying for Federal assistance</u>.

___.13 <u>Debarment and suspension</u>.

___.14 <u>Special award conditions</u>.

___.15 <u>Metric system of measurement</u>.

___.16 <u>Resource Conservation and Recovery Act</u>.

___.17 <u>Certifications and representations</u>.

## SUBPART C - POST-AWARD REQUIREMENTS

### Financial and Program Management

___.20 <u>Purpose of financial and program management</u>.

___.21 <u>Standards for financial management systems</u>.

___.22 <u>Payment</u>.

___.23 <u>Cost sharing or matching</u>.

___.24 <u>Program income</u>.

___.25 <u>Revision of budget and program plans</u>.

___.26 <u>Non-Federal audits</u>.

___.27 <u>Allowable costs</u>.

___.28 <u>Period of availability of funds</u>.

___.29 <u>Conditional exemptions</u>.

### Property Standards

_____.30 Purpose of property standards.

_____.31 Insurance coverage.

_____.32 Real property.

_____.33 Federally-owned and exempt property.

_____.34 Equipment.

_____.35 Supplies and other expendable property.

_____.36 Intangible property.

_____.37 Property trust relationship.

**Procurement Standards**

_____.40 Purpose of procurement standards.

_____.41 Recipient responsibilities.

_____.42 Codes of conduct.

_____.43 Competition.

_____.44 Procurement procedures.

_____.45 Cost and price analysis.

_____.46 Procurement records.

_____.47 Contract administration.

_____.48 Contract provisions.

**Reports and Records**

_____.50 Purpose of reports and records.

_____.51 Monitoring and reporting program performance.

_____.52 Financial reporting.

_____.53 Retention and access requirements for records.

**Termination and Enforcement**

___.60 <u>Purpose of termination and enforcement.</u>

___.61 <u>Termination.</u>

___.62 <u>Enforcement.</u>

## SUBPART D - AFTER-THE-AWARD REQUIREMENTS

___.70 <u>Purpose.</u>

___.71 <u>Closeout procedures.</u>

___.72 <u>Subsequent adjustments and continuing responsibilities.</u>

___.73 <u>Collection of amounts due.</u>

# APPENDIX A - CONTRACT PROVISIONS

## SUBPART A - General

___.1 <u>Purpose.</u> This Circular establishes uniform administrative requirements for Federal grants and agreements awarded to institutions of higher education, hospitals, and other non-profit organizations. Federal awarding agencies shall not impose additional or inconsistent requirements, except as provided in Sections ___.4, and ___.14 or unless specifically required by Federal statute or executive order. Non-profit organizations that implement Federal programs for the States are also subject to State requirements.

___.2 <u>Definitions.</u>

(a) **Accrued expenditures** means the charges incurred by the recipient during a given period requiring the provision of funds for: (1) goods and other tangible property received; (2) services performed by employees, contractors, subrecipients, and other payees; and, (3) other amounts becoming owed under programs for which no current services or performance is required.

(b) **Accrued income** means the sum of: (1) earnings during a given period from (i) services performed by the recipient, and (ii) goods and other tangible property delivered to purchasers, and (2) amounts becoming owed to the recipient for which no current services or performance is required by the recipient.

(c) **Acquisition cost of equipment** means the net invoice price of the equipment, including the cost of modifications, attachments, accessories, or auxiliary apparatus necessary to make the property usable for the purpose for which it was acquired. Other charges, such as the cost of installation, transportation, taxes, duty or protective in-transit

insurance, shall be included or excluded from the unit acquisition cost in accordance with the recipient's regular accounting practices.

(d) **Advance** means a payment made by Treasury check or other appropriate payment mechanism to a recipient upon its request either before outlays are made by the recipient or through the use of predetermined payment schedules.

(e) **Award** means financial assistance that provides support or stimulation to accomplish a public purpose. Awards include grants and other agreements in the form of money or property in lieu of money, by the Federal Government to an eligible recipient. The term does not include: technical assistance, which provides services instead of money; other assistance in the form of loans, loan guarantees, interest subsidies, or insurance; direct payments of any kind to individuals; and, contracts which are required to be entered into and administered under procurement laws and regulations.

(f) **Cash contributions** means the recipient's cash outlay, including the outlay of money contributed to the recipient by third parties.

(g) **Closeout** means the process by which a Federal awarding agency determines that all applicable administrative actions and all required work of the award have been completed by the recipient and Federal awarding agency.

(h) **Contract** means a procurement contract under an award or subaward, and a procurement subcontract under a recipient's or subrecipient's contract.

(i) **Cost sharing or matching** means that portion of project or program costs not borne by the Federal Government.

(j) **Date of completion** means the date on which all work under an award is completed or the date on the award document, or any supplement or amendment thereto, on which Federal sponsorship ends.

