## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| **:** | Civil Action No. |
| ASSOCIATION OF COMMUNITY : | 09-CV-4888 (NG) |
| ORGANIZATIONS FOR REFORM : | |
| NOW, et al., : | |
| : | |
| Plaintiffs, : | |
| : | (Gershon, J.) |
| vs. : | (Bloom, M.J.) |
| : | |
| UNITED STATES OF AMERICA, SHAUN : | |
| DONOVAN, Secretary of the Department of : | |
| Housing and Urban Development; PETER : | |
| ORSZAG, Director of Office of Management : | |
| and Budget; and TIMOTHY GEITHNER, : | |
| Secretary of the Department of the Treasury : | |
| of the United States. : | |
| : | |
| Defendants. : | |

-------------------------------------------------------------x

## FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT. ............................................................................. 1

STATEMENT OF FACTS. ................................................................................... 3

ARGUMENT. ....................................................................................................... 8

I.    PLAINTIFFS HAVE SHOWN NO LIKELIHOOD OF IRREPARABLE
      HARM .................................................................................................... 9

II.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. .......... 12

      A.    Section 163 Does Not Constitute a Bill of Attainder. ............................... 13

            1.    Section 163 Does Not Constitute Punishment. ............................ 13

                  a.    Section 163 Does Not Meet the Historical
                        Punishment Test. ............................................... 15

                  b.    Section 163 Does Not Meet the Functional Test. ............ 18

                  c.    Section 163 Does Not Meet the Motivational Test. ......... 22

            2.    Section 163 Does Not Legislatively Determine Plaintiffs' Guilt.. 23

      B.    Congress' Decision Not to Fund ACORN or its Affiliates Does Not
            Constitute a Substantial Imposition on Their Associational Freedom. ..... 24

      C.    Congress' Decision Not to Fund ACORN or its Affiliates Entities Does
            Not Deprive Them of Liberty or Property Without Due Process of Law. 29

III.  THE PUBLIC INTEREST WEIGHS AGAINST ENJOINING FEDERAL
      DEFENDANTS. ...................................................................................... 32

CONCLUSION. ................................................................................................ 33

# TABLE OF AUTHORITIES

## CASES

Able v. United States,
 44 F.3d 128 (2d Cir. 1995)........................................................................ 8, 32

Abood v. Detention Board of Education,
 431 U.S. 209 (1977)................................................................................ 26

Atkins v. Parker,
 472 U.S. 115 (1985)............................................................................ 29, 31

Atonio v. Wards Cove Packing Co.,
 10 F.3d 1485 (9th Cir. 1993). ................................................................ 15

Board of Regents v. Roth,
 408 U.S. 564 (1972)................................................................................ 31

Bell & Howell: Mamiya Co. v. Masel Supply,
 719 F.2d 42 (2d Cir. 1983)...................................................................... 9

Boy Scouts of America v. Dale,
 530 U.S. 640 (2000)................................................................................ 26

Chi Iota Colony of Alpha Epsilon Pi Fratern. v. City University of N.Y.,
 502 F.3d 136 (2d Cir. 2007)................................................................... 26

Consolidated Edison Co. of New York v. Pataki,
 292 F.3d 338 (2d Cir. 2002)........................................................... passim

County of Suffolk v. First America Real Estate Solutions,
 261 F.3d 179 (2d Cir. 2001)................................................................... 21

Cummings v. Missouri,
 71 U.S. (4 Wall.) 277 (1866). ........................................................... 14, 23

De Veau v. Braisted,
 363 U.S. 144 (1960)................................................................................ 23

Dent v. West Virginia,
 129 U.S. 114 (1889)................................................................................ 14

Edwards v. Aguillard,
        482 U.S. 578 (1987)................................................................... 23

Empire Transit Mix, Inc. v. Giuliani,
        37 F. Supp. 2d 331 (S.D.N.Y. 1999).......................................... 30

Flemming v. Nestor,
        363 U.S. 603 (1960)........................................................... passim

Foretich v. United States,
        351 F.3d 1198 (D.C. Cir. 2003). ................................................ 18

Ex parte Garland,
        71 U.S. (4 Wall.) 333 (1866). .................................................... 14

Gidatex, S.r.L. v. Campaniello Imports, Ltd.,
        13 F. Supp. 2d 417 (S.D.N.Y. 1998)............................................. 9

Hawker v. New York,
        170 U.S. 189 (1898)................................................................... 19

Healy v. James,
        408 U.S. 169 (1972)................................................................... 26

Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
        455 U.S. 489 (1982)................................................................... 28

Hoffman v. City of Warwick,
        909 F.2d 608 (1st Cir. 1990). ..................................................... 31

JSG Trading Corp. v. Tray-Wrap, Inc.,
        917 F.2d 75 (2d Cir. 1990)............................................................ 8

Logan v.  Zimmerman Brush Co.,
        455 U.S. 422 (1982).............................................................. 29, 31

Lyng v. International Union,
        485 U.S. 360 (1988)................................................................... 26

Lyng v. Northwest Indian Cemetery, Protective Association,
        485 U.S. 439 (1988)................................................................... 28

Moore v. Consolidated Edison Co. of N.Y., Inc.,
        409 F.3d 506 (2d Cir. 2005)........................................................... 8

-iii-

Myers & Myers, Inc. v. U.S. Postal Serv.,
    527 F.2d 1252 (2d Cir. 1975) ........................................................................ 30

NAACP v. Button,
    371 U.S. 415 (1963) ...................................................................................... 27

NAACP v. Claiborne Hardware Co.,
    458 U.S. 886 (1982) ................................................................................. 25, 27

N.Y. State Club Association v. City of New York,
    487 U.S. 1 (1988) .......................................................................................... 27

Navegar, Inc. v. United States,
    192 F.3d 1050 (D.C. Cir. 1999) .................................................................... 15

Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.,
    992 F.2d 430 (2d Cir. 1993) .......................................................................... 12

Nixon v. Administrator of General Services,
    433 U.S. 425 (1977) ............................................................................... passim

Phillip v. Fairfield University,
    118 F.3d 131 (2d Cir. 1997) ............................................................................ 9

Pierce v. Carskadon,
    83 U.S. (16 Wall.) 234 (1872) ...................................................................... 14

Regan v. Taxation with Representation of Washington,
    461 U.S. 540 (1983) ...................................................................................... 26

Register.com, Inc. v. Verio, Inc.,
    356 F.3d 393 (2d Cir. 2004) .......................................................................... 32

Robert W. Stark, Jr. v. New York Exch., Inc.,
    466 F.2d 743 (2d Cir. 1972) ............................................................................ 8

Roberts v. United States Jaycees,
    468 U.S. 609 (1984) ................................................................................. 25, 26

SBC Commc'n v. FCC,
    154 F.3d 226 (5th Cir. 1998) ........................................................................ 24

S&D Maintenance Co., Inc. v. Goldin,
    844 F.2d 962 (2d Cir. 1988) .......................................................................... 31

Sanitation and Recycling Industrial, Inc. v. City of New York,
        107 F.3d 985 (2d Cir. 1997)...................................................... 26, 27

SeaRiver Maritime Finance v. Mineta,
        309 F.3d 662 (9th Cir. 2002). .................................................. 13, 19

Selective Serv. System v. Minn. Public Interest Research Group,
        468 U.S. 841 (1984). ............................................................... passim

Siegel v. Lyng,
        851 F.2d 412 (D.C. Cir. 1988). ....................................................... 24

Story v. Green,
        978 F.2d 60 (2d Cir. 1992)............................................................. 32

Tenaska Washington Partners II, L.P. v. United States,
        34 Fed. Cl. 434 (1995). ................................................................... 6

Tough Traveler, Ltd. v. Outbound Products,
        60 F.3d 964 (2d Cir. 1995).............................................................. 9

TriHealth, Inc. v. Board Of Comm'rs,
        430 F.3d 783 (6th Cir. 2005). ........................................................ 31

Trifax Corp. v. District of Columbia,
        314 F.3d 641 (D.C. Cir. 2003). ....................................................... 30

United States v. America Trucking Association,
        310 U.S. 534 (1940)........................................................................ 21

United States v. Brown,
        381 U.S. 437 (1965)................................................................. passim

United States v. Lovett,
        328 U.S. 303 (1946)................................................................. passim

United States v. O'Brien,
        391 U.S. 367 (1968)....................................................................... 23

United States v. Williams,,
        --- U.S. --- 128 S. Ct. 1830 (2008)........................................... 27, 28

Wagner Seed Co. v. Daggett,
        800 F.2d 310 (2d Cir. 1986)............................................................. 9

White Plains Towing Corp. v. Patterson,
991 F.2d 1049 (2d Cir. 1993)............................................................ 30

