**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
**ACORN; ACORN INSTITUTE, INC.; and**
**NEW YORK ACORN HOUSING**
**COMPANY, INC.,**

**Plaintiffs,**

**OPINION AND ORDER**

-against-

**09-cv-4888 (NG)**

**UNITED STATES OF AMERICA;**
**SHAUN DONOVAN, Secretary of the**
**Department of Housing and Urban Development;**
**PETER ORSZAG, Director,**
**Office of Management and Budget; and**
**TIMOTHY GEITHNER,**
**Secretary of the Department of Treasury**
**of the United States,**

**Defendants.**

------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y
★ DEC 1 1 2009 ★
P.M.
TIME A.M. _____

**GERSHON, United States District Judge:**

The plaintiffs in this case, the Association of Community Organizations for Reform Now, Inc. ("ACORN") and two of its affiliates, challenge as an unconstitutional bill of attainder a continuing appropriations resolution enacted by Congress that bars ACORN and its affiliates, subsidiaries, and allied organizations from receiving federal funding from the government, even under its ongoing contracts with federal agencies. In doing so, the plaintiffs ask this court to consider the constitutionality of a provision that was approved by both houses of Congress and signed into law by the President. Such a task can be approached only with the utmost gravity; legislative decisions enjoy a high presumption of legitimacy. This is particularly true where the challenge is brought under a rarely-litigated provision of the Constitution, the Bill of Attainder Clause, which has been successfully invoked only five times in the Supreme Court since the signing of the Constitution.

ACORN's critics consider it responsible for fraud, tax evasion, and election violations, and members of Congress have argued that precluding ACORN from federal funding is necessary to protect taxpayer money. ACORN, by contrast, while acknowledging that it has made mistakes, characterizes itself as an organization dedicated to helping the poor, and argues that it has been the object of a partisan attack against its mission. This case does not involve resolution of these contrasting views. It concerns only the means Congress may use to effect its goals. Nor does this case depend upon whether Congress has the right to protect the public treasury from fraud, waste and abuse; it unquestionably does. The question here is only whether the Constitution allows Congress to declare that a single, named organization is barred from all federal funding in the absence of a trial. Because it does not, and because the plaintiffs have shown the likelihood of irreparable harm in the absence of an injunction, I grant the plaintiffs' motion for a preliminary injunction.

## BACKGROUND

On this motion for a preliminary injunction, I have considered the complaint and the various documents and declarations submitted by the parties, who have agreed that there are no disputed issues of fact that need to be decided for the purposes of the motion.

ACORN describes itself as "the nation's largest community organization of low-and-moderate income families." ACORN, in addition to its own work, has affiliations with a number of other organizations, including its co-plaintiffs ACORN Institute, Inc. and New York ACORN Housing Company, Inc. ("NYAHC"). The plaintiffs have, in past years, received millions of dollars in federal funding from a variety of grants, embodied in contractual agreements with various federal agencies, including the Department of Housing and Urban Development ("HUD").

2

Numerous accusations have been made against ACORN.  Most prominently, ACORN came under attack after publication of hidden-camera videos in September of 2009, in which employees of an ACORN affiliate are seen to be advising a purported prostitute and her boyfriend about how to engage in various illegal activities and evade law enforcement while doing so.  Other allegations include that ACORN violated tax laws governing non-profit organizations, misused taxpayer dollars, committed voter fraud, and violated federal election laws by playing an impermissibly partisan role in its voter registration campaign.  ACORN alleges that it has responded by terminating staff members found to have engaged in misconduct, reorganizing its board of directors, and hiring new counsel, including a former Attorney General of Massachusetts, to conduct an internal investigation.

In the fall of 2009, in the absence of 2010 appropriations acts for all federal agencies and programs, Congress enacted, and President Obama signed into law, a Continuing Appropriations Resolution ("Continuing Resolution").[1]  That Continuing Resolution included the provision at issue in this case, Section 163.  Division B – Continuing Appropriations Resolution, 2010, Pub. L. No. 111-68, § 163, 123 Stat. 2023, 2053 (2009).  Section 163 reads:

> None of the funds made available by this joint resolution or any
> prior Act may be provided to the Association of Community
> Organizations for Reform Now (ACORN), or any of its affiliates,
> subsidiaries, or allied organizations.

