UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, et al., | : : : : | Civil Action No. 09-CV-4888 (NG) |
| Plaintiffs, | : : | |
| vs. | : : | (Gershon, J.) (Bloom, M.J.) |
| UNITED STATES OF AMERICA, et al., | : : : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO RECONSIDER OR AMEND THE COURT'S DECEMBER 11, 2009 OPINION AND ORDER**

**INTRODUCTION**

On December 11, 2009, the Court held that plaintiffs had established a likelihood of success on their claim that a validly-enacted law of Congress, which the Court recognized "enjoy[s] a high presumption of legitimacy," is a bill of attainder. Opinion and Order (Dock No. 9) at 1, 2 ("Opinion"). The Opinion emphasized the Court's difficulty in discerning a non-punitive purpose that Congress had in enacting the legislation. Id. at 11, 15. But after the hearing on plaintiffs' Motion for a Preliminary Injunction, an investigative report commissioned by Plaintiff ACORN and authored by the former Attorney General for the Commonwealth of Massachusetts was released to the public. This independent analysis, which documents ACORN's "longstanding management weaknesses" and "obvious" "internal potential for fraud" – expressly confirming the very concerns expressed by members of Congress supporting Section 163 – reinforces the non-punitive basis for Section 163. The information contained in this report might reasonably be expected to alter the

1

Court's previous conclusions, and the Court should reconsider its injunction as a result.

Even if after considering the Harshbarger Report the Court concludes that Section 163 constitutes a bill of attainder, the injunction entered by the Court should be amended. The plain language of 5 U.S.C. § 702 bars enjoining the United States in a case like this one.

## STANDARD OF REVIEW

Federal Defendants seek an order reconsidering and/or amending the Court's preliminary injunction pursuant to Local Civil Rule 6.3 and Fed. R. Civ. P. 59(e) and 60(b)(6). Pursuant to Rule 6.3 of the Local Civil Rules of the Eastern District of New York, a party may file a motion for reconsideration of a prior decision entered by the district court. Rule 59(e) states that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Although the Rule "does not [necessarily] prescribe specific grounds for granting a motion to alter or amend an otherwise final judgment," Munafo v. Metropolitan Transp. Authority, 381 F.3d 99, 105 (2d Cir. 2004), "district courts may alter or amend a judgment 'to correct a clear error of law or prevent manifest injustice.'" Id. (quoting Collison v. Int'l Chem. Workers Union, Local 217, 34 F.3d 233, 236 (4th Cir.1994)); see also Wood v. F.B.I., 432 F.3d 78, 85 n.4 (2d Cir. 2005) (affirming denial of Rule 59(e) motion where "district court did not commit error or a manifest injustice."). In other words, "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). Under Rule 60(b)(6), on the other hand, the Court may reconsider its December 11 order for "any other reason that justifies relief."

## ARGUMENT

**A.	The Harshbarger Report Confirms The Non-Punitive Basis For Section 163**

On December 7, 2009, which was after the hearing on plaintiffs' Motion for a Preliminary Injunction, an investigative report commissioned by ACORN and authored by the former Attorney General for the Commonwealth of Massachusetts, Scott Harshbarger, was released to the public.[1] See Exhibit 1, "An Independent Governance Assessment of ACORN: The Path to Meaningful Reform, http://www.proskauer.com/files/uploads/report2.pdf. ACORN has essentially admitted the adverse facts found and conclusions drawn in this report.[2] The Harshbarger Report, of which the Court should take judicial notice, might reasonably be expected to alter the conclusion reached by the Court that Section 163 does not serve any conceivable non-punitive purpose; indeed, it reinforces Congress' purpose in preventing fraud, waste and abuse.[3] See SeaRiver Mar. Fin. Holdings Inc. v. Mineta, 309 F.3d 662, 674 (9th Cir. 2002) ("[E]ven if the Act singles out an individual on the basis

---

[1] The Court acknowledged that the Harshbarger Report was impending. Opinion at 3.

[2] On December 7, 2009, ACORN CEO Bertha Lewis acknowledged that "Mr. Harshbarger was tough but fair in examining where ACORN has been and what we still need to accomplish in having the most effective possible organization to represent the interests of the communities we represent--low and moderate income, African American and Latino families across America." See http://www.acorn.org/index.php?id=12439&tx_ttnews%5btt_news%5d=22634&tx_ttnews%5bbackPid%5d=12340&cHash=b2b96a472c.