(k) **Disallowed costs** means those charges to an award that the Federal awarding agency determines to be unallowable, in accordance with the applicable Federal cost principles or other terms and conditions contained in the award.

(l) **Equipment** means tangible nonexpendable personal property including exempt property charged directly to the award having a useful life of more than one year and an acquisition cost of $5000 or more per unit. However, consistent with recipient policy, lower limits may be established.

(m) **Excess property** means property under the control of any Federal awarding agency that, as determined by the head thereof, is no longer required for its needs or the discharge of its responsibilities.

(n) **Exempt property** means tangible personal property acquired in whole or in part with Federal funds, where the Federal awarding agency has statutory authority to vest title in the recipient without further obligation to the Federal Government. An example of exempt property authority is contained in the Federal Grant and Cooperative Agreement Act (31 U.S.C. 6306), for property acquired under an award to conduct basic or applied research by a non-profit institution of higher education or non-profit organization whose principal purpose is conducting scientific research.

(o) **Federal awarding agency** means the Federal agency that provides an award to the recipient.

(p) **Federal funds authorized** means the total amount of Federal funds obligated by the Federal Government for use by the recipient. This amount may include any authorized carryover of unobligated funds from prior funding periods when permitted by agency regulations or agency implementing instructions.

(q) **Federal share** of real property, equipment, or supplies means that percentage of the property's acquisition costs and any improvement expenditures paid with Federal funds.

(r) **Funding period** means the period of time when Federal funding is available for obligation by the recipient.

(s) **Intangible property and debt instruments** means, but is not limited to, trademarks, copyrights, patents and patent applications and such property as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership, whether considered tangible or intangible.

(t) **Obligations** means the amounts of orders placed, contracts and grants awarded, services received and similar transactions during a given period that require payment by the recipient during the same or a future period.

(u) **Outlays or expenditures** means charges made to the project or program. They may be reported on a cash or accrual basis. For reports prepared on a cash basis, outlays are the sum of cash disbursements for direct charges for goods and services, the amount of indirect expense charged, the value of third party in-kind contributions applied and the amount of cash advances and payments made to subrecipients. For reports prepared on an accrual basis, outlays are the sum of cash disbursements for direct charges for goods and services, the amount of indirect expense incurred, the value of in-kind contributions applied, and the net increase (or decrease) in the amounts owed by the recipient for goods and other property received, for services performed by employees, contractors, subrecipients and other payees and other amounts becoming owed under programs for which no current services or performance are required.

(v) **Personal property** means property of any kind except real property. It may be tangible, having physical existence, or intangible, having no physical existence, such as copyrights, patents, or securities.

(w) **Prior approval** means written approval by an authorized official evidencing prior consent.

(x) **Program income** means gross income earned by the recipient that is directly generated by a supported activity or earned as a result of the award (see exclusions in paragraphs ____.24 (e) and (h)). Program income includes, but is not limited to, income from fees for services performed, the use or rental of real or personal property acquired under federally-funded projects, the sale of commodities or items fabricated under an award, license fees and royalties on patents and copyrights, and interest on loans made with award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal awarding agency regulations or the terms and conditions of the award, program income does not include the receipt of principal on loans, rebates, credits, discounts, etc., or interest earned on any of them.

(y) **Project costs** means all allowable costs, as set forth in the applicable Federal cost principles, incurred by a recipient and the value of the contributions made by third parties in accomplishing the objectives of the award during the project period.

(z) **Project period** means the period established in the award document during which Federal sponsorship begins and ends.

(aa) **Property** means, unless otherwise stated, real property, equipment, intangible property and debt instruments.

(bb) **Real property** means land, including land improvements, structures and appurtenances thereto, but excludes movable machinery and equipment.

(cc) **Recipient** means an organization receiving financial assistance directly from Federal awarding agencies to carry out a project or program. The term includes public and private institutions of higher education, public and private hospitals, and other quasi-public and private non-profit organizations such as, but not limited to, community action agencies, research institutes, educational associations, and health centers. The term may include commercial organizations, foreign or international organizations (such as agencies of the United Nations) which are recipients, subrecipients, or contractors or subcontractors of recipients or subrecipients at the discretion of the Federal awarding agency. The term does not include government-owned contractor-operated facilities or research centers providing continued support for mission-oriented, large-scale programs that are government-owned or controlled, or are designated as federally-funded research and development centers.

(dd) **Research and development** means all research activities, both basic and applied, and all development activities that are supported at universities, colleges, and other non-profit institutions. "Research" is defined as a systematic study directed toward fuller scientific knowledge or understanding of the subject studied. "Development" is the systematic use of knowledge and understanding gained from research directed toward the production of useful materials, devices, systems, or methods, including design and

development of prototypes and processes. The term research also includes activities involving the training of individuals in research techniques where such activities utilize the same facilities as other research and development activities and where such activities are not included in the instruction function.