Winter v. NRDC,
129 S. Ct. 365 (2008)............................................................ 32, 33

## STATUTES

28 U.S.C. §§ 511-13. .................................................................... 6

31 U.S.C. § 3325(a). .................................................................... 7

31 U.S.C. § 3528(a). .................................................................... 7

28 C.F.R. § 0.25(a). .................................................................... 6

155 Cong. Rec. H9965, H9968. ...................................................... 4, 21

155 Cong. Rec. H9970, 9972. ........................................................ 4

155 Cong. Rec. S9499, S9517. ...................................................... 5, 21

155 Cong. Rec. H11871, H11919. .................................................... 5

155 Cong. Rec. H12057-H12068, S10893-S10908. ................................ 4

Agriculture, Rural Development, Food and Drug Administration, and Related Agencies
Appropriations Act, 2010, Pub. L. No. 111-80, 123 Stat. 2090 (Oct. 21,
2009). ...................................................................... 17

CR (H.R. 2918) ...................................................................... 3, 20

Division B - Continuing Appropriations Resolution, 2010, Pub. L. No. 111-68, § 163, 123
Stat. 2023, 2053 (2009). ............................................................ 1

Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-80, 123 Stat.
2142 (Oct. 28, 2009). .............................................................. 17

December 18, 2009,Division B - Further Continuing Appropriations Resolution, 2010, Pub.
L. No. 111-88, § 101, 123 Stat. 2904, 2972 (2009). .................................. 4

Energy and Water Development and Related Agencies Appropriations Act, 2010, Pub. L.
No. 111-85, 123 Stat. 2845, 2880 (2009). ............................................ 4

H.R. Conf. Rep. No. 111-316. ........................................................ 4, 5

H.R. 2996 ................................................................................................................... 4, 5

Pub. L. 111-68 ............................................................................................................ 3, 20

Pub. L. No. 111-68, §§ 101, 106, 123 Stat. 2023, 2044. ............................................... 3

U.S. Const. art. I, § 9, cl. 3 ............................................................................................ 13

## MISCELLANEOUS

Ashford Decl., ¶ 7. ............................................................................................... passim

Bratcher Decl., ¶¶ 6-8. .................................................................................................. 7

C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 431 (1973). ........... 9

Pl. Compl., ¶¶ 17, 39 .......................................................................................... passim

Pl. Ex. B, ¶ 9. ......................................................................................................... 7, 10

Pl. Ex. F, ¶ 6, Pl. Compl., ¶¶ 17d, 17g ................................................................ 10, 28

## SUMMARY OF ARGUMENT

Plaintiffs contend Congress acted unconstitutionally and caused them irreparable harm when, in the Continuing Appropriations Resolution (CR) that was passed on October 1, 2009 and that expires on December 18, 2009, it provided:

> [n]one of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organization for Reform Now (ACORN) or any of its affiliates, subsidiaries, or allied organizations.[1]

Plaintiffs fail to meet their heavy burden of proof with regards to either contention.

Undercutting their allegation of irreparable harm, plaintiffs delayed six weeks after this provision (Section 163) was enacted to seek emergency relief from this court.  In addition, although plaintiffs' complaint reads the provision broadly, the Executive Branch has interpreted it more narrowly, such that "section 163 does not direct or authorize [Agencies] to refuse payment on binding contractual obligations that predate the Continuing Appropriations Resolution."  See Declaration of Ronald T. Ashford ("Ashford Decl."), Exhibit B.  Accordingly, plaintiffs' assertion that work done by ACORN and/or its affiliates based on prior grant agreements will not be paid is simply incorrect.  Furthermore, the temporary nature of a CR is obvious from the text of the resolution itself.

Against this backdrop, plaintiffs' allegation that Section 163 constitutes a Bill of Attainder is fatally flawed.  Section 163 is neither retrospective nor punitive.  It finds plaintiffs guilty of no offense, imposes no punishment upon them, and fails to stigmatize them in any fashion.  Congress passed Section 163 using its power-of-the-purse in an attempt to avoid

---

[1] Division B - Continuing Appropriations Resolution, 2010, Pub. L. No. 111-68, § 163, 123 Stat. 2023, 2053 (2009).

potential fraud, waste, and abuse, and the provision should be upheld as a constitutional exercise of Congressional authority.

Plaintiffs' allegation that Section 163 violates their First Amendment rights fares no better.  This contention rests on Congress' decision to suspend the funding of not just ACORN, but also its "affiliates, subsidiaries or allied organizations."  Plaintiffs posit hypothetical situations in which practically any organization that associates with ACORN in any fashion might face defunding.  These scenarios fail to account for the fact that ACORN is an umbrella organization, and that by using the terms "affiliates, subsidiaries or allied organizations," Congress was simply attempting to ensure that its funding ban comprehensively covered ACORN's use of government funds, either directly or through its affiliates.  ACORN itself has identified many organizations, including Plaintiffs ACORN Institute, Inc. (ACORN Institute) and New York Acorn Housing Company, Inc. (NYAHC), as being "allied" with ACORN.[2] Moreover, the constitutional avoidance doctrine instructs the Court to read this language no more broadly than is necessary to decide this case.

Finally, plaintiffs claim that Section 163 violates their rights to due process, but plaintiffs do not have a constitutionally-protected liberty interest in future government grants or contracting and cannot show that the unavailability of federal funds under the CR resulted in the "stigma plus" necessary to plead a protected liberty interest.  To the extent that plaintiffs' reputation has suffered due to the disclosure of hidden camera videos and the resulting negative

---

[2]A snapshot version of ACORN's website from August 22, 2009 may be found at http://web.archive.org/web/20080822055910/http://www.acorn.org/.  ACORN's own list of "allied organizations" which includes both co-plaintiffs ACORN Institute and Acorn Housing Corporation (the umbrella organization for NYHAC) may be found at http://web.archive.org/web/20080822090025/www.acorn.org/index.php?id=12375.

press coverage, such stigma is not attributable to Section 163.  Nor do plaintiffs have a protected property interest in either Congress' continuous funding of work done by ACORN or its affiliates after October 1, 2009 or in bidding on future government contracts or competing for discretionary government grants.  Even if plaintiffs could plead a cognizable liberty or property interest, the legislative decision-making process provides all the notice and procedure that is due.

Plaintiffs have fallen far short of showing that they will suffer irreparable harm absent a preliminary injunction, and they are unlikely to prevail on the merits of their claims.

## STATEMENT OF FACTS

On October 1, 2009, Congress enacted the Continuing Appropriations Resolution, 2010 which allowed for continued funding, as provided in the applicable FY 2009 appropriations acts, until the enactment into law of any FY 2010 appropriation act addressing activities covered by the resolution.  See Pub. L. No. 111-68, §§ 101, 106, 123 Stat. 2023, 2044.  Included within this CR, Section 163 forbade the allocation of funds to ACORN or "any of its affiliates, subsidiaries, or allied organizations," during the pendency of the resolution, which remained in effect, under its original terms, until October 31, 2009.[3]

The temporary nature of the CR was readily apparent from the legislative debate surrounding its passage.  During the September 25, 2009 House debate on the original CR (H.R. 2918, which eventually became Pub. L. 111-68), Rep. Jerry Lewis (R-CA) explained that although he understood the CR was a four-week resolution, a consensus was emerging under the Republican leadership that ACORN should be denied funding for the next fiscal year "because of recently disclosed efforts, caught on videotape, proposing the use of taxpayer dollars to

---

[3] See supra at n.1.

support prostitution." 155 Cong. Rec. H9970, 9972 (daily ed. Sep. 25, 2009) (statement of Rep.

Lewis (R-CA)).  But Rep. David Obey (D-WI), the chairman of the Appropriations Committee,

responded that the resolution then under consideration contains "no policy judgments": "We

change no existing policy except that, in accordance with the House vote last week, we also say

no more funds *for this 30-day period* for ACORN."  155 Cong. Rec. H9970, 9973 (daily ed. Sep.

25, 2009) (statement of Rep. Obey (D-WI)) (emphasis added).  Rep. David Dreier (R-CA)

emphasized that since the House was empowered with spending taxpayer dollars under Article I,

Section 9 of the Constitution, it could choose not provide ACORN with government funds.  155

Cong. Rec. H9965, H9968 (daily ed. Sep. 25, 2009) (statement of Rep. Dreier (R-CA)).  But he

also observed that the CR was only in effect for thirty days, after which point, funding to

ACORN could potentially be resumed.  Id.