The Continuing Resolution containing Section 163 went into effect on October 1, 2009, and was extended, on October 31, 2009, to December 18, 2009, when it is now scheduled to expire. Division B – Further Continuing Appropriations Resolution, 2010, Pub. L. No. 111-88, § 101,

---

[1]     A continuing resolution is "[l]egislation in the form of a joint resolution enacted by Congress, when the new fiscal year is about to begin or has begun, to provide budget authority for Federal agencies and programs to continue in operation until the regular appropriations acts are enacted."  United States Senate Glossary, http://www.senate.gov/reference/glossary_term/continuing_resolution.htm (last visited Dec. 11, 2009).

123 Stat. 2904, 2972 (2009). [2] As the expiration date for the Continuing Resolution draws near, it is unknown whether there will be a need for a further extension. That will depend on whether all regular appropriations acts are passed; according to the government, only four of the expected thirteen appropriations acts had been enacted as of the date of the preliminary injunction hearing.

On October 7, 2009, Peter Orszag, the Director of the Office of Management and Budget ("OMB") and a defendant here, issued a memorandum to the heads of all executive branch agencies regarding the implementation of Section 163 ("OMB Memorandum"). The OMB Memorandum directs, *inter alia*, that "[n]o agency or department should obligate or award any Federal funds to ACORN or any of its affiliates, subsidiaries or allied organizations (collectively 'affiliates') during the period of the [Continuing Resolution]," even where the agencies have already determined that funds should be awarded to ACORN, but have not yet entered into binding agreements with the organization to do so. This prohibition applies not just to the 2010 fiscal year, but also to appropriations made in fiscal year 2009, and to any funds left over from prior years' appropriations. In addition, the OMB Memorandum states, agencies should, "where permissible," suspend performance and payment under existing contracts with ACORN and its affiliates, and ask for guidance on any legal considerations from the agencies' own counsel, OMB, or the Department of Justice. Finally, turning to subcontractors, the OMB Memorandum instructs agencies to "take steps so that no Federal funds are awarded or obligated by your grantees or contractors to ACORN or its affiliates" and recommends that each agency notify federal grant and contract recipients about Section 163. On November 19, 2009, HUD gave

---

[2]     The extension of the Continuing Resolution was included in the same law as the 2010 appropriations act for the Department of the Interior, Environment, and Related Agencies. Division A – Dep't of the Interior, Environment and Related Agencies Appropriations Act, 2010, Pub. L. No. 111-88, § 427, 123 Stat. 2904, 2962 (2009). That appropriations act also includes a restriction on funding for ACORN, using somewhat different language. Only Section 163 of the Continuing Resolution is at issue in this case.

notice to plaintiff ACORN Institute that it was suspending several of its contracts with the organization because of Section 163.

The plaintiffs filed suit in this court on November 12, 2009, arguing that Section 163 is an unconstitutional bill of attainder and that it violates their rights under both the First Amendment and the Due Process Clause. In their complaint, the plaintiffs alleged that, as a direct consequence of Section 163, agencies have refused to review their grant applications; that grants they were told they would receive have now been rescinded; that previously-awarded grants have not been renewed; and that HUD has refused to pay on its contractual obligations even for work already performed. More generally, the plaintiffs also alleged that other organizations, such as private corporations and foundations, have cut ties to them as a result of Section 163.

On November 13, 2009, I denied the plaintiffs' request for a temporary restraining order, but required the parties to brief the preliminary injunction motion on an expedited schedule, and heard argument on December 4, 2009.

In opposition to the motion for a preliminary injunction, the government argues that Section 163 is not a bill of attainder because, even though it singles out ACORN, it does not do so for the purpose of punishment. The defendants rely in part on a Department of Justice Office of Legal Counsel ("OLC") memorandum, written by David J. Barron, Acting Assistant Attorney General, in response to a request for guidance from HUD as to whether Section 163 prohibits payments to ACORN to satisfy contractual obligations that arose prior to Section 163's enactment.[3] The OLC memorandum advises HUD that "[S]ection 163 should not be read as

---

[3]     Although dated October 23, 2009, the memorandum was not released to the plaintiffs or the public until late November. While the memorandum was written specifically for HUD, the government views the memorandum as binding on all agencies of government.

directing or authorizing HUD to breach a pre-existing binding contractual obligation to make payments to ACORN or its affiliates, subsidiaries, or allied organizations where doing so would give rise to contractual liability." To read Section 163 otherwise, the memorandum notes, would "undo a binding governmental contractual promise." The memorandum explains that its construction of Section 163 not only avoids abrogating "binding governmental contractual promises," but also avoids constitutional concerns, in particular those arising from the Bill of Attainder Clause, that "may be presented by reading the statute, which applies to specific named entities, to abrogate such contracts, including even in cases where performance has already been completed but payment has not been rendered."