[3] Although the Harshbarger Report was released after Congress enacted the Continuing Resolution, Congress anticipated ACORN's internal audi, and the facts upon which Congress acted parallel in many respects the facts documented in the Harshbarger Report. See 155 Cong. Rec. H9946, 9951 (daily ed. Sep. 24, 2009) (statement of Rep. King (R-IA)) (noting that "ACORN wants to examine themselves and audit themselves" and "has appointed someone [Mr. Harshbarger]" to do that task, but emphasizing the importance of prompt action without delay caused by ACORN's own investigation); 155 Cong. Rec. H9784, 9788 (daily ed. Sep. 25, 2009) (statement of Rep. Carter (R-TX)) (pointing to concerns that the internal audit was not enough and that ACORN had "engaged in self-dealing and aided and abetted the coverup of embezzlement by Dan Rathke, the brother of ACORN founder Wade Rathke.").

of irreversible past conduct, if it furthers a nonpunitive legislative purpose, it is not a bill of attainder").

ACORN's uncontroverted longstanding management problems, set forth in detail in the Report, fully support Congress' non-punitive concern with ACORN's misuse of federal funds. See generally Sabri v. United States, 541 U.S. 600, 605 (2004) (Congress has authority "to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off"); see also id. at 608 ("The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place"); cf Houston v. Williams, 547 F.3d 1357, 1364 (11th Cir. 2008) (upholding a prospective, discretionary funding restriction against a bill of attainder challenge because the policy neither determined guilt nor inflicted punishment and furthered "the non-punitive goal of allocating resources."). Moreover, Section 163 can fail the functional test only if there is simply no conceivable non-punitive rational basis – the subjective purpose of individual members of Congress is not the proper focus of the Court's second prong inquiry. See Flemming v. Nestor, 363 U.S. 603, 617 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.").

The Harshbarger Report sets forth nine recommendations for improvement arising from numerous criticisms of ACORN as it currently exists, but recognizes that reform "will not occur

overnight." Report at 5.[4]  The findings regarding ACORN's management and internal controls reinforce Congress' concern with the misuse of federal funds. Considering ACORN's organizational structure, the Report finds that "ACORN leadership at every level is thin . . . the infrastructure needed to manage and oversee a sprawling federation has not been developed; and key policing mechanisms and staffing, such as a chief financial officer, or independent members of boards of trustees, have not been integrated into the organization." Id. at 9-10.  The Report concludes these pervasive organizational weaknesses have been exacerbated as ACORN has evolved from an organization dedicated to community organizing to one that provides services related to taxes, food stamps, housing foreclosure and citizenship applications, the same types of services for which plaintiffs apply for federal grants to provide. Moreover, "[t]he culture of hands-off management that was a hallmark of the ACORN organizing model is inappropriate and risky when applied to service delivery under governmental contracts and other legal and regulatory requirements." Id. at 15.  Finally, "[t]he internal potential for fraud due to the lack of checks and balances and oversight, is obvious . . . ." Id.

By their own admission, Plaintiffs derive significant portions of their funding from the federal government.  Given the complexities of ACORN's structure Congress can reasonably regard all misuse of ACORN funds as directly related to the potentially improper expenditure of federal

---

[4] Although the Report also identifies areas where ACORN has focused on reform, it finds "[t]his focus, however, has not yet been matched by a similar attention to key management, human resources and field operation functions, creating vulnerabilities for the entire organization." Report at 10.  Moreover, it notes that "[p]revious professional reports demonstrate major flaws and weaknesses in all aspects of the ACORN financial and operational systems, and the steps needed to remedy them." Id. at 17.

5

funds.[5]  As the Supreme Court explained in Flemming v. Nestor, "[i]n determining whether legislation which bases a disqualification on the happening of a certain past event imposes a punishment, the Court has sought to discern the objects on which the enactment in question was focused." 363 U.S. at 613-14.  And "[w]here the source of legislative concern can be thought to be the activity or status from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected." Id. at 614.