(ee) **Small awards** means a grant or cooperative agreement not exceeding the small purchase threshold fixed at 41 U.S.C. 403(11) (currently $25,000).

(ff) **Subaward** means an award of financial assistance in the form of money, or property in lieu of money, made under an award by a recipient to an eligible subrecipient or by a subrecipient to a lower tier subrecipient. The term includes financial assistance when provided by any legal agreement, even if the agreement is called a contract, but does not include procurement of goods and services nor does it include any form of assistance which is excluded from the definition of "award" in paragraph (e).

(gg) **Subrecipient** means the legal entity to which a subaward is made and which is accountable to the recipient for the use of the funds provided. The term may include foreign or international organizations (such as agencies of the United Nations) at the discretion of the Federal awarding agency.

(hh) **Supplies** means all personal property excluding equipment, intangible property, and debt instruments as defined in this section, and inventions of a contractor conceived or first actually reduced to practice in the performance of work under a funding agreement ("subject inventions"), as defined in 37 CFR part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts, and Cooperative Agreements."

(ii) **Suspension** means an action by a Federal awarding agency that temporarily withdraws Federal sponsorship under an award, pending corrective action by the recipient or pending a decision to terminate the award by the Federal awarding agency. Suspension of an award is a separate action from suspension under Federal agency regulations implementing E.O.s 12549 and 12689, "Debarment and Suspension."

(jj) **Termination** means the cancellation of Federal sponsorship, in whole or in part, under an agreement at any time prior to the date of completion.

(kk) **Third party in-kind contributions** means the value of non-cash contributions provided by non-Federal third parties. Third party in-kind contributions may be in the form of real property, equipment, supplies and other expendable property, and the value of goods and services directly benefiting and specifically identifiable to the project or program.

(ll) **Unliquidated obligations**, for financial reports prepared on a cash basis, means the amount of obligations incurred by the recipient that have not been paid. For reports prepared on an accrued expenditure basis, they represent the amount of obligations incurred by the recipient for which an outlay has not been recorded.

(mm) **Unobligated balance** means the portion of the funds authorized by the Federal awarding agency that has not been obligated by the recipient and is determined by deducting the cumulative obligations from the cumulative funds authorized.

(nn) **Unrecovered indirect cost** means the difference between the amount awarded and the amount which could have been awarded under the recipient's approved negotiated indirect cost rate.

(oo) **Working capital advance** means a procedure where by funds are advanced to the recipient to cover its estimated disbursement needs for a given initial period.

____.3 Effect on other issuances. For awards subject to this Circular, all administrative requirements of codified program regulations, program manuals, handbooks and other nonregulatory materials which are inconsistent with the requirements of this Circular shall be superseded, except to the extent they are required by statute, or authorized in accordance with the deviations provision in Section ____.4.

____.4 Deviations. The Office of Management and Budget (OMB) may grant exceptions for classes of grants or recipients subject to the requirements of this Circular when exceptions are not prohibited by statute. However, in the interest of maximum uniformity, exceptions from the requirements of this Circular shall be permitted only in unusual circumstances. Federal awarding agencies may apply more restrictive requirements to a class of recipients when approved by OMB. Federal awarding agencies may apply less restrictive requirements when awarding small awards, except for those requirements which are statutory. Exceptions on a case-by-case basis may also be made by Federal awarding agencies.

____.5 Subawards. Unless sections of this Circular specifically exclude subrecipients from coverage, the provisions of this Circular shall be applied to subrecipients performing work under awards if such subrecipients are institutions of higher education, hospitals or other non-profit organizations. State and local government subrecipients are subject to the provisions of regulations implementing the grants management common rule,"Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," published at 53 FR 8034 (3/11/88).

**SUBPART B - Pre-Award Requirements**

____.10 Purpose. Sections ____.11 through ____.17 prescribes forms and instructions and other pre-award matters to be used in applying for Federal awards.

____.11 Pre-award policies.

(a) Use of Grants and Cooperative Agreements, and Contracts. In each instance, the Federal awarding agency shall decide on the appropriate award instrument (i.e., grant, cooperative agreement, or contract). The Federal Grant and Cooperative Agreement Act (31 U.S.C. 6301-08) governs the use of grants, cooperative agreements and contracts. A

grant or cooperative agreement shall be used only when the principal purpose of a transaction is to accomplish a public purpose of support or stimulation authorized by Federal statute. The statutory criterion for choosing between grants and cooperative agreements is that for the latter, "substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement." Contracts shall be used when the principal purpose is acquisition of property or services for the direct benefit or use of the Federal Government.