In late October 2009, Congress extended the CR, which is now in effect until December

18, 2009.[4]  The extension of the CR was included in the same law (Public Law 111-88) as the

full-year appropriations act for the Department of the Interior, Environment, and Related

Agencies.  The final version of this full-year act includes a provision regarding ACORN funding

(section 427) that the Senate had approved on September 17 and that was ultimately approved by

the House without debate when the House approved the conference report after reconciliation of

---

[4] Division B - Further Continuing Appropriations Resolution, 2010, Pub. L. No. 111-88, § 101, 123 Stat. 2904, 2972 (2009) ("The Continuing Appropriations Resolution, 2010 (division B of Public Law 111-68) is amended by striking the date specified in section 106(3) and inserting 'December 18, 2009'.").  Floor debates on the extension of the CR, in both the House and Senate, did not specifically refer to section 163.  See 155 Cong. Rec.  H12057-H12068, S10893-S10908 (daily ed. Oct. 29, 2009) (consideration of H.R. Conf. Rep. No. 111-316 on H.R. 2996).  The CR had previously been amended, in a manner not relevant here, in Section 507 of the Energy and Water Development and Related Agencies Appropriations Act, 2010, Pub. L. No. 111-85, 123 Stat. 2845, 2880 (2009).

two versions of the bill. <u>See</u> 155 Cong. Rec. H11871, H11919 (daily ed. Oct. 28, 2009) (setting

forth the text of H.R. Conf. Rep. No. 111-316 on H.R. 2996; the Conference Report noted the

retention of Section 427, a provision included by the Senate prohibiting the distribution of funds

to ACORN or its subsidiaries). That provision, in turn, had been proposed by Sen. Mike Johanns

(R-NE) as Amendment No. S.2394 to H.R. 2996. <u>See</u> 155 Cong. Rec. S9499, S9517 (daily ed.

Sept. 17, 2009) (statement of Sen. Johanns). In proposing this amendment, Sen. Johanns urged

Congress to act, not on the basis of a finding that ACORN was guilty of misconduct, but on the

basis that ACORN was "in an absolute free fall when it comes to allegations of illegal activity,"

and that it was "besieged by allegations of fraud and corruption and employee wrongdoing." <u>Id.</u>

Sen. Johanns proposed his amendment "to defend taxpayers against waste, fraud, and abuse" and

to stop "the flow of taxpayer funds" to an organization that was operating under such a cloud of

scandal, while an investigation of ACORN was undertaken. <u>Id.</u> He stated:

> I want to say that we cannot relent, just because some taxpayer money was
> safeguarded, until a full government investigation is launched and completed, and
> if it turns out with no problem, so be it, but we cannot rest until that is done and
> we are assured and we can assure our citizens back home that no taxpayer money
> is being used in this organization.

<u>Id.</u> at S9518. Thus, like section 163 of the CR, section 427 of the Department of the Interior,

Environment, and Related Agencies Appropriations Act was viewed as a necessary measure to

protect the public fisc.

Since the enactment of the CR on October 1, 2009, three other full-year Fiscal Year 2010

Appropriations bills have been enacted, none of which disqualify ACORN or its affiliates from

government contracting, namely the Fiscal Year 2010 Acts for Agriculture, Rural Development,

Food and Drug Administration, and Related Agencies (P.L. 111-80), Department of Homeland

Security (P.L. 111-83), and Energy and Water Development and Related Agencies (P.L. 111-85).    Consistent with its practice of notifying agencies of recently-enacted appropriations provisions of broad significance, the Office of Management and Budget (OMB) issued a memorandum to agencies regarding Section 163 on October 7, 2009.  Declaration of Courtney B. Timberlake ("Timberlake Decl."), ¶ 12.  In this memorandum, OMB stated that each agency "must immediately commence all necessary and appropriate steps to comply with section 163," including undertaking no new obligations or awards of Federal funds to ACORN or its affiliates, and with respect to existing grant agreements or contracts with ACORN entities, directed that agencies "should . . . *where permissible*, immediately suspend performance of any obligations under the contract or agreement, including payment of Federal funds."  Id. (emphasis added).  With respect to the latter point, OMB instructed agencies to "consult promptly with the agency's general counsel and, if necessary, [OMB and DOJ] concerning the legal considerations that bear on the performance of such obligations under the existing contract or agreement."  Id.

    After receiving the OMB memorandum, the Department of Housing and Urban Development (HUD) requested guidance from the Office of Legal Counsel of the Department of Justice (OLC).[5]  Specifically, HUD asked whether section 163 prohibited the Department from making payment to ACORN or its affiliates, subsidiaries or allied organizations to satisfy an existing contractual obligation that arose prior to the enactment of the CR.  On October 23, 2009, the OLC issued guidance to HUD that concluded "section 163 does not direct or authorize HUD

_____

[5]The opinions of the OLC are generally considered binding on Executive Branch agencies.  See 28 U.S.C. §§ 511-13; 28 C.F.R. § 0.25(a); Office and Duties of Attorney General, 6 Op. A.G. 326, 334 (1854); Tenaska Washington Partners II, L.P. v. United States, 34 Fed. Cl. 434, 439 (1995).

to refuse payment on binding contractual obligations that predate the Continuing Appropriations Resolution." See Ashford Decl., ¶ 7, Exhibit B.

Six weeks after passage of Section 163, on November 12, 2009, plaintiffs sought emergency relief from this Court. According to plaintiffs, their ability to retain various federal and state government contracts has been affected by Section 163, see generally Pl. Compl., ¶¶ 17, 39 (describing generally plaintiffs' loss of government contracts and their effects), including not being able to receive grants from various entities, such as the Environmental Protection Agency (EPA), the Department of Commerce, and the Department of Agriculture, see Pl. Exh. B, ¶ 9; Id. at ¶¶ 10,11; Pl. Compl., ¶ 39e.[6] The primary injury plaintiffs alleged against an agency named in this litigation[7] was that HUD has suspended grants to ACORN Institute under the Resident Opportunity and Supportive Services Program ("ROSS"), discretionary funding to which ACORN Institute claims to be entitled, see Pl. Exh. B and attachments; see Ashford Decl., ¶¶ 4-6. HUD has agreed to "review all vouchers submitted by the grantees" and "make payments for work completed prior to the date of the Notice of Suspension, dated November 19, 2009." Ashford Decl., ¶ 6.

_____

[6] The EPA, Department of Commerce, and Department of Agriculture have not been specifically named as defendants in this litigation.

[7] Plaintiffs name the Secretary of the Treasury ("Treasury") in his official capacity as a defendant in this case as well. See Pl. Compl., ¶ 21. However, it is the federal paying agency that certifies a payment before it is disbursed, and it is the paying agency's certifying official who is accountable for ensuring that funding for the payment is available to that agency under an appropriations act, including the CR at issue in this case. See 31 U.S.C. § 3528(a); Declaration of Rita Bratcher ("Bratcher Decl."), ¶¶ 6-8. Treasury disburses payments in accordance with the payment instructions of the payment certifying agency. See 31 U.S.C. § 3325(a); see Bratcher Decl., ¶¶ 6-8. Treasury performs the certification function only when it disburses payments under its own programs.

On November 13, 2009, this Court denied plaintiffs' request for a temporary restraining order and ordered expedited briefing on the request for a preliminary injunction.

## ARGUMENT

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990). A district court may only grant a preliminary injunction where the moving party establishes, by a clear showing: (1) that it is likely to suffer irreparable injury if the injunction is not granted; and (2) either (a) a likelihood of success on the merits of its claim, or (b) the existence of serious questions going to the merits of its claim and a balance of the hardships tipping decidedly in its favor. See Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005). This "serious questions" prong is frequently termed the "fair ground for litigation" standard, see Able v. United States, 44 F.3d 128, 130-31 (2d Cir. 1995); however, it is unavailable where a plaintiff is challenging a federal government program. The plaintiff must instead show, along with irreparable injury, a substantial likelihood to prevail on the merits. Id. The Court of Appeals for this Circuit has explained that: "[t]his exception reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Id. at 131.

Movants seeking preliminary injunctive relief against the federal government therefore have a "heavy burden" to sustain. See Robert W. Stark, Jr. v. New York Exch., Inc., 466 F.2d 743, 744 (2d Cir. 1972). Furthermore, "where an injunction is mandatory — that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act — the

moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997). As explained below, plaintiffs fall far short of meeting these burdens, and their motion for a preliminary injunction should be denied.

## I.  PLAINTIFFS HAVE SHOWN NO LIKELIHOOD OF IRREPARABLE HARM

Irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." Bell & Howell: Mamiya Co. v. Masel Supply, 719 F.2d 42, 45 (2d Cir. 1983), *quoting* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948, at 431 (1973). Consequentially, any delay by a plaintiff in seeking preliminary relief is a relevant factor when considering whether the plaintiff has met his burden to show that irreparable harm is likely. "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citation omitted); Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("Courts have not imposed rigid deadlines by which a request for preliminary injunctive relief must be made: In some circumstances, even a relatively brief delay may be too long."). Plaintiffs must show that in the absence of an injunction, they would "suffer[] non-compensable harm," and that "this harm arose from the constitutional violations-which if litigated-would either be successful or at least be substantial challenges to the statute's validity." Wagner Seed Co. v. Daggett, 800 F.2d 310, 314 (2d Cir. 1986).