The plaintiffs acknowledge that HUD, pursuant to the OLC memorandum, has paid, or has agreed to pay, for work already performed under existing contracts. The plaintiffs, however, complain that the time lag between the release of the OLC memorandum and the notification of suspension prevented them from working, and therefore earning payment, under the existing contracts. They also contend that the government's suspension of existing contracts, based solely on Section 163, violates the Bill of Attainder Clause, as does denial of the opportunity to obtain future contracts, whether renewals or new contracts, for which the plaintiffs are now ineligible.

## DISCUSSION

A district court may enter a preliminary injunction "staying government action taken in the public interest pursuant to a statutory or regulatory scheme only when the moving party has demonstrated that [the party] will suffer irreparable injury, and [that] there is a likelihood that [the party] will succeed on the merits of [its] claim." *Alleyne v. N.Y. Educ. Dep't*, 516 F.3d 96, 101 (2d Cir. 2008) (internal quotation marks omitted).

6

## A. Likelihood of Success on the Merits

Article I, Section 9, of the Constitution provides that "No Bill of Attainder or ex post facto Law shall be passed."[4]  A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).  Enacted as a "bulwark against tyranny" by Congress, "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply -- trial by legislature." *United States v. Brown*, 381 U.S. 437, 443, 442 (1965).  This principle of separation of powers animates bill of attainder jurisprudence; its prohibition "reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons." *Id.* at 445.[5]

Three factors "guide a court's determination of whether a statute directed at a named or readily identifiable party is punitive":  first, "whether the challenged statute falls within the historical meaning of legislative punishment;" second, "whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes," an inquiry sometimes referred to as the "functional test";  and third, "whether the legislative record evinces a legislative intent to punish." *See Consolidated Edison Co. of N.Y., Inc. v. Pataki* ("*Con Ed*"), 292 F.3d 338, 350 (2d Cir. 2002) (internal quotation marks and alterations omitted).  A statute "need not fit all three factors to be considered a bill of

---

[4]     The Constitution includes two clauses prohibiting bills of attainder.  Article I, Section 9, implicated here, restricts Congress; Article I, Section 10, restricts state legislatures.
[5]     The Second Circuit has concluded that the Bill of Attainder Clause applies both to individuals *and* to corporations. *See Consolidated Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 346-47 (2d Cir. 2002).

attainder; rather, those factors are the evidence that is weighed together in resolving a bill of attainder claim." *Id.*

### 1. *Historical Meaning of Legislative Punishment*

As the Second Circuit has explained, "[s]ome types of legislatively imposed harm . . . are considered to be punitive per se." *Id.* at 351. "The classic example is death, but others include "imprisonment, banishment, . . . the punitive confiscation of property, and prohibition of designated individuals or groups from participation in specified employments or vocations." *Id.*[6]

Any consideration of the "historical" meaning of punishment in the bill of attainder context must begin with the handful of Supreme Court cases finding statutes bills of attainder. In each of the five cases in which the Supreme Court has found legislation to violate the Bill of Attainder Clause, the context of the Court's ruling was protection of political liberty.[7] In *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1866), for example, the Court concluded that a statute that barred persons from certain professions unless they took an oath that they had never been connected to an organization "inimical to the government of the United States" was punishment for past association with the Confederacy. *Accord Ex Parte Garland*, 71 U.S. (4 Wall.) 333 (1866); *Pierce v. Carskadon*, 83 U.S. (16 Wall.) 234 (1872). Similarly, in *United States v. Brown*, 381 U.S. 437 (1965), the Court held that a statute making it a crime for a member of the Communist Party to serve as an officer or employee of a labor union was a bill of attainder. In the fifth case, *United States v. Lovett*, 328 U.S. 303 (1946), the Court held that a statute that permanently barred three government employees, who had been accused of being communists, from government service was an unconstitutional bill of attainder.

---

[6]     The history of the bill of attainder, and its roots in fourteenth century England, has been described elsewhere. *See, e.g.*, *Brown*, 381 U.S. at 441-49; *In re Extradition of McMullen*, 989 F.2d 603, 604-06 (2d Cir. 1993).

[7]     Here, plaintiffs allege that ACORN has been punished both for alleged misconduct, such as fraud, and for its alleged impermissible partisanship.

At first blush, the idea that the deprivation of the opportunity to apply for discretionary federal funds is "punitive" within the meaning of the attainder clause seems implausible. Neither the Supreme Court nor the Second Circuit has been faced with such a claim. One district court, however, in a case much like this one, has concluded that denial of the opportunity to apply for state government contracts amounts to punishment under Article 1, Section 10. *See Fla. Youth Conservation Corps., Inc. v. Stutler*, No. 06-275, 2006 WL 1835967, at *2 (N.D. Fla. June 30, 2006). For the reasons described below, I agree with the district court in Florida and conclude that the discretionary nature of governmental funding does not foreclose a finding that Congress has impermissibly singled out plaintiffs for punishment.