The Harshbarger Report, paid for by ACORN itself, concludes that ACORN has suffered through years of "serious management challenges[.]"  "The hidden camera controversy is perceived by many as a third strike against ACORN on the heels of the disclosure in June 2008 of an embezzlement cover-up, which triggered the firing of ACORN's founder,[6] and the allegations of voter registration fraud during the 2008 election, done in collaboration with Project Vote." Report at 2.  No similarly direct connection between the legislative concern at issue and the disqualification existed in Lovett.  The purpose of the statute in Lovett "clearly was to 'purge' the then existing and all future lists of government employees of those whom Congress deemed guilty of 'subversive activities' and therefore 'unfit' to hold a federal job."  328 U.S. at 314.  Similarly, in Brown, the

---

[5] The Harshbarger Report notes that "[t]he legal and governance structure of ACORN (the "ACORN Family") is incredibly complex, with a number of separate but interrelated components that at one point was estimated at approximately 200 entities, but now consists of 29 entities . . . ."  Report at 6.  The Report identifies both Plaintiff ACORN Institute and Acorn Housing Corporation (the umbrella organization for Plaintiff New York Acorn Housing Company, Inc.) as part of the "ACORN Family." Id.

[6] The Report was commissioned in part to "[e]valuate the management and governance reforms that ACORN's new leadership" developed "since the termination of founder Wade Rathke following the disclosure of his eight-year cover-up of an embezzlement by his brother, the then Chief Executive Officer of CCI." Report at 1, 7.

6

Court invalidated legislation because it was founded on the constitutionally repugnant premise that political affiliation could predict an individual's propensity to engage in future misconduct. 381 U.S. at 455-56.  And the 19th century cases striking down loyalty oath requirements were likewise condemned because the requirements bore "no possible relation" to a legitimate legislative objective. Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 319 (1866).

By contrast, there is nothing improper in congressional consideration of the use of federal funds and congressional action to limit temporarily what it perceives as misdirected expenditures. Although these sorts of limitations generally sweep more broadly than one entity, there is no constitutional requirement that they do so.

**B.     By Extending the Injunction to the United States, the Court Committed A Clear Error of Law**

The only possible waiver of sovereign immunity that can apply in the present case is the Administrative Procedure Act (APA).  7 U.S.C. §§ 701, *et seq*.  The APA requires that when a court issues an injunction it "shall specify the Federal officer or officers (by name or by title) … personally responsible for compliance."  Id.; § 702.  Here, the court may only enjoin the named federal officers because an injunction can not run against the United States.  The only "officer[s]" specified by name in the preliminary injunction are the Secretaries of HUD and Treasury, and the Director of OMB. Only those officials are named in the injunction, and the injunction therefore cannot apply, through the United States, to every other agency and department that comprises the Executive Branch.  If plaintiffs – who are in the best position to know from which agencies they receive federal funds – wish to contend that they are entitled to injunctive relief against the heads of agencies other than those plaintiffs named in the complaint, they are entitled to amend their complaint to add those

officials as parties.

## CONCLUSION

WHEREFORE, for good cause shown, Defendants request the Court reconsider or amend its Opinion and Injunction (Dock. Nos. 9, 10) pursuant to Local Civil Rule 6.3 and Federal Rules 59(e) and 60(b)(6).

Dated: December 16, 2009					Respectfully Submitted,


							TONY WEST
							Assistant Attorney General

							IAN HEATH GERSHENGORN
							Deputy Assistant Attorney General

							BENTON J. CAMPBELL
							United States Attorney

							F. FRANKLIN AMANAT
							Assistant United States Attorney

							/s/ Peter D. Leary
							PETER D. LEARY, Virginia Bar #71196
							MICHAEL SITCOV, D.C. Bar # 308682
							BRADLEY H. COHEN, D.C. Bar #495145
							Trial Attorney
							U.S. Department of Justice
							Civil Division, Federal Programs Branch
							20 Massachusetts Ave., N.W. Room 7322
							P.O. Box 883
							Washington, D.C. 20044
							(202) 514-3313
							(202) 616-8470 (fax)
							Email: Peter.Leary@usdoj.gov

							*Attorneys for the United States*

**CERTIFICATE OF SERVICE**

I, Peter D. Leary, hereby certify under penalty of perjury that on this sixteenth day of December, 2009, I did cause true and correct copies of the above and foregoing instrument, Defendants' Motion to Reconsider or Amend the Court's December 11, 2009 Opinion and Order, to be served electronically on counsel for plaintiffs.

/s/ Peter D. Leary
PETER D. LEARY
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
P.O. Box 883
Washington, D.C. 20044
(202) 514-3313
(202) 616-8470 (fax)
Email: peter.leary@usdoj.gov