(b) Public Notice and Priority Setting. Federal awarding agencies shall notify the public of its intended funding priorities for discretionary grant programs, unless funding priorities are established by Federal statute.

_____.12 Forms for applying for Federal assistance.

(a) Federal awarding agencies shall comply with the applicable report clearance requirements of 5 CFR part 1320, "Controlling Paperwork Burdens on the Public," with regard to all forms used by the Federal awarding agency in place of or as a supplement to the Standard Form 424 (SF-424) series.

(b) Applicants shall use the SF-424 series or those forms and instructions prescribed by the Federal awarding agency.

(c) For Federal programs covered by E.O. 12372, "Intergovernmental Review of Federal Programs," the applicant shall complete the appropriate sections of the SF-424 (Application for Federal Assistance) indicating whether the application was subject to review by the State Single Point of Contact (SPOC). The name and address of the SPOC for a particular State can be obtained from the Federal awarding agency or the **Catalog of Federal Domestic Assistance**. The SPOC shall advise the applicant whether the program for which application is made has been selected by that State for review.

(d) Federal awarding agencies that do not use the SF-424 form should indicate whether the application is subject to review by the State under E.O. 12372.

_____.13 Debarment and suspension. Federal awarding agencies and recipients shall comply with the nonprocurement debarment and suspension common rule implementing E.O.s 12549 and 12689, "Debarment and Suspension." This common rule restricts subawards and contracts with certain parties that are debarred, suspended or otherwise excluded from or ineligible for participation in Federal assistance programs or activities.

_____.14 Special award conditions. If an applicant or recipient: (a) has a history of poor performance, (b) is not financially stable, (c) has a management system that does not meet the standards prescribed in this Circular, (d) has not conformed to the terms and conditions of a previous award, or (e) is not otherwise responsible, Federal awarding agencies may impose additional requirements as needed, provided that such applicant or recipient is notified in writing as to: the nature of the additional requirements, the reason

why the additional requirements are being imposed, the nature of the corrective action needed, the time allowed for completing the corrective actions, and the method for requesting reconsideration of the additional requirements imposed. Any special conditions shall be promptly removed once the conditions that prompted them have been corrected.

____.15 Metric system of measurement. The Metric Conversion Act, as amended by the Omnibus Trade and Competitiveness Act (15 U.S.C. 205) declares that the metric system is the preferred measurement system for U.S. trade and commerce. The Act requires each Federal agency to establish a date or dates in consultation with the Secretary of Commerce, when the metric system of measurement will be used in the agency's procurements, grants, and other business-related activities. Metric implementation may take longer where the use of the system is initially impractical or likely to cause significant inefficiencies in the accomplishment of federally-funded activities. Federal awarding agencies shall follow the provisions of E.O. 12770, "Metric Usage in Federal Government Programs."

____.16 Resource Conservation and Recovery Act (RCRA) (Pub. L. 94-580 codified at 42 U.S.C. 6962). Under the Act, any State agency or agency of a political subdivision of a State which is using appropriated Federal funds must comply with Section 6002. Section 6002 requires that preference be given in procurement programs to the purchase of specific products containing recycled materials identified in guidelines developed by the Environmental Protection Agency (EPA) (40 CFR parts 247-254). Accordingly, State and local institutions of higher education, hospitals, and non-profit organizations that receive direct Federal awards or other Federal funds shall give preference in their procurement programs funded with Federal funds to the purchase of recycled products pursuant to the EPA guidelines.

____.17 Certifications and representations. Unless prohibited by statute or codified regulation, each Federal awarding agency is authorized and encouraged to allow recipients to submit certifications and representations required by statute, executive order, or regulation on an annual basis, if the recipients have ongoing and continuing relationships with the agency. Annual certifications and representations shall be signed by responsible officials with the authority to ensure recipients' compliance with the pertinent requirements.

## SUBPART C - Post-Award Requirements

### Financial and Program Management

____.20 Purpose of financial and program management. Sections ____.21 through ____.28 prescribe standards for financial management systems, methods for making payments and rules for: satisfying cost sharing and matching requirements, accounting for program income, budget revision approvals, making audits, determining allowability of cost, and establishing fund availability.

_____.21 Standards for financial management systems.

(a) Federal awarding agencies shall require recipients to relate financial data to performance data and develop unit cost information whenever practical.

(b) Recipients' financial management systems shall provide for the following.

> (1) Accurate, current and complete disclosure of the financial results of each federally-sponsored project or program in accordance with the reporting requirements set forth in Section _____.52. If a Federal awarding agency requires reporting on an accrual basis from a recipient that maintains its records on other than an accrual basis, the recipient shall not be required to establish an accrual accounting system. These recipients may develop such accrual data for its reports on the basis of an analysis of the documentation on hand.