Plaintiffs cannot demonstrate any irreparable harm. First, plaintiffs' delay of six weeks

from the time of enactment until the time of challenge seriously undermines any claim for emergency relief. When one considers that the CR is scheduled to expire on December 18, the relative significance of this six-week delay is magnified. Plaintiffs' motion simply lacks the sense of urgency that ordinarily accompanies a motion for preliminary relief, and this Court should be wary to undertake the weighty decision of overturning a legislative enactment a scant two weeks before it is scheduled to lapse.

Second, plaintiffs attempt to frame the irreparable harm they will suffer based on applications they contemplate making for funds from private and public entities, none of which are parties to this lawsuit. See generally Pl. Compl., ¶¶ 17, 39 (describing plaintiffs' alleged loss of government contracts). Much of plaintiffs' alleged immediate "injury" is purely speculative based on discretionary government grants for which they had simply hoped to apply. ACORN Institute pleads a general desire to apply for a $780,000 grant with the EPA (which is not a named defendant in this suit), see Pl. Exh. B, ¶ 9, and a $6.2 million grant for a study, and for which they hoped to apply to the Department of Commerce (which is also not a named defendant in this suit). Id. ACORN Institute has listed various other grant applications to parties not named as defendants in this litigation. See id. at ¶¶ 10,11; Pl. Compl., ¶ 39e. NYAHC has pointed to various state and local government entities and nonprofits, who by its account, failed to provide NYAHC with opportunities to counsel indigent clients, which in turn, plaintiffs attribute to action taken by the federal government. Pl. Exh. F, ¶ 6, Pl. Compl., ¶¶ 17d, 17g. Plaintiffs fail to demonstrate how the alleged harm from private banks and foundations is somehow attributable to action taken by OMB, HUD, or Treasury, how this alleged harm might have arisen from the constitutional violations allegedly committed by these agencies, or how this

10

harm will be terminated by enjoining the Federal Defendants sued in this case.

ACORN Institute claims that it is "likely to dissolve or declare itself bankrupt,"unless it has access to federal funds.[8]  See Pl. Exh. B (Affidavit of Brennan Griffin), ¶ 18.  However, by its own admission, ACORN Institute's Ford Foundation grants were cancelled months before the enactment of Section 163 due to the embezzlement of ACORN funds by ACORN's former executive director's brother.  Id., ¶ 17.  ACORN Institute claims that section 163 has caused an 85% reduction in staff, but only point to two employees in King's County, Washington who were scheduled to do $90,000 of work, id., ¶ 10 (through the U.S. Department of Agriculture, which is no longer under section 163 and has no restriction on making funds available to ACORN for fiscal year 2010), and six employees who would have done work under continuation of a FEMA grant, id., ¶ 11 (a U.S. Department of Homeland Security appropriation, also not under section 163 and with no restriction on making funds available to ACORN for fiscal year 2010).

Third, plaintiffs allege that they will be harmed in the absence of a preliminary injunction because defendants have "refus[ed] to reimburse plaintiffs for expenditures incurred by plaintiffs in connection with work done on these contracts prior to suspension or termination," Pl. Compl., ¶ 74.  This is simply incorrect.  HUD sought advice from the OLC regarding whether HUD was required under Section 163 to stop payment on pre-existing contractual arrangements.  Ashford Decl., ¶ 7.  HUD was informed in a formal opinion that Section 163 does not direct or authorize HUD to refuse payment for work done under binding contractual arrangements undertaken prior

_____

[8] The other two plaintiffs do not allege that unavailability of federal funds will necessarily put them out of business.

to the enactment of the CR.  Id.; Exhibit B.

Specifically, ACORN Institute alleges irreparable harm in connection with a series of contracts for ROSS grants to which they claim to be entitled.  See Pl. Exh. B and attachments. HUD acknowledges that six grant agreements with ACORN Institute have been suspended due to the requirement of Section 163, see Ashford Decl., ¶ 6, Exhibit A.  However, HUD has agreed to "review all vouchers submitted by the grantees" and "make payments for work completed prior to the date of the Notice of Suspension, dated November 19, 2009."  Ashford Decl., ¶ 6. HUD has calculated that as of November 19, 2009, a combined $558,853.41 remains undisbursed under the six ROSS grants, and ACORN Institute may submit vouchers for work completed before November 19.  Id., ¶ 8.

In sum, just one of the plaintiffs, ACORN Institute, has identified only six grant agreements that were suspended on November 19, 2009 by one of the agencies or departments named in this lawsuit, but for which ACORN Institute will still receive payment for work performed prior to that date.[9]  This does not constitute "irreparable injury" for which the most "extraordinary remedy" should be granted.

## II    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

Plaintiffs are unlikely to succeed on the merits on their bill of attainder argument, or on

---

[9]Plaintiffs cite Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430 (2d Cir. 1993) for the proposition that a "major disruption of a business can be as harmful as [an employee] termination" and a threat to an organization's existence can constitute irreparable injury. Id. at 435; Pl. Mem. at 36 (describing ACORN Institute's reduction of 85% of its employees).  However, in Nemer, there was a contractual provision which allowed for a maintenance of the "status quo" franchise relationship during the pendency of arbitration.  992 F.2d at 434.  In light of that, the district court analyzed the motion for preliminary injunction under the more "flexible" standard for specific performance, see id., rather than the heightened preliminary injunction framework used to enjoin a federal government program.

their First or Fifth Amendment claims.

## A.     Section 163 Does Not Constitute a Bill of Attainder

The Constitution provides that "[n]o Bill of Attainder . . . shall be passed."  U.S. Const.

art. I, § 9, cl. 3.  "[A] statute can be a bill of attainder only if (1) it 'determines guilt and inflicts

punishment,' (2) 'upon an identifiable individual,' and (3) 'without provision of the protections

of a judicial trial.'"  Consol. Edison Co. of New York v. Pataki, 292 F.3d 338, 346 (2d Cir. 2002)

(*quoting* Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 468 (1977).  Section 163 does not

constitute a bill of attainder because it neither inflicts punishment nor determines guilt of the

plaintiffs.[10]  Accordingly, it must be upheld as a constitutional exercise of Congressional power.

## 1.     Section 163 Does Not Constitute Punishment

"The proscription against bills of attainder reaches *only* statutes that inflict *punishment*

on the specified individual or group."  Selective Serv. Sys. v. Minn. Pub. Interest Research

Group, 468 U.S. 841, 851 (1984) (emphasis added).  Accord Nixon, 433 U.S. at 472-73;

Flemming v. Nestor, 363 U.S. 603, 613 (1960).  The Supreme Court thus has made clear that

"the mere specificity of [a] law does not call into play the Bill of Attainder Clause."  Nixon, 433

U.S. at 471 n.33.

Nor does the fact that a statute imposes burdens on a person or group mean that the

statute imposes punishment forbidden by the Constitution, since "there may be reasons other

than punitive for such deprivation."  Selective Serv. Sys., 468 U.S. at 851 n.8 (*quoting* United

---

[10]Although the Supreme Court has never applied the Bill of Attainder Clause to
corporations or organizations, the Second Circuit has concluded that corporations "may not be
singled out for punishment under the Bill of Attainder Clause in Article I, Section 10."  See Con.
Ed., 292 F.3d at 349; see also SeaRiver Mar. Fin. v. Mineta, 309 F.3d 662, 668 (9th Cir. 2002)
(assuming, without deciding, that the Bill of Attainder Clause applies to corporations).

13

States v. Lovett, 328 U.S. 303, 324 (1946) (Frankfurter, J., concurring)).  "[T]he severity of a sanction is not determinative of its character as punishment.  That burdens are placed on citizens by federal authority does not make those burdens punishment."  Selective Serv. Sys., 468 U.S. at 851 (citation omitted).  Thus, even a statute that imposed burdens on a single individual — identified in the statute by name — was found not to be a bill of attainder because it did not impose punishment within the meaning of the constitutional proscription.  Nixon, 433 U.S. at 472-73.