*Lovett* is particularly instructive in this regard. In *Lovett*, a congressman attacked thirty-nine specifically named government employees, including the plaintiffs, as "irresponsible, unrepresentative, crackpot, radical bureaucrats," and affiliates of "communist front organizations." *Lovett*, 328 U.S. at 308-09. Following secret hearings, Congress passed an act that no appropriation could then, or later, be used to pay the plaintiffs' government salaries. *Id.* at 312-13.

The Supreme Court concluded that the appropriations act "clearly accomplishes the punishment of named individuals without a judicial trial." *Id.* at 316. That Congress placed the prohibition in an *appropriations* bill carried no weight. "The fact that the punishment is inflicted through the instrumentality of an Act specifically cutting off the pay of certain named individuals found guilty of disloyalty," the Court concluded, "makes it no less galling or effective than if it had been done by an Act which designated the conduct as criminal." *Id.*

The government attempts to distinguish this case from *Lovett* on the ground that the plaintiffs in that case had a "vested property interest" in their jobs, whereas here, as the plaintiffs unequivocally acknowledge, they have no *right* to the award of a grant or contract from the

9

federal government. But the Court in *Lovett* did not base its decision on a property rights analysis. The Supreme Court found a deprivation amounting to punishment under the Bill of Attainder Clause, not only because the plaintiffs were deprived of their earned income on existing government jobs, but also because they were deprived of any *future opportunity* to serve the government. As the Court stated, "[t]his permanent proscription from any opportunity to serve the Government is punishment, and of a most severe type." *Id.* That the plaintiffs had no right to any particular future job was of no moment.[8]

The government relies on *Flemming v. Nestor*, 363 U.S. 603 (1960), to argue that the denial of the opportunity to apply for federal funding cannot be punishment. In *Flemming*, the plaintiff argued that a statute, which denied Social Security benefits to a limited category of deported aliens, was a bill of attainder. The Supreme Court disagreed, describing the deprivation as only the "mere denial of a noncontractual government benefit" and finding no punitive intent in the design of the statute. *Id.* at 617. The government also points to *Selective Service System v. Minnesota Public Interest Research Group* ("*Selective Service*"), 468 U.S. 841, 853 (1984), where the Court upheld a statute barring persons who had not registered for the draft from federal student aid as not constituting punishment.

This case is closer to *Lovett* than to *Flemming* or *Selective Service*. The Supreme Court in both *Flemming* and *Selective Service* found the statutes at issue to be nonpunitive. In *Flemming*, the Court concluded that the legislative record "falls short of any persuasive showing that Congress was in fact concerned alone with the grounds of deportation," which, in the

---

[8]     The government argues that, unlike the provision in *Lovett*, the bar here is "temporary." But even if Section 163 proves to be short-lived — a matter in doubt as, according to the government, nine appropriations acts have yet to be enacted — its effect on ACORN may not be "temporary." Plaintiff ACORN Institute, for example, has a pending application with the Department of Commerce and another with the Environmental Protection Agency, both of which would last three years. Compl., Ex. B (Griffin Aff. ¶¶ 8-9). A short deprivation of the opportunity to apply could therefore have long-term ramifications.

plaintiff's case, was prior membership in the Communist party. *Flemming*, 363 U.S. at 619. In *Selective Service*, the Court reasoned that the statute had the valid goal of encouraging a class of persons to do what they were already legally obligated to do – register for the draft. *See Selective Service*, 468 U.S. at 860. As discussed further below, I cannot similarly discern any valid, non-punitive purpose for Congress enacting the legislation in this case.

Also, in neither *Flemming* nor *Selective Service* did Congress single out any particular individual or entity for adverse treatment; rather, each statute applied to an entire category of people. Here, in contrast, the Congressional deprivation is imposed only on ACORN and its affiliates, and, unlike the statute in *Selective Service*, cannot be avoided by ACORN through any conduct on its part. *See Flemming*, 363 U.S. at 619 (reasoning that, even if the legislative history were read "as evidencing Congress'[s] concern with the grounds [of prior Communist party membership], rather than the fact, of deportation," "[t]his would still be a far cry from the situations involved in [prior Supreme Court cases] where the legislation was on its face aimed at particular individuals."). *Cf. Nixon v. Adm'r of Gen. Services*, 433 U.S. at 485 (Stevens, J. concurring) (stating that "[i]t has been held permissible for Congress to deprive Communist deportees, as a group, of their social security benefits, but it would surely be a bill of attainder for Congress to deprive a single, named individual of the same benefit. . . . The very specificity would mark it as punishment, for there is rarely any valid reason for such narrow legislation[.]") (citations omitted).