> (2) Records that identify adequately the source and application of funds for federally-sponsored activities. These records shall contain information pertaining to Federal awards, authorizations, obligations, unobligated balances, assets, outlays, income and interest.

> (3) Effective control over and accountability for all funds, property and other assets. Recipients shall adequately safeguard all such assets and assure they are used solely for authorized purposes.

> (4) Comparison of outlays with budget amounts for each award. Whenever appropriate, financial information should be related to performance and unit cost data.

> (5) Written procedures to minimize the time elapsing between the transfer of funds to the recipient from the U.S. Treasury and the issuance or redemption of checks, warrants or payments by other means for program purposes by the recipient. To the extent that the provisions of the Cash Management Improvement Act (CMIA) (Pub. L. 101-453) govern, payment methods of State agencies, instrumentalities, and fiscal agents shall be consistent with CMIA Treasury-State Agreements or the CMIA default procedures codified at 31 CFR part 205, "Withdrawal of Cash from the Treasury for Advances under Federal Grant and Other Programs."

> (6) Written procedures for determining the reasonableness, allocability and allowability of costs in accordance with the provisions of the applicable Federal cost principles and the terms and conditions of the award.

> (7) Accounting records including cost accounting records that are supported by source documentation.

(c) Where the Federal Government guarantees or insures the repayment of money borrowed by the recipient, the Federal awarding agency, at its discretion, may require

adequate bonding and insurance if the bonding and insurance requirements of the recipient are not deemed adequate to protect the interest of the Federal Government.

(d) The Federal awarding agency may require adequate fidelity bond coverage where the recipient lacks sufficient coverage to protect the Federal Government's interest.

(e) Where bonds are required in the situations described above, the bonds shall be obtained from companies holding certificates of authority as acceptable sureties, as prescribed in 31 CFR part 223, "Surety Companies Doing Business with the United States."

____.22 Payment.

(a) Payment methods shall minimize the time elapsing between the transfer of funds from the United States Treasury and the issuance or redemption of checks, warrants, or payment by other means by the recipients. Payment methods of State agencies or instrumentalities shall be consistent with Treasury-State CMIA agreements or default procedures codified at 31 CFR part 205.

(b) Recipients are to be paid in advance, provided they maintain or demonstrate the willingness to maintain: (1) written procedures that minimize the time elapsing between the transfer of funds and disbursement by the recipient, and (2) financial management systems that meet the standards for fund control and accountability as established in Section ____.21. Cash advances to a recipient organization shall be limited to the minimum amounts needed and be timed to be in accordance with the actual, immediate cash requirements of the recipient organization in carrying out the purpose of the approved program or project. The timing and amount of cash advances shall be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program or project costs and the proportionate share of any allowable indirect costs.

(c) Whenever possible, advances shall be consolidated to cover anticipated cash needs for all awards made by the Federal awarding agency to the recipient.

   (1) Advance payment mechanisms include, but are not limited to, Treasury check and electronic funds transfer.

   (2) Advance payment mechanisms are subject to 31 CFR part 205.

   (3) Recipients shall be authorized to submit requests for advances and reimbursements at least monthly when electronic fund transfers are not used.

(d) Requests for Treasury check advance payment shall be submitted on SF-270, "Request for Advance or Reimbursement," or other forms as may be authorized by OMB. This form is not to be used when Treasury check advance payments are made to the

recipient automatically through the use of a predetermined payment schedule or if precluded by special Federal awarding agency instructions for electronic funds transfer.

(e) Reimbursement is the preferred method when the requirements in paragraph (b) cannot be met. Federal awarding agencies may also use this method on any construction agreement, or if the major portion of the construction project is accomplished through private market financing or Federal loans, and the Federal assistance constitutes a minor portion of the project.

(1) When the reimbursement method is used, the Federal awarding agency shall make payment within 30 days after receipt of the billing, unless the billing is improper.

(2) Recipients shall be authorized to submit request for reimbursement at least monthly when electronic funds transfers are not used.

(f) If a recipient cannot meet the criteria for advance payments and the Federal awarding agency has determined that reimbursement is not feasible because the recipient lacks sufficient working capital, the Federal awarding agency may provide cash on a working capital advance basis. Under this procedure, the Federal awarding agency shall advance cash to the recipient to cover its estimated disbursement needs for an initial period generally geared to the awardee's disbursing cycle. Thereafter, the Federal awarding agency shall reimburse the recipient for its actual cash disbursements. The working capital advance method of payment shall not be used for recipients unwilling or unable to provide timely advances to their subrecipient to meet the subrecipient's actual cash disbursements.

(g) To the extent available, recipients shall disburse funds available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries and interest earned on such funds before requesting additional cash payments.