Because of "the heavy presumption of legitimacy that is ordinarily accorded legislative decisions," the Bill of Attainder Clause has rarely been invoked to condemn legislation, and then only where it is "*manifestly retrospective* in focus" and "*unavoidably punitive* in operation." Con. Ed., 292 F.3d at 355 (emphasis added).  The Supreme Court has struck down statutes on bill of attainder grounds only five times.  In each case, the government had sought to punish "members of a political group thought to present a threat to the national security."  United States v. Brown, 381 U.S. 437, 453 (1965).  Three of these cases are from the 19th Century, and they involved Civil War era laws imposing statutory disabilities on persons who would not take an oath that they had not supported the Confederacy.  Cummings v. Missouri, 71 U.S. (4 Wall.) 277 (1866); Ex parte Garland, 71 U.S. (4 Wall.) 333 (1866); Pierce v. Carskadon, 83 U.S. (16 Wall.) 234 (1872).  The two 20th century cases involved congressional attempts to punish "subversives" or members of the Communist Party by barring them from certain jobs.  Lovett, 328 U.S. 303; United States v. Brown, 381 U.S. 437 (1965).  In all of these cases, the Court found that the legislature had "assume[d] the guilt and adjudge[d] the punishment" of certain persons for their *past* actions, Cummings, 71 U.S. at 325, and found no basis for the contentions

14

that the statutes were designed to avert *prospective* harm, id. at 319. See also Dent v. West Virginia, 129 U.S. 114, 126 (1889).

The three-part test that the Supreme Court has articulated to determine whether an act of Congress constitutes legislative "punishment" within the meaning of the Bill of Attainder Clause derives from these basic principles:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

Selective Serv. Sys., 468 U.S. at 852; see also Nixon, 433 U.S. at 473, 475-76, 478; Con. Ed., 292 F.3d at 350 ("The party challenging the statute has the burden of establishing that the legislature's action constituted punishment . . . .") (citation omitted). When applied here, these principles confirm the conclusion that Section 163 is not "punishment," but was instead a valid exercise of the Congressional power-of-the-purse to protect the public fisc.

### a.    Section 163 Does Not Meet the Historical Punishment Test

"In England a bill of attainder originally connoted a parliamentary Act sentencing a named individual or identifiable members of a group to death." Nixon, 433 U.S. at 473. In American history, the Constitution's ban on bills of attainder was also applied to imprisonment, banishment, and the punitive confiscation of property. See id. at 473-74. More recently, the Supreme Court has expanded the definition of punishment to include "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations, a mode of punishment commonly employed against those legislatively branded as disloyal." Id. at 474; see also Selective Serv. Sys., 468 U.S. at 852; Navegar, Inc. v. United

15

<u>States</u>, 192 F.3d 1050, 1066 (D.C. Cir. 1999), <u>Atonio v. Wards Cove Packing Co., Inc.</u>, 10 F.3d 1485, 1496 (9th Cir. 1993). Thus, while the Supreme Court has not strictly limited the Bill of Attainder Clause to the punishments specifically contemplated by the Framers, the Court has found it applicable in only five instances, in each of which Congress had, in fact, inflicted punishment for political acts or beliefs.

Plaintiffs argue that the circumstances surrounding their defunding are "strikingly similar" to the actions that Congress took with respect to the respondents in <u>Lovett</u>. In fact, the situation in this case is entirely different than the one in <u>Lovett</u>. The respondents in <u>Lovett</u>, federal employees, lost a vested property right to continue to receive pay for their ongoing work. <u>Lovett</u>, 328 U.S. at 304-05. Plaintiffs lost this right after a House of Representatives Subcommittee, convened to pass judgment on them, conducted secret proceedings, heard evidence collected by the Federal Bureau of Investigation, and found them guilty of being "subversives." <u>Id.</u> at 310-11. Having been found guilty of engaging in subversive activity by a House Subcommittee, they suffered the brand of a serious note of infamy. <u>Id.</u> at 311-12.

Plaintiffs here, by contrast, have merely experienced the denial of certain prospective governmental benefits, from only certain agencies, and even then for only a finite period of time. In general, the Supreme Court has indicated that the denial of a benefit does not constitute historical punishment in the bill of attainder context. In <u>Flemming v. Nestor</u>, 363 U.S. 603 (1960), the Court considered whether the denial of Social Security benefits to an eligible alien who was deported constituted a bill of attainder. The Court observed that this denial did not fall within the traditional meaning of a legislative punishment. <u>Id.</u> at 617 ("Here the sanction is the mere denial of a noncontractual governmental benefit."); <u>see also</u> <u>Selective Serv. Sys.</u>, 468 U.S.

16

at 853 (*quoting* <u>Flemming v. Nestor</u> for this point).

Plaintiffs, like any other organization, have no property right or entitlement to receive appropriated funds from Congress, which stands in sharp contrast to the employment right the <u>Lovett</u> respondents enjoyed.  In <u>Lovett</u>, the challenged statute "prohibited respondents from *ever* engaging in *any* government work, except as jurors or soldiers. . . . What is involved . . . is a Congressional proscription of Lovett, Watson, and Dodd, prohibiting their *ever* holding a Government job."  <u>Lovett</u>, 328 U.S. at 314 (emphasis added).  The Supreme Court held that a permanent proscription from any opportunity to serve the Government is punishment, and of a most severe type.  <u>Id.</u> at 316.  Section 163, by contrast, enacts no such permanent proscription.  Moreover, the CR, of which Section 163 is a part, is a temporary appropriations measure inserted by Congress until annual Appropriations bills can be enacted.  Tellingly, three of the four full-year Fiscal Year 2010 Appropriations Acts that have been enacted since the CR went into effect contain no provisions foreclosing plaintiffs from applying for or receiving federal grants.  As noted above, these three Acts include appropriations for various federal departments and agencies including the Department of Agriculture and the Department of Homeland Security (both of whom have awarded grants to ACORN affiliates in the past).  <u>See</u> Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2010, Pub. L. No. 111-80, 123 Stat. 2090 (Oct. 21, 2009); Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 2142 (Oct. 28, 2009).  Nothing in the CR, including Section 163, prevents plaintiffs from obtaining government grants funded by appropriations that are contained in those three appropriation acts or in future appropriations acts.

17

Unlike in <u>Lovett</u>, there have been no Star Chamber-like proceedings, and plaintiffs have not been found guilty of anything by Congress.[11]  Finally, no black mark has been placed by plaintiffs' names.  The law in <u>Lovett</u> "stigmatized [respondents] reputation and seriously impaired their chance to earn a living . . . ."  <u>Lovett</u>, 328 U.S. at 314.  Section 163 does nothing of the sort.  It passed no judgment on plaintiffs, and as discussed above, they are free to seek new contracts with or grants from agencies whose appropriations are not subject to the CR.  Where legislation does not censure or condemn a person, then that legislation is not within the historical definition of punishment for bill-of-attainder purposes.  <u>See</u> <u>United States v. Brown</u>, 381 U.S. 437, 453-54 (1965); <u>Foretich v. United States</u>, 351 F.3d 1198, 1220 (D.C. Cir. 2003) ("While the prohibition against bills of attainder has evolved far beyond the original context of capital sentences, it continues to focus on legislative enactments that 'set a note of infamy' on the persons to whom the statute applies.") (<i>quoting</i> <u>Brown</u>, 381 U.S. at 453-54.)).  Section 163 contains no legislative censure nor any public reprimand of plaintiffs, and it certainly imposes nothing akin to imprisonment.

---

[11] The fact that Congressman Darrell Issa (R-CA), Ranking Member of the House Committee on Oversight and Government Reform, commissioned a report investigating ACORN is not the sort of institutionalized, quasi-judicial process described in <u>Lovett</u>.  Even if some Congressmen intended to punish ACORN when they voted for Section 163, "[t]he statements of a few legislators are plainly not overwhelming evidence of penal intent . . . ."  <u>Con. Ed.</u>, 292 F.3d at 355.  The Subcommittee that found the <u>Lovett</u> respondents guilty of being "subversives" had been convened to adjudicate that very question, and the House of Representatives voted to pass an unconstitutional bill of attainder that punished the Lovett respondents shortly after receiving the Subcommittee's findings.  The "Issa Report," by contrast, was not commissioned by Congress and was not adopted by the Committee as a whole.  It was released on July 23, 2009, but the CR was not enacted until October 1, 2009—less than a month after a videotape was widely circulated in the media depicting ACORN employees appearing to give advice on how to circumvent numerous laws.  <u>See, e.g.</u>, http://www.cnn.com/2009/POLITICS/09/10/acorn.prostitution/.

### b.      Section 163 Does Not Meet the Functional Test

In addition to the "historical" test, courts apply a "functional test" to gauge whether a law constitutes a bill of attainder.  This functional test inquires:

> whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes. Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers.

Nixon, 433 U.S. at 475-76, 97 S.Ct. 2777 (internal citations omitted).