2. *The Functional Test*

I next consider whether Section 163 furthers non-punitive legislative purposes in light of the type and severity of the burdens the statute imposes.

The Court of Appeals for the Second Circuit explored this factor at length in *Consolidated Edison of New York, Inc. v. Pataki*, in which the Court concluded that an act of the

11

New York state legislature constituted an unconstitutional bill of attainder under Article 1, § 10 of the Constitution. 292 F.3d at 345. Based on a finding that Consolidated Edison ("Con Ed") had "failed to exercise reasonable care on behalf of the health, safety and economic interests of its customers," when it failed to promptly replace steam generators it knew to be faulty, and which then failed, the New York legislature passed a law forbidding Con Ed from passing along the costs associated with the outage to the ratepayers. *Id.* at 344-45.

The Second Circuit found that the State had no valid non-punitive reason that justified singling out Con Ed. It rejected the State's argument that the statute had the legitimate non-punitive purpose of preventing innocent ratepayers from paying for Con Ed's mistakes. The statute, the Court concluded, did more than simply re-distribute or minimize costs. Rather, the "type and severity of the burdens imposed" by the statute belied the legitimacy of the regulatory justification. *Id.* at 353. There was little question that Con Ed could have passed on the cost of obtaining power elsewhere if it had replaced the generators during a *scheduled* outage; "[w]hat then," the Court asked, "other than punishment can justify forcing Con Ed to absorb these same costs after the accidental outage?" *Id.* Further, the legislature could have enacted "less burdensome alternatives" to achieve its legitimate objectives, such as excluding "those substantial costs that would have been incurred absent misconduct on Con Ed's part." *Id.* at 354.

Here, in defending Section 163, the government argues that, because there was no formal congressional finding of misconduct against ACORN, the bar on all funding to ACORN is not punitive. But, as in *Con Ed*, the nature of the bar and the context within which it occurred make it unmistakable that Congress determined ACORN's guilt before defunding it. Wholly apart from the vociferous comments by various members of Congress as to ACORN's criminality and

fraud, as described below, no reasonable observer could suppose that such severe action would have been taken in the absence of a conclusion that misconduct had occurred.

The government also emphasizes that Congress withheld funds from plaintiffs for a limited time for the non-punitive reason of protecting "the public fisc," not to penalize ACORN for past wrongdoing. But Congress's interest in preventing *future* misconduct does not render the statute regulatory rather than punitive. Deterring future misconduct, as *Con Ed* stressed, is a traditional justification of punishment. *See Con Ed.*, 292 F.3d at 353; *see also Brown*, 381 U.S. at 458; *Selective Service*, 468 U.S. at 851-52 ("Punishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct.").

The government further suggests that there was an emergency requiring immediate suspension of ACORN's funding and the initiation of an investigation. But under *Con Ed*, there must be some connection between the burdens of the statute and the government's purpose in enacting it. *See Con Ed*, 292 F.3d at 354. Here, although investigations of ACORN by state and federal agencies are underway, no congressional investigation of ACORN was initiated as part of the challenged legislation, nor did Congress order any agency of government to conduct an investigation. This undercuts the asserted emergency rationale.

Moreover, the award of grants and contracts by federal agencies is governed by comprehensive regulations that have been promulgated to address the very concerns Congress has expressed about ACORN. There is no indication that Congress found these available mechanisms for investigation, leading to possible, and even immediate, suspension, by grant-awarding agencies, inadequate to address the various allegations of misconduct. For example, the Code of Federal Regulations establishes a formal process for determining when federal contractors can be suspended or debarred. *See, e.g.*, 2 C.F.R. Ch. 1, Part 180. Subpart G of this part provides that a suspending official may impose suspension after considering a range of

factors; the official can even take "immediate action" if "necessary to protect the public interest." *See, e.g.*, 2 C.F.R. § 180.705 ("In deciding whether immediate action is needed to protect the public interest, the suspending official has wide discretion . . . .").