(h) Unless otherwise required by statute, Federal awarding agencies shall not withhold payments for proper charges made by recipients at any time during the project period unless (1) or (2) apply.

(1) A recipient has failed to comply with the project objectives, the terms and conditions of the award, or Federal reporting requirements.

(2) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A-129, "Managing Federal Credit Programs." Under such conditions, the Federal awarding agency may, upon reasonable notice, inform the recipient that payments shall not be made for obligations incurred after a specified date until the conditions are corrected or the indebtedness to the Federal Government is liquidated.

(i) Standards governing the use of banks and other institutions as depositories of funds advanced under awards are as follows.

> (1) Except for situations described in paragraph (i)(2), Federal awarding agencies shall not require separate depository accounts for funds provided to a recipient or establish any eligibility requirements for depositories for funds provided to a recipient. However, recipients must be able to account for the receipt, obligation and expenditure of funds.

> (2) Advances of Federal funds shall be deposited and maintained in insured accounts whenever possible.

(j) Consistent with the national goal of expanding the opportunities for women-owned and minority-owned business enterprises, recipients shall be encouraged to use women-owned and minority-owned banks (a bank which is owned at least 50 percent by women or minority group members).

(k) Recipients shall maintain advances of Federal funds in interest bearing accounts, unless (1), (2) or (3) apply.

> (1) The recipient receives less than $120,000 in Federal awards per year.

> (2) The best reasonably available interest bearing account would not be expected to earn interest in excess of $250 per year on Federal cash balances.

> (3) The depository would require an average or minimum balance so high that it would not be feasible within the expected Federal and non-Federal cash resources.

(l) For those entities where CMIA and its implementing regulations do not apply, interest earned on Federal advances deposited in interest bearing accounts shall be remitted annually to Department of Health and Human Services, Payment Management System, Rockville, MD 20852. Interest amounts up to $250 per year may be retained by the recipient for administrative expense. State universities and hospitals shall comply with CMIA, as it pertains to interest. If an entity subject to CMIA uses its own funds to pay pre-award costs for discretionary awards without prior written approval from the Federal awarding agency, it waives its right to recover the interest under CMIA.

(m) Except as noted elsewhere in this Circular, only the following forms shall be authorized for the recipients in requesting advances and reimbursements. Federal agencies shall not require more than an original and two copies of these forms.

> (1) SF-270, Request for Advance or Reimbursement. Each Federal awarding agency shall adopt the SF-270 as a standard form for all nonconstruction programs when electronic funds transfer or predetermined advance methods are not used. Federal awarding agencies, however, have the option of using this form for construction programs in lieu of the SF-271, "Outlay Report and Request for Reimbursement for Construction Programs."

(2) SF-271, Outlay Report and Request for Reimbursement for Construction Programs. Each Federal awarding agency shall adopt the SF-271 as the standard form to be used for requesting reimbursement for construction programs. However, a Federal awarding agency may substitute the SF-270 when the Federal awarding agency determines that it provides adequate information to meet Federal needs.

____.23 Cost sharing or matching.

(a) All contributions, including cash and third party in-kind, shall be accepted as part of the recipient's cost sharing or matching when such contributions meet all of the following criteria.

(1) Are verifiable from the recipient's records.

(2) Are not included as contributions for any other federally-assisted project or program.

(3) Are necessary and reasonable for proper and efficient accomplishment of project or program objectives.

(4) Are allowable under the applicable cost principles.

(5) Are not paid by the Federal Government under another award, except where authorized by Federal statute to be used for cost sharing or matching.

(6) Are provided for in the approved budget when required by the Federal awarding agency.

(7) Conform to other provisions of this Circular, as applicable.

(b) Unrecovered indirect costs may be included as part of cost sharing or matching only with the prior approval of the Federal awarding agency.

(c) Values for recipient contributions of services and property shall be established in accordance with the applicable cost principles. If a Federal awarding agency authorizes recipients to donate buildings or land for construction/facilities acquisition projects or long-term use, the value of the donated property for cost sharing or matching shall be the lesser of (1) or (2).

(1) The certified value of the remaining life of the property recorded in the recipient's accounting records at the time of donation.

(2) The current fair market value. However, when there is sufficient justification, the Federal awarding agency may approve the use of the current fair market value of the donated property, even if it exceeds the certified value at the time of donation to the project.

(d) Volunteer services furnished by professional and technical personnel, consultants, and other skilled and unskilled labor may be counted as cost sharing or matching if the service is an integral and necessary part of an approved project or program. Rates for volunteer services shall be consistent with those paid for similar work in the recipient's organization. In those instances in which the required skills are not found in the recipient organization, rates shall be consistent with those paid for similar work in the labor market in which the recipient competes for the kind of services involved. In either case, paid fringe benefits that are reasonable, allowable, and allocable may be included in the valuation.