Accordingly, the fact that a restriction inflicts penalties of the type historically associated with punishment does not necessarily mean that the restriction constitutes a bill of attainder. Instead, the restriction will survive bill of attainder scrutiny if it serves a nonpunitive purpose. See Hawker v. New York, 170 U.S. 189, 196 (1898) (rejecting bill of attainder and ex post facto challenges to a statute barring ex-felons from the practice of medicine); SeaRiver, 309 F.3d at 674 ("[E]ven if the Act singles out an individual on the basis of irreversible past conduct, if it furthers a nonpunitive legislative purpose, it is not a bill of attainder.").

Section 163 plainly "can be said to further nonpunitive legislative purposes." Selective Serv. Sys., 468 U.S. at 852 (internal quotation marks omitted).  Congress chose to deny discretionary financial support to an organization that it feared might misuse the funds.  This congressional concern for preventing future waste, fraud, and abuse, coming in the form of withholding discretionary payments, constitutes a nonpunitive purpose and a legitimate exercise of the Article I power-of-the-purse.

The text and legislative history of Section 163 also make it apparent that this provision furthers Congress' nonpunitive legislative obligation to protect the public fisc by withholding the

19

discretionary payment of taxpayer funds to an organization which is under a cloud of allegations of misconduct.

By its terms, the original CR (Division B of Public Law 111-68) was in effect until October 31, 2009, which was later extended to December 18, 2009.  Nothing in the text of Section 163, or in any other provision of the CR, suggests that the suspension of ACORN's access to federal funding is permanent, or, indeed, extends beyond the current expiration date of the CR.

The fact that Congress has included the two enacted ACORN funding provisions in appropriations bills (namely, section 163 of the CR and Section 427 of the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2010), rather than in substantive regulatory statutes demonstrates that, in enacting those provisions, Congress has made no functionally-punitive determination that ACORN is forever to be barred from accessing federal funds.  Rather, in enacting those provisions, Congress has concluded that, *for the time being*, no taxpayer funds should be provided to an organization that has come under such a cloud of controversial allegations.  This is a permissible step to be taken by Congress, which under Article I of the Constitution controls the public purse-strings.

The relevant legislative history of the CR provides support for the proposition that Congress had a non-punitive justification for its actions.  During the September 25, 2009, House debate on the first CR (H.R. 2918, which eventually became Pub. L. 111-68), Rep. Lewis (R-CA), Rep. Obey (D-WI), and Rep. Dreier (R-CA) all recognized that regardless of future intentions of the Republican leadership, the vote on that section of the CR was simply a decision whether withdraw funds from ACORN for thirty days, *supra* at 3-4.  Rep. Dreier asserted that

20

this prospective funding decision was made pursuant to Congress' power of the purse, *supra* at 4; 155 Cong. Rec. H9965, H9968 (daily ed. Sep. 25, 2009) (statement of Rep. Dreier (R-CA)). Moreover, in proposing an amendment to the Interior, Environment, and Related Agencies appropriations bill which later became section 427, see *supra* at 5, Sen. Johanns urged Congress to act, not on the basis of a finding that ACORN was guilty of misconduct, but "to defend taxpayers against waste, fraud, and abuse" and to stop "the flow of taxpayer funds" to an organization that was operating under such a cloud of scandal. Id.; See 155 Cong. Rec. S9499, S9517 (daily ed. Sept. 17, 2009) (statement of Sen. Johanns).

In sum, the text and legislative history of both of these ACORN funding provisions (Section 163 and Section 427), Congress withheld funding for ACORN and its affiliates for a limited period of time to protect the taxpayers from waste, fraud, and abuse.

In asserting that the CR works a functional punishment on ACORN and its affiliates, ACORN cites to, and quotes heavily from, floor debates and other Congressional materials relating to a number of other Congressional bills – none of which have as yet been enacted into law. See, e.g., Pl. Mem. at 3, 11, 14-16. However, the Constitutional enjoinder against "bills of attainder" applies to enacted statutes, not to mere proposed legislation. See County of Suffolk v. First Am. Real Estate Solutions, 261 F.3d 179, 189-90 (2d Cir. 2001) ("[Defendants] point to the existence of pending legislation or proposals for legislative action to prove their . . . contentions that the Legislature intended FOIL to preclude or not to preclude a state agency's assertion of its copyright. . . . [H]owever, attempting to extrapolate from these bills, which have not yet been enacted, what the Legislature that enacted FOIL intended with respect to a covered entity's copyright is of questionable utility."). See also United States v. Am. Trucking Ass'n, 310 U.S.

21

534, 550 (1940) (observing that Congressional action on pending legislation shed little light on

meaning attributed by Congress to prior legislation). Accordingly, statements from Members of

Congress in connection with these unenacted provisions are irrelevant.

Finally, a Court evaluating a bill of attainder claim should "inquire into the existence of

less burdensome alternatives by which [the] legislature ... could have achieved its legitimate

nonpunitive objectives." Nixon, 433 U.S. at 482.  In the present case, the legitimate nonpunitive

Congressional objective was the time-sensitive concern that public funds were possibly being

improperly spent by ACORN, and that any money so spent could perhaps never be recouped.

The alternative Congress chose, to withhold funding for ACORN and its affiliates until

investigations could gather more information about allegations of improper conduct, was, in fact,

the least burdensome alternative by which the legislature could achieve its legitimate,

nonpunitive objective.  Given Congressional concern for possible ongoing abuse of the public

fisc by ACORN, a prophylactic enactment of a funding provision was appropriate.

### c.        Section 163 Does Not Meet the Motivational Test

Although part of the constitutional analysis, the search for punitive legislative motives is

rarely significant.  As the Supreme Court explained:

> We observe initially that only the clearest proof could suffice to establish the
> unconstitutionality of a statute on such a ground.  Judicial inquiries into
> Congressional motives are at best a hazardous matter, and when that inquiry seeks
> to go behind objective manifestations it becomes a dubious affair indeed.
> Moreover, the presumption of constitutionality with which this enactment, like
> any other, comes to us forbids us lightly to choose that reading of the statute's
> setting which will invalidate it over that which will save it.

Fleming v. Nestor, 363 U.S. 603, 617 (1960); see also Selective Serv. Sys., 468 U.S. 841, 855

n.15 (1984) (requiring "*unmistakable* evidence of punitive intent" by Congress before a statute

may be invalidated on bill of attainder grounds) (*quoting* <u>Fleming</u>, 363 U.S. at 619) (emphasis added).  The Court of Appeals for this Circuit has echoed that "[t]he legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects *overwhelmingly* a clear legislative intent to punish."  <u>Con. Ed.</u>, 292 F.3d at 354 (emphasis added).  "Statements by a smattering of legislators do not constitute the required *unmistakable* evidence of punitive intent."  <u>Id.</u> (citation and quotation omitted) (emphasis added); <u>see also</u> <u>United States v. O'Brien</u>, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."); <u>Edwards v. Aguillard</u>, 482 U.S. 578, 637-638 (1987) (Scalia, J., dissenting).

Plaintiffs argue "[i]t would be hard to find a legislative process more clearly motivated by legislators' punitive intent than the one that has thus far resulted in the Continuing Resolution challenged here."  Pl. Mem. at 27.  As explained above, however, there is nothing to this charge.  The legislative history of section 163 shows that the Congressmen and Senators who advocated in favor of the ACORN provision in the CR (and for the separate ACORN provision in the subsequent Interior, Environment, and Related Agencies Appropriations Act, 2010) presented legitimate and nonpunitive reasons for the provision.  The legislative history reveals no "unmistakable" or "overwhelming" intent to punish plaintiffs.

### 2.    Section 163 Does Not Legislatively Determine Plaintiffs' Guilt

"Another indispensible element of a bill of attainder is its retrospective focus: it defines past conduct as wrongdoing and then imposes punishment on that past conduct."  <u>Con. Ed.</u>, 292 F.3d at 349; <u>see also</u> <u>De Veau v. Braisted</u>, 363 U.S. 144, 160 (1960) ("The distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt.");

Cummings, 71 U.S. (4 Wall.) at 323 (in enacting a bill of attainder "the legislative body ... assumes ... judicial magistracy; it pronounces upon the guilt of the party, without any of the forms or safeguards of trial"). Underlying this element is the interest in ensuring the separation of powers between the different branches of government. See, e.g., Siegel v. Lyng, 851 F.2d 412, 416 (D.C. Cir. 1988) ("Broadly speaking, the Bill of Attainder Clause is a further constitutional iteration of the separation of powers logic that structures our government."); see also Lovett, 328 U.S. at 322-23 (1946) (Frankfurter, J., concurring) ("All bills of attainder specify the offense for which the attainted person was deemed guilty and for which the punishment was imposed.").