The government also argues that Congress's enactment of three 2010 appropriations acts containing no bar on funding ACORN, out of four signed into law thus far, belies the alleged punitive intent behind Section 163. This argument of course further undercuts the government's emergency rationale: if there were an emergency requiring the draconian action taken by Congress in Section 163, no explanation has been offered by the government as to why that emergency would apply only for some agencies and not others. And, the government agrees that, even for those agencies whose appropriations acts do not limit funding for the plaintiffs for fiscal year 2010, the plaintiffs remain barred from available funds appropriated to those agencies in previous years so long as Section 163 is in force. Prel. Inj. Tr. 14-15, Dec. 4, 2009. *See also* OMB Memorandum (Oct. 7, 2009) ("[T]he text of [S]ection 163 is sufficiently broad to cover funding that was made available for fiscal year (FY) 2009 and prior fiscal years, as well as funding that is or will be made available for FY10."). Most importantly, in the absence of any justification for distinguishing among agencies, that the restriction does not cover every agency's appropriations does not affect its punitive nature.

That ACORN was singled out is obvious and undisputed by the government. In *Nixon*, the Supreme Court found that a statute naming former President Nixon specifically was not necessarily a bill of attainder. The specific mention of his name was "easily explained by the fact that at the time of the Act's passage, only his [papers and recordings] demanded immediate attention." 433 U.S. at 472. Nixon, and only Nixon, had entered into an agreement with a depository which called for destruction of the materials upon Nixon's death. Thus, Nixon "constituted a legitimate class of one, and this provides a basis for Congress' decision to proceed

14

with dispatch with respect to his materials while accepting the status of his predecessors' papers and ordering the further consideration of generalized standards to govern his successors." *Id.*

Here, the government has offered no similarly unique reason to treat ACORN differently from other contractors and to bar the funding of ACORN without either a judicial trial or the administrative process applicable to all other government contractors. The specificity of Section 163 aggravates the punitive nature of the statute.

As in *Con Ed*, none of the government's justifications stand up to scrutiny. I can discern no non-punitive rationale for Congressional preclusion of the plaintiffs, and the plaintiffs alone, from federal funding.

### 3. *Legislative Intent*

The third, and final, element in determining whether an act is punitive is legislative intent. *See Selective Service*, 468 U.S. at 852. "The legislative record by itself is insufficient evidence for classifying a statute as a bill of attainder unless the record reflects overwhelmingly a clear legislative intent to punish." *Con Ed.*, 292 F.3d at 354. Determining Congress's intent is often a difficult exercise; the stated comments of one legislator do not necessarily represent the unspoken thoughts of others who voted for a bill. Particular difficulties present themselves in this case, where legislators have discussed ACORN in a variety of contexts, making it difficult to separate out legislative intent for Section 163 in particular. Nevertheless, since the Supreme Court instructs that legislative intent is a key part of the framework for determining whether a legislative act is a bill of attainder, it must be examined.

Here, the task is made easier because the legislative history that the government itself relies on as evidence of non-punitive intent unmistakably indicates *punitive* intent. The government relies on the statements of Senator Mike Johanns, who sponsored a provision defunding ACORN in the Department of Interior's appropriation act, which provision is similar

to the language of Section 163. He stated that he was proposing the legislation "to defend taxpayers against waste, fraud, and abuse." 155 Cong. Rec. S9517 (daily ed. Sept. 17, 2009). Senator Johanns also urged Congress to act because ACORN was "in an absolute free fall when it comes to allegations of illegal activity" and was "besieged by allegations of fraud and corruption and employee wrongdoing." *Id.* Such statements require an implicit finding of wrongdoing by the plaintiffs; protection of taxpayers' money is a logical justification for Section 163 only if wrongdoing is assumed.

The punitive nature of the just-quoted comments of Senator Johanns is manifest when they are considered in light of Senator Johanns's other comments about ACORN, in the context of other proposed legislation seeking to defund the organization. *See, e.g.*, 155 Cong. Rec. S9317 (daily ed. Sept. 14, 2009) (statement of Sen. Johanns) ("Somebody has to go after ACORN. Madam President, I suggest this afternoon that 'somebody' is each and every Member of the Senate."). Other legislators echo this punitive sentiment. *See, e.g.*, 155 Cong. Rec. S9314 (daily ed. Sept. 14, 2009) (statement of Sen. Kit Bond) (stating that "[w]e cannot allow taxpayer funds to support groups engaged in repeated voter registration fraud activities, and now their repeated assistance for housing, tax, and mortgage fraud.") In addition, the staff of Representative Darrell Issa authored an 88-page report entitled "Is ACORN Intentionally Structured As A Criminal Enterprise?", which states that "ACORN has repeatedly and deliberately engaged in systemic fraud" and accuses ACORN of conspiring to use taxpayer funds for partisan purposes.[9] The government correctly notes that the Issa Report was authored solely