(e) When an employer other than the recipient furnishes the services of an employee, these services shall be valued at the employee's regular rate of pay (plus an amount of fringe benefits that are reasonable, allowable, and allocable, but exclusive of overhead costs), provided these services are in the same skill for which the employee is normally paid.

(f) Donated supplies may include such items as expendable equipment, office supplies, laboratory supplies or workshop and classroom supplies. Value assessed to donated supplies included in the cost sharing or matching share shall be reasonable and shall not exceed the fair market value of the property at the time of the donation.

(g) The method used for determining cost sharing or matching for donated equipment, buildings and land for which title passes to the recipient may differ according to the purpose of the award, if (1) or (2) apply.

(1) If the purpose of the award is to assist the recipient in the acquisition of equipment, buildings or land, the total value of the donated property may be claimed as cost sharing or matching.

(2) If the purpose of the award is to support activities that require the use of equipment, buildings or land, normally only depreciation or use charges for equipment and buildings may be made. However, the full value of equipment or other capital assets and fair rental charges for land may be allowed, provided that the Federal awarding agency has approved the charges.

(h) The value of donated property shall be determined in accordance with the usual accounting policies of the recipient, with the following qualifications.

(1) The value of donated land and buildings shall not exceed its fair market value at the time of donation to the recipient as established by an independent appraiser (e.g., certified real property appraiser or General Services Administration representative) and certified by a responsible official of the recipient.

(2) The value of donated equipment shall not exceed the fair market value of equipment of the same age and condition at the time of donation.

(3) The value of donated space shall not exceed the fair rental value of comparable space as established by an independent appraisal of comparable space and facilities in a privately-owned building in the same locality.

(4) The value of loaned equipment shall not exceed its fair rental value.

(i) Volunteer services shall be documented and, to the extent feasible, supported by the same methods used by the recipient for its own employees.

(ii) The basis for determining the valuation for personal service, material, equipment, buildings and land shall be documented.

___.24 Program income.

(a) Federal awarding agencies shall apply the standards set forth in this section in requiring recipient organizations to account for program income related to projects financed in whole or in part with Federal funds.

(b) Except as provided in paragraph (h) below, program income earned during the project period shall be retained by the recipient and, in accordance with Federal awarding agency regulations or the terms and conditions of the award, shall be used in one or more of the ways listed in the following.

(1) Added to funds committed to the project by the Federal awarding agency and recipient and used to further eligible project or program objectives.

(2) Used to finance the non-Federal share of the project or program.

(3) Deducted from the total project or program allowable cost in determining the net allowable costs on which the Federal share of costs is based.

(c) When an agency authorizes the disposition of program income as described in paragraphs (b)(1) or (b)(2), program income in excess of any limits stipulated shall be used in accordance with paragraph (b)(3).

(d) In the event that the Federal awarding agency does not specify in its regulations or the terms and conditions of the award how program income is to be used, paragraph (b)(3) shall apply automatically to all projects or programs except research. For awards that support research, paragraph (b)(1) shall apply automatically unless the awarding agency indicates in the terms and conditions another alternative on the award or the recipient is subject to special award conditions, as indicated in Section ____.14.

(e) Unless Federal awarding agency regulations or the terms and conditions of the award provide otherwise, recipients shall have no obligation to the Federal Government regarding program income earned after the end of the project period.

(f) If authorized by Federal awarding agency regulations or the terms and conditions of the award, costs incident to the generation of program income may be deducted from gross income to determine program income, provided these costs have not been charged to the award.

(g) Proceeds from the sale of property shall be handled in accordance with the requirements of the Property Standards (See Sections ____.30 through ____.37).

(h) Unless Federal awarding agency regulations or the terms and condition of the award provide otherwise, recipients shall have no obligation to the Federal Government with respect to program income earned from license fees and royalties for copyrighted material, patents, patent applications, trademarks, and inventions produced under an award. However, Patent and Trademark Amendments (35 U.S.C. 18) apply to inventions made under an experimental, developmental, or research award.

____.25 Revision of budget and program plans.

(a) The budget plan is the financial expression of the project or program as approved during the award process. It may include either the Federal and non-Federal share, or only the Federal share, depending upon Federal awarding agency requirements. It shall be related to performance for program evaluation purposes whenever appropriate.

(b) Recipients are required to report deviations from budget and program plans, and request prior approvals for budget and program plan revisions, in accordance with this section.

(c) For nonconstruction awards, recipients shall request prior approvals from Federal awarding agencies for one or more of the following program or budget related reasons.

(1) Change in the scope or the objective of the project or program (even if there is no associated budget revision requiring prior written approval).

(2) Change in a key person specified in the application or award document.