Section 163 does not contain a legislative determination of plaintiffs' guilt. See Brown, 381 U.S. at 454 n.29; Lovett, 328 U.S. at 323 (Frankfurter, J., concurring) ("There was always a declaration of guilt either of the individual or the class to which he belonged. The offense might be a pre-existing crime or an act made punishable ex post facto."); Siegel, 851 F.2d at 416. As discussed above, legitimate, non-punitive reasons exist for the passage of Section 163. It is well within Congress' discretion, in exercising its power-of-the-purse, not to allocate discretionary funds to an organization – particularly on a temporary basis for a limited number of agencies – when Congress questions whether those funds will be misused or believes the funds could be better spent elsewhere. Congress' enactment of a prophylactic regulatory measure to prevent a feared waste of government funds is not tantamount to a prohibited finding of guilt. See, e.g., SBC Commc'n v. FCC, 154 F.3d 226, 235 (5th Cir. 1998) (distinguishing "between the punitive and the prophylactically regulatory").

**B.** **Congress' Decision Not to Fund ACORN or its Affiliates Does Not Constitute a Substantial Imposition on Their Associational Freedom**

Plaintiff's First Amendment challenge is likewise meritless.  ACORN Institute admits that it "collaborate[s] closely" with ACORN and "gets many grants which it contracts with ACORN to carry out," including ROSS grants from HUD.  Pl. Compl., ¶ 16(c), 16(d).  NYAHC seeks HUD grants through ACORN Housing Corporation, which ACORN describes as an "allied organization."  Plaintiffs have failed to show that the language "affiliates, subsidiaries, or allied organizations" has been or will be improperly applied to them or any other parties not encompassed within Congress' concern with fraud, waste, or abuse.

Plaintiffs argue that the CR, along with its extension, forces organizations into a "draconian choice" of either associating with ACORN or potentially losing federal government funding and/or the ability to engage in government contracting.  Pl. Mem. at 27-29.  Specifically, they allege that the CR "will undoubtedly substantially deter and chill" the non-ACORN plaintiffs (ACORN Institute and NYAHC) from associating with ACORN with regard to political, social, and economic speech, and will deter ACORN from associating with these groups for expressive purposes.  See Pl. Compl., ¶¶ 59-62.  Plaintiff NYAHC also raises the entirely implausible claim that private banks, such as Bank of America and Citibank, will somehow become ineligible for federal government funds by virtue of meeting with NYAHC and discussing loan modifications for NYAHC clients.  See Pl. Compl., ¶ 17f.

The right to engage in activities protected by the First Amendment includes the right to associate with others for expressive purposes, see Roberts v. United States Jaycees, 468 U.S. 609, 622-23 (1984); see also NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-909 (1982). The government may not infringe upon this right to expressive association by imposing penalties or withholding benefits from individuals because of their membership in a disfavored group, see,

25

e.g., Healy v. James, 408 U.S. 169, 180-84 (1972), or by forcing the group to expressly associate with those with whose conduct they disagree, e.g., Boy Scouts of America v. Dale, 530 U.S. 640, 653-55 (2000); see also Abood v. Det. Bd. of Educ., 431 U.S. 209, 233-36 (1977).

However, this right to associate for expressive purposes is not "absolute," Roberts, 468 U.S. at 623, and the withdrawal of a government benefit that does not "directly and substantially" interfere with a recipient's ability to associate does not have an "unconstitutional impact" on the right of individuals to associate for various purposes, see, e.g., Lyng v. Int'l Union, 485 U.S. 360, 366-68 (1988); Regan v. Taxation with Representation of Wash., 461 U.S. 540, 549 (1983). Rather, in cases where the government's policy "interferes only to a limited extent" with the organization's associational rights, courts have found that there is no First Amendment violation, see Chi Iota Colony of Alpha Epsilon Pi Fratern. v. City Univ. of N.Y., 502 F.3d 136, 148 (2d Cir. 2007) ("CSI's refusal to subsidize the Fraternity's activities does not constitute a substantial imposition on the group's associational freedom."); Lyng, 485 U.S. at 368 (upholding the government's refusal to extend food stamp benefits to workers who strike, because "the strikers' right of association does not require the Government to furnish funds to maximize the exercise of that right.").

Congress employed the language "affiliates, subsidiaries, or allied organizations" so that its preventive action to temporarily bar groups directly involved in fraud, waste, and abuse would apply not solely to the national umbrella ACORN organization (incorporated in Arkansas) but also to ACORN-related entities carrying out ACORN's activities. This scope of coverage was designed to cover possible fraud, waste and abuse throughout the umbrella organization. Plaintiffs point to Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 996-

1000 (2d Cir. 1997), which examined under heightened scrutiny, a New York state law which

restricted the ability of carters in New York to knowingly associate with someone who has been

convicted of racketeering activity or belonging to a trade association where the association has

violated the antitrust laws or been convicted of racketeering.  Id. at 999.  As plaintiffs

acknowledge, the court in that case did *not* invalidate the law, but instead read the statute

narrowly to avoid any constitutional infirmity.  Id.[12]

　　Notwithstanding plaintiffs' assertion, see Pl. Compl., ¶ 57(a), the language "affiliates,

subsidiaries, or affiliated organizations" is not broader than necessary to accomplish Congress'

purpose.  The Supreme Court has cautioned that "[t]he overbreadth doctrine is strong medicine

that is used sparingly and only as a last resort."  N.Y. State Club Ass'n v. City of New York, 487

U.S. 1, 14 (1988) (internal quotation and citation omitted).  There must be a "substantial"

number of unconstitutional applications that chill protected conduct both "in an absolute sense"

and "relative to the statute's plainly legitimate sweep," and courts must "vigorously enforce" this

substantiality requirement.  United States v. Williams, --- U.S. ---, 128 S.Ct. 1830, 1838 (2008).

Plaintiffs have failed to identify any non-ACORN-related parties realistically threatened by

Section 163, it is difficult to see how it would cause a substantial number of people to be

"deter[red] from engaging in constitutionally protected speech" in absolute terms.  Id. at 1838.

Plaintiffs' assertion that private companies such as Citibank, Chase, and Bank of America, will

---

　　[12] Moreover, unlike other expressive association cases cited by plaintiffs, the failure of
Congress to make funds available does not impose criminal or civil liability for specific types of
expressive activity.  See, e.g., NAACP v. Button, 371 U.S. 415, 423-25 (1963) (state law
forbidding an organization from soliciting litigants for class-action civil rights claims); Claiborne
Hardware Co., 458 U.S. at 919-20 (state law allowing private parties to sue an organization for
the economic impact of a boycott).

somehow be classified as "affiliated" or "allied organizations" with ACORN by virtue of negotiating with NYAHC over loan modifications for NYAHC clients, see Pl. Exh. F, ¶ 9 (Affidavit of Isemene Speliotis), is frivolous.

The language "affiliates, subsidiaries, or allied organizations" is not so vague as to violate plaintiffs' due process rights, see Pl. Compl., ¶ 57(b). Plaintiffs argue that non-ACORN organizations must "guess as to [the] meaning" of the terms "affiliates, subsidiaries, and allied organizations" and "differ as to its application." Id. When confronting a facial vagueness challenge to a statute, a court should consider any limiting construction offered by the enforcing agency. See Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982); see also Williams, 128 S. Ct. at 1839. In this case, plaintiffs have not shown how "affiliates" and/or "allied organizations," terms that ACORN itself has used, are unconstitutionally vague. In Williams, the Court concluded that the statute at issue there was not overbroad - despite the presence of terms "susceptible of multiple and wide-ranging meanings" - by employing the "commonsense canon of *noscitur a sociis* - which counsels that a word is given more precise content by the neighboring words with which it is associated" to reach a narrow construction of the statute. See 128 S.Ct. at 1839. Here, the terms "affiliates" and "allied organizations" appear next to "subsidiaries," in a funding statute, suggesting that Congress intended to reach only those entities financially or organizationally intertwined with ACORN with respect to federal grants.

A "fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions, in advance of the necessity of deciding them." Lyng v. Northwest Indian Cemetery, Protective Ass'n, 485 U.S. 439, 445 (1988). To the extent the language "affiliates, subsidiaries, or allied organizations" raises questions about "foundations,

banks, and other organizations from associating with ACORN," see Pl. Mem. at 31, it is not necessary to read these terms in such a broad fashion.

**C.     Congress' Decision Not to Fund ACORN or Its Affiliates Does Not Deprive Them of Liberty or Property Without Due Process of Law**

Plaintiff's procedural due process challenge fares no better.  The thrust of plaintiffs' due process claim is that the CR deprives them of the ability to bid on certain federal government contracts, resulting in stigma, which implicates a constitutionally protected liberty interest.  Pl. Mem. at 31-33, 35.  They also claim that the CR deprives them of a constitutionally protected property interest in not having their existing government contracts terminated or suspended without cause and to be paid for work already completed on those contracts.  Id. at 34.  As previously discussed, the OLC has issued a memorandum in response to a question from HUD concluding that "Section 163 does not direct or authorize HUD to refuse payment on binding contractual obligations that predate the Continuing Appropriations Resolution."  See Ashford Decl., ¶ 7, Exhibit B.  Thus, HUD has explained that it will pay ACORN and its affiliates for work done through the date of a notice of suspension of a grant agreement. See Ashford Decl., ¶ 6, Exhibit A.

Plaintiffs do not have a constitutionally-protected liberty interest in future government contracting or grant receipt.  Nor do they have a protected property interest in either Congress' continuous funding of work done by ACORN or its affiliates after they receive notice of suspension or in bidding on future government contracts.  Even if they could plead a cognizable liberty or property interest, the legislative decision-making process provides all the notice and procedure that is due.  See Atkins v. Parker, 472 U.S. 115, 129-30 (1985); see also Logan v.

Zimmerman Brush Co., 455 U.S. 422, 433 (1982).[13]

Plaintiffs have failed to demonstrate a "liberty interest" as a result of their temporary, broad preclusion from receiving government funds.  See generally Trifax Corp. v. District of Columbia, 314 F.3d 641, 643-44 (D.C. Cir. 2003).   They allege that ACORN Institute's six ROSS grant agreements have been canceled or suspended, see Pl. Exh. B, Attachments 2-6; Ashford Decl., ¶ 6.  However, they do not explain why the suspension of these grant agreements, as opposed to the disclosure of hidden camera videos and the resulting negative press coverage, resulted in this stigma, and therefore why this case implicates a constitutionally protected liberty interest.  While cases such as Myers & Myers, Inc. v. U.S. Postal Serv., 527 F.2d 1252 (2d Cir. 1975) acknowledge that disqualification from bidding or contracting without notice and a hearing might give rise to serious constitutional issues, 527 F.2d at 1259, the cases also demonstrate that the impairment of future contracting opportunities as the result of government defamation is not enough, see Trifax Corp., 314 F.3d at 643.  Rather plaintiffs must show "stigma plus," i.e., some additional harm resulting from loss of government contracts.  See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1062-63 (2d Cir. 1993).  For example, courts have held that even if a city bars an entity from supplying concrete to contractors working on city construction projects, Empire Transit Mix, Inc. v. Giuliani, 37 F. Supp. 2d 331, 333-334 (S.D.N.Y. 1999), it may not be "sufficiently stigmatizing" so as to give rise to a procedural due process claim.  Id. at 337.  Moreover, even if the allegations are widely publicized, the stigma

---

[13] As plaintiffs at least implicitly recognize by devoting the lions' share of their brief to a bill of attainder argument, the Constitution's prohibition on bills of attainder is designed to protect them from the reputational harm they assert as a liberty interest protected by the Due Process Clause.  Their desire for a notice of reasons and opportunity to respond, see Pl. Mem. at 34, is satisfied by the legislative process itself.

may not be a result of the government's actions.  See generally S&D Maint. Co. v. Goldin, 844 F.2d 962, 970-71 (2d Cir. 1988).

Plaintiffs also have not pointed to any federal statute or regulation which gives them a property interest or "legitimate claim of entitlement" to government funds, see Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972).[14]  They attempt to assert a property right emanating from previous grant agreements between HUD and the ACORN Institute and from the OMB memorandum.  See Pl. Mem. at 34; Pl. Exh. B, Attachment 4.  However, the Court of Appeals for the Second Circuit has explicitly rejected the idea that a party contracting with the government in a multi-year contract has a constitutionally-protected property interest in the continuing payment under that contract.  S&D Maintenance Co., 844 F.2d at 967-68.  In fact, plaintiffs' ROSS grant agreements with HUD (and perhaps certain of its other federal grant agreements) are governed by the HUD appropriation acts "as they may from time to time be amended."  See Ashford Decl., ¶ 5.

As Congress makes changes to who is entitled to government benefits, in the absence of any substantive constitutional infirmity, "the legislative determination provides all the process that is due."  Hoffman v. City of Warwick, 909 F.2d 608, 619-20 (1st Cir. 1990) (quoting Zimmerman Brush Co., 455 U.S. at 433); see also Atkins, 472 U.S. at 129.  Congress' changes to an appropriations bill curtailing ACORN and its affiliates' access to government funding is presumed to have provided them with all the procedure that the Fifth Amendment demands.  "Having enacted a statute that created such a right ... the legislature retains the power to enact

---

[14] Nor have Plantiffs demonstrated an independent, constitutionally-protected property interest in being able to bid on public contracts.  See TriHealth, Inc. v. Bd. Of Comm'rs, 430 F.3d 783, 792-94 (6th Cir. 2005).

31

new legislation altering or eliminating the right, and that elimination does not contravene the

Due Process [Clause of the Constitution]." Story v. Green, 978 F.2d 60, 62-63 (2d Cir. 1992).

## III    THE PUBLIC INTEREST WEIGHS AGAINST ENJOINING FEDERAL DEFENDANTS

Finally, the public interest precludes a preliminary injunction here. "[A] district court

deciding whether to grant equitable relief should consider and balance private and public

interests whenever public interests are implicated." Register.com, Inc. v. Verio, Inc., 356 F.3d

393, 424 (2d Cir. 2004). Moreover, the Supreme Court has reiterated that district courts must

consider the public interest in weighing a potential preliminary injunction. See Winter v.

NRDC, 129 S.Ct. 365, 375 (2008) ("A plaintiff seeking a preliminary injunction must establish

that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

is in the public interest."); see also id at 376 (stating that "proper consideration" of the public

interest and the government's interest "alone requires denial" of a preliminary injunction). Here,

the public interests are significant, and they weigh against the entry of a preliminary injunction.

The "the heavy presumption of legitimacy that is ordinarily accorded legislative

decisions" is well established. Con. Ed., 292 F.3d at 355. "[G]overnmental policies

implemented through legislation or regulations developed through presumptively reasoned

democratic processes are entitled to a higher degree of deference and should not be enjoined

lightly." Able, 44 F.3d at 131. In the present case, both Houses of Congress made the decision,

in the interests of preserving public funds and avoiding potential waste of tax dollars, that

Section 163 should be enacted. The heavy presumption of legitimacy this Court should afford

this legislative decision underscores the strong public interest in the maintenance of Section 163.

Entering an injunction would frustrate that interest.

More practically, this Court should carefully consider the potentially drastic effect on the public interest that a mandatory injunction preventing federal agencies, or even just HUD, from awarding contracts or grants to other entities where plaintiffs also have applied for these grants. See, e.g., Winter, 129 S.Ct. at 376-77 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citation and quotation omitted).[15]  At the hearing on Plaintiffs' Motion for a Temporary Restraining Order, this Court stated: "I don't see any basis in the record . . . to issue the extraordinary relief of a TRO at this point especially on the second request to stop the Government from giving out contracts and basically stop the contracting process."  Tr. 27:19-23. Nothing has changed since this Court issued that ruling; no basis exists to stop the Government from giving out contracts and basically stop the contracting process.

Accordingly, the public interest weighs against enjoining any of the Federal Defendants in this case.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

Dated: December 1, 2009                      Respectfully Submitted,

                                             TONY WEST
                                             Assistant Attorney General

---

[15] In fact, such an injunction might foreclose the ability of an agency to *ever* award certain contracts or grants if the money Congress had appropriated for the purpose of the grants had a limited period of availability that expired before the preliminary injunction was lifted.

33

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

BENTON J. CAMPBELL
United States Attorney

F. FRANKLIN AMANAT
Assistant United States Attorney

/s/ Peter D. Leary
PETER D. LEARY, Va. Bar #71196
MICHAEL SITCOV, D.C. Bar # 308682
BRADLEY H. COHEN, D.C. Bar #495145
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
P.O. Box 883
Washington, D.C. 20044
(202) 305-9855
(202) 616-8470 (fax)
Email: peter.leary@usdoj.gov
        michael.sitcov@usdoj.gov
        bradley.cohen@usdoj.gov

*Attorneys for the United States*

34

## CERTIFICATE OF SERVICE

I, Peter D. Leary, hereby certify under penalty of perjury that on this 1st day of December, 2009, I did cause true and correct copies of the above and foregoing instrument, Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, to be served electronically on counsel for plaintiffs.

/s/ Peter D. Leary
PETER D. LEARY
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
P.O. Box 883
Washington, D.C. 20044
(202) 514-3313
(202) 616-8470 (fax)
Email: peter.leary@usdoj.gov