---

[9]     With respect to plaintiffs' allegations that Section 163 is intended to punish ACORN for its impermissible partisanship, a statement Representative Issa made in response to OLC's October 23, 2009 memorandum construing the scope of Section 163 is noteworthy. In that statement, Representative Issa accused OLC of "old-fashioned cronyism" and stated that "[t]axpayers should not have to continue subsidizing a criminal enterprise that helped Barack Obama get elected President." Press Release, Rep.

by Representative Issa's office and was not commissioned by Congress. Nevertheless, particularly because Senator Johanns himself requested that its executive summary be entered into the congressional record, it is relevant to this inquiry. *See* 155 Cong. Rec. S9309 (daily ed. Sept. 14, 2009) (statement of Sen. Johanns).[10]

Without more, legislative history may not be enough to render the legislation a bill of attainder. But these statements underline the punitive nature of the government's purportedly non-punitive reason. *See Con Ed*, 292 F.3d at 355. ("[T]he stated intent of at least some legislators—most notably one of the floor managers of the legislation—to punish Con Ed reinforces our independent conclusion that a substantial part of the legislation cannot be justified by any legislative purpose but punishment.").

The Supreme Court counseled in *Flemming* that each attainder case "turn[s] on its own highly particularized context." *Flemming*, 363 U.S. at 616. Here, as in *Lovett*, Congress deprived the plaintiffs of an opportunity available to all others. In these circumstances, where the plaintiffs have received many federal grants and contracts over the years, it cannot be said that such deprivation is anything short of punishment as that has been understood in the bill of attainder cases. Section 163, by singling out ACORN and its affiliates for severe, sweeping restrictions, constitutes punishment under the three factors the Supreme Court has articulated for

---

Darrell Issa, Issa Blasts Administrative Decision to Fund ACORN – Reeks of Political Cronyism (Nov. 27, 2009) (attached to plaintiffs' reply memorandum of law as Exhibit I).

[10]   At least one representative, Representative Rush Holt, voiced his concern that the provision was a bill of attainder. *See* 115 Cong. Rec. H9975 (September 25, 2009) (statement of Rep. Holt). In his comments, Rep. Holt referenced a report from the Congressional Research Service. This report, which was written regarding a different bill, "the Defund ACORN Act," analyzed that bill and concluded that "a court would have a sufficient basis to overcome the presumption of constitutionality and find that [the Defund ACORN Act violates the prohibition against bills of attainder." Kenneth Thomas, U.S Congressional Research Service Report for Congress: The Proposed 'Defund ACORN Act': Is it a Bill of Attainder? (Sept. 22, 2009). The Defund ACORN Act has not been enacted, and is not at issue in this case.

making this determination. I therefore conclude that the plaintiffs have established a likelihood of success on the merits of their bill of attainder claim.[11]

## B. Irreparable Harm

That the plaintiffs have shown a likelihood of success on the merits does not alone entitle them to a preliminary injunction. Rather, irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983) (internal quotation marks omitted). If an injury can be compensated by monetary damages, then "no irreparable injury may be found to justify specific relief." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). "But, irreparable harm may be found where damages are difficult to establish and measure." *Id.*

The plaintiffs have been the recipients of significant federal grants; their expectations of awards of renewals and new grants cannot be dismissed as speculative. The government does not dispute that ACORN Institute has pending contracts that have been suspended while Section 163 is in force. For example, ACORN Institute has six ongoing contracts with HUD, totaling approximately $40,000 to $60,000 per year, to provide services to public housing residents, which contracts have been suspended. Plaintiff NYAHC has a subcontract that was funded by HUD that also was suspended. The government also does not dispute that ACORN Institute has pending applications with federal agencies which will not be considered while Section 163 is in force. For example, ACORN Institute cites pending applications with both the Department of Commerce and the Environmental Protection Agency. It is undisputed that those contracts may be awarded to other parties, and then become unavailable to the plaintiffs. Nor does the government dispute that ACORN Institute had been approved as a subcontractor on a grant

---

[11]     Because I find Section 163 unconstitutional under the Bill of Attainder Clause, I do not reach the plaintiffs' claims under the First Amendment and the Due Process Clause.

funded by the Department of Agriculture, but, before the contract for that grant could be signed, the contractor cancelled the grant because of Section 163. ACORN Institute also asserts that it had another subcontract, also funded by the Department of Agriculture, that would have been renewed if not for Section 163.

The plaintiffs identify these harms, and a wide range of others, as irreparable. Several of the harms that the plaintiffs allege, such as the layoff of a large percentage of ACORN Institute's staff, undoubtedly cannot at this point be attributed solely to Section 163. But the government does not dispute that the deprivation of the opportunity to obtain renewals of existing contracts and compete for other contracts is non-compensable by money damages. *See Lion Raisins, Inc. v. United States*, 52 Fed. Cl. 115 (Fed. Cl. 2002) (concluding that the plaintiff, which was wrongfully suspended from government contracting, could not recover its lost profits on a contract that its suspension precluded it from bidding on). Notably, even in non-constitutional cases that involve suspension or debarment from federal contracting, courts have granted preliminary injunctive relief where money damages will not be available and where the contractor has made a sufficient showing on the merits of its claim. *See, e.g., Alf v. Donley*, --- F. Supp. 2d ---, 2009 WL 3461128 at *7-*8 (D.D.C. Oct. 29, 2009) (taking into account the plaintiff's inability to recoup lost income because of sovereign immunity as a factor in finding irreparable harm). Even putting aside the role of sovereign immunity in barring the recovery of damages, and any other limitations on the recovery of damages by government contractors where sovereign immunity has been waived, the amount of money the plaintiffs might have been awarded had they been allowed to compete for contracts is, as the government acknowledges, impossible to calculate.

A finding of significant violation of constitutional rights also supports the finding of irreparable harm. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged

deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also* 11A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice And Procedure § 2948.1 (2d ed. 2009) (same).  For all of the above-described reasons, I conclude that the plaintiffs have established the likelihood of irreparable harm.

Finally, issuance of a preliminary injunction will serve the public interest.  In deciding preliminary injunction motions, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, --- U.S ---, 129 S. Ct. 365, 376 (2008).  The plaintiffs have raised a fundamental issue of separation of powers.  They have been singled out by Congress for punishment that directly and immediately affects their ability to continue to obtain federal funding, in the absence of any judicial, or even administrative, process adjudicating guilt.  The potential harm to the government, in granting the injunction, is less.  The public will not suffer harm by allowing the plaintiffs to continue work on contracts duly awarded by federal agencies, which was stopped solely by reason of Section 163.  For grants for which the plaintiffs have applied, or for which they will apply, each agency will continue to be able to use its discretion to determine the merit of the plaintiffs' proposals, and to suspend the contracts for cause, or even to debar ACORN, if warranted under the terms and procedures in the contracts and applicable regulations.  Therefore, balancing "the competing claims of injury," I find a preliminary injunction to be in the public interest.

## CONCLUSION

The plaintiffs have established a likelihood of success on the merits of their bill of attainder claim.  They have also established the likelihood of irreparable harm absent an injunction and that issuance of a preliminary injunction is in the public interest.  Therefore the

plaintiffs' motion for a preliminary injunction is GRANTED.[12]  A preliminary injunction in the following form shall issue:

> Defendants the **UNITED STATES OF AMERICA**; **SHAUN DONOVAN**, in his official capacity as Secretary of the Department of Housing and Urban Development; **PETER ORSZAG**, in his official capacity as Director of the Office of Management and Budget; and **TIMOTHY GEITHNER**, in his official capacity as Secretary of the Department of Treasury of the United States; and all those acting in concert with them, are hereby
>
> **ENJOINED**, during the pendency of this action, from enforcing Section 163 of Division B – Continuing Appropriations Resolution, 2010, Pub. L. No. 111-68, § 163, 123 Stat. 2023, 2053 (2009), as renewed by Division B – Further Continuing Appropriations Resolution, 2010, Pub. L. No. 111-88, § 101, 123 Stat. 2904, 2972 (2009), which provides that "None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, or allied organizations." The defendants are hereby further
>
> **ENJOINED**, during the pendency of this action, from enforcing the Office of Management and Budget Memorandum, entitled "Memorandum for the Heads of Executive Departments and Agencies" providing "[g]uidance on [S]ection 163 of the Continuing Resolution regarding the Association of Community Organizations for Reform Now (ACORN)," dated October 7, 2009.

SO ORDERED.

s/ Nina Gershon
**NINA GERSHON**
**United States District Judge**

Dated:  December _11_, 2009
        Brooklyn, New York

---

[12]    Although Rule 65 provides that "no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper," "an exception to the bond requirement has been crafted for, *inter alia,* cases involving the enforcement of 'public interests' . . . ." *Pharmaceutical Soc. of State of New York, Inc. v. N.Y. Dep't of Soc. Services,* 50 F.3d 1168, 1174 (2d Cir. 1995).  Because I find this action, which implicates important constitutional questions, to be in the public interest, the bond requirement is waived.