(3) The absence for more than three months, or a 25 percent reduction in time devoted to the project, by the approved project director or principal investigator.

(4) The need for additional Federal funding.

(5) The transfer of amounts budgeted for indirect costs to absorb increases in direct costs, or vice versa, if approval is required by the Federal awarding agency.

(6) The inclusion, unless waived by the Federal awarding agency, of costs that require prior approval in accordance with OMB Circular A-21, "Cost Principles for Educational Institutions," OMB Circular A-122, "Cost Principles for Non-Profit Organizations," or 45 CFR part 74 Appendix E, "Principles for Determining Costs Applicable to Research and Development under Grants and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

(7) The transfer of funds allotted for training allowances (direct payment to trainees) to other categories of expense.

(8) Unless described in the application and funded in the approved awards, the subaward, transfer or contracting out of any work under an award. This provision does not apply to the purchase of supplies, material, equipment or general support services.

(d) No other prior approval requirements for specific items may be imposed unless a deviation has been approved by OMB.

(e) Except for requirements listed in paragraphs (c)(1) and (c)(4) of this section, Federal awarding agencies are authorized, at their option, to waive cost-related and administrative prior written approvals required by this Circular and OMB Circulars A-21 and A-122. Such waivers may include authorizing recipients to do any one or more of the following.

(1) Incur pre-award costs 90 calendar days prior to award or more than 90 calendar days with the prior approval of the Federal awarding agency. All pre-award costs are incurred at the recipient's risk (i.e., the Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive an award or if the award is less than anticipated and inadequate to cover such costs).

(2) Initiate a one-time extension of the expiration date of the award of up to 12 months unless one or more of the following conditions apply. For one-time extensions, the recipient must notify the Federal awarding agency in writing with the supporting reasons and revised expiration date at least 10 days before the expiration date specified in the award. This one-time extension may not be exercised merely for the purpose of using unobligated balances.

(i) The terms and conditions of award prohibit the extension.

(ii) The extension requires additional Federal funds.

(iii) The extension involves any change in the approved objectives or scope of the project.

(3) Carry forward unobligated balances to subsequent funding periods.

(4) For awards that support research, unless the Federal awarding agency provides otherwise in the award or in the agency's regulations, the prior approval requirements described in paragraph (e) are automatically waived (i.e., recipients need not obtain such prior approvals) unless one of the conditions included in paragraph (e)(2) applies.

(f) The Federal awarding agency may, at its option, restrict the transfer of funds among direct cost categories or programs, functions and activities for awards in which the Federal share of the project exceeds $100,000 and the cumulative amount of such transfers exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency. No Federal awarding agency shall permit a transfer that would cause any Federal appropriation or part thereof to be used for purposes other than those consistent with the original intent of the appropriation.

(g) All other changes to nonconstruction budgets, except for the changes described in paragraph (j), do not require prior approval.

(h) For construction awards, recipients shall request prior written approval promptly from Federal awarding agencies for budget revisions whenever (1), (2) or (3) apply.

(1) The revision results from changes in the scope or the objective of the project or program.

(2) The need arises for additional Federal funds to complete the project.

(3) A revision is desired which involves specific costs for which prior written approval requirements may be imposed consistent with applicable OMB cost principles listed in Section ___.27.

(i) No other prior approval requirements for specific items may be imposed unless a deviation has been approved by OMB.

(j) When a Federal awarding agency makes an award that provides support for both construction and nonconstruction work, the Federal awarding agency may require the recipient to request prior approval from the Federal awarding agency before making any fund or budget transfers between the two types of work supported.

(k) For both construction and nonconstruction awards, Federal awarding agencies shall require recipients to notify the Federal awarding agency in writing promptly whenever the amount of Federal authorized funds is expected to exceed the needs of the recipient for the project period by more than $5000 or five percent of the Federal award, whichever is greater. This notification shall not be required if an application for additional funding is submitted for a continuation award.

(l) When requesting approval for budget revisions, recipients shall use the budget forms that were used in the application unless the Federal awarding agency indicates a letter of request suffices.

(m) Within 30 calendar days from the date of receipt of the request for budget revisions, Federal awarding agencies shall review the request and notify the recipient whether the budget revisions have been approved. If the revision is still under consideration at the end of 30 calendar days, the Federal awarding agency shall inform the recipient in writing of the date when the recipient may expect the decision.

_____.26 Non-Federal audits.

(a) Recipients and subrecipients that are institutions of higher education or other non-profit organizations (including hospitals) shall be subject to the audit requirements contained in the Single Audit Act Amendments of 1996 (31 USC 7501-7507) and revised OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations."

(b) State and local governments shall be subject to the audit requirements contained in the Single Audit Act Amendments of 1996 (31 USC 7501-7507) and revised OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations."