UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ASSOCIATION OF COMMUNITY
ORGANIZATIONSFOR REFORM NOW;          CIVIL ACTION NUMBER
ACORN INSTITUTE, INC.; and
NEW YORK ACORN HOUSING                09-CV-4888 (NG)(LB)
COMPANY, INC.

                    Plaintiffs,

          versus

UNITED STATES OF AMERICA;
SHAUN DONOVAN, Secretary of the Department
of Housing and Urban Development;
PETER ORSZAG, Director,
Office of Management and Budget; and
TIMOTHY GEITHNER, Secretary of the
Department of Treasury of the United States,

                    Defendants.


PLAINTIFFS' FIRST AMENDED
COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF

## PRELIMINARY STATEMENT

1.    This action seeks declaratory judgment that Acts of Congress – (i) Continuing Appropriations Resolution, 2010, Division B of Public Law No. 111-68, Section 163; (ii) Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010, Division A of Public Law No. 111-88, Section 427; and (iii) the recently enacted Consolidated Appropriations Act of 2010, HR 3288, Division A, Section 418, Division B, Section 534 and Division E, Section 511 – are unconstitutional, and seeks an order enjoining their enforcement. These Acts de-fund and de-bar the Plaintiff ACORN and any civil rights and social justice organizations and allied or affiliated with the ACORN from receiving any federal grants or funds or from participation in federal programs.

2.    These Acts of Congress are unconstitutional due to the fact that Section 163 of the Continuing Appropriations Resolution (hereinafter "Sec. 163"), Section 427 of the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010, (hereinafter "Sec. 427"), and Sections 418, 534 and 511 of the Consolidated Appropriations Act of 2010, H.R. 3288 (hereinafter "Secs. 418, 534 and 511") constitute bills of attainder within the meaning of Article I, Section 9 of the Constitution of the United States. As well, they violate the First and Fifth Amendments of the Constitution.

3.    Section 163 states in pertinent part:

> "Sec. 163. None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organizations for Reform Now (hereafter "ACORN"), or any of ACORN'S affiliates, subsidiaries, or allied organizations."

4.      Section 163 went into effect on October 1, 2009.  On October 31, 2009 it was extended

and is currently due to expire on December 18, 2009, unless, as it has been before, it is

extended again.

5.      Section 427 states in pertinent part:

> "**Sec. 427**. None of the funds made available under this Act may be distributed to
> the Association of Community Organizations for Reform Now (ACORN) or its
> subsidiaries."

6.      Section 427, which prohibits funding by the Department of Interior, Environment and

Related Agencies to ACORN or any of its "affiliates, subsidiaries or allies," went into

effect on October 31, 2009, and is in effect for the full fiscal year of 2010.

7.      On December 13, 2009, Congress passed H.R.3288, the consolidated  budget bill for the

full fiscal year of 2010, (two days after Section 163 was judicially declared to be an

unconstitutional bill of attainder), including Sections 418, 534 and 511. On December 16,

2009, it was signed into law by President Obama, and contains the following

unconstitutional provisions:

a.  **Division A, Transportation, Housing and Urban Development, and Related
    Agencies Appropriations Act, 2010, Title IV, Sec. 418:**

b.  **"Sec. 418**.  None of the funds made available under this Act or any prior Act may
    provided to the Association of Community Organizations for Reform Now
    (ACORN), or any of its affiliates, subsidiaries or allied organizations." **Division B,
    Commerce, Justice, Science and  Related Agencies Appropriations Act, 2010,
    Title V, Sec. 534:**

    "Sec. 534. None of the funds made available under this Act may be distributed to the
    Association of Community Organizations for Reform Now (ACORN) or its subsidiaries."

c.  **Division E, Military, Construction and Veterans Affairs, Title V, Sec. 511:**

    **"Sec.  511: None of the funds made available in this division or any other
    division in this Act may be distributed to the Association of Community
    Organizations for Reform Now (ACORN) or its subsidiaries.**

8.    The history, Congressional intent and particularized context of the aforementioned
legislation reveals a malicious and punitive intent against, and a singling out of the
Plaintiffs that arises from the heavily funded and orchestrated political campaign against
the Plaintiffs, referenced below.  As such, this legislation constitutes a bill of attainder,
forbidden and prohibited by Article I, Section 9 of the Constitution of the United States
and therefore in violation thereof.

9.    The nonpartisan Congressional Research Service, an agency within the Library of
Congress, warned Congress in a written report on September 22, 2009 titled *"The
Proposed 'Defund ACORN Act': is it a 'Bill of Attainder' "* (CRS Report 7-5700
authored by Kenneth R. Thomas) that singling out ACORN, as it has since been in Sec.
163, may well constitute an unconstitutional bill of attainder.

10.   Notwithstanding the concerns of the Congressional Research Service, as well as similar
warnings by other members of Congress, the majority of Congress went forward and
enacted Sec. 163 anyway.

11.   Notwithstanding the express ruling of this Court on December 11, 2009 that the singling
out of ACORN make it unmistakable that Congress determined ACORN's guilt before
defunding it, Congress has now transformed the purportedly short-term temporary act
into a long-term one  -- at least for the entire fiscal year of 2010 -- by using essentially
identical language in its legislative defunding of ACORN in Sections 427 (Department of
Interior), 418 (Departments of Transportation and HUD), 534 (Departments of
Commerce, Justice and Science)  and 511 (Departments of Military and Veterans
Affairs).

4

12. Currently the Code of Federal Regulations contains extensive regulations that provide for a comprehensive regulatory scheme to address federal contractors or grantees who are accused of fraud or misconduct.

13. Nonetheless, in Section 163 of the Continuing Resolution, Section 427, and Sections 418, 534 and 511 of the omnibus budget, Congress has specifically bypassed the regulations found in the Code of Federal Regulations, referenced above, and instead peremptorily singled out ACORN and the Plaintiffs herein. In so doing neither Congress nor defendants have provided any notice or hearing before or after the deprivation wrought as a direct result of Section 163, Section 427, and Sections 418, 534 and 511.

14. In addition to the fact that this legislation constitutes a bill of attainder, it also violate the Plaintiffs' rights, secured by the First Amendment of the United States Constitution , as well as the Plaintiffs' rights to due process, as secured by the Fifth Amendment of the United States Constitution.

## JURISDICTION AND VENUE

15. This court has jurisdiction pursuant to 28 USC, Section 1331 (federal question jurisdiction) and 28 USC, Section 2201(Declaratory Judgment Act).

16. Article I, Section 9 of the Constitution specifically forbids Congress from passing a bill of attainder.

17. This action is brought directly under Article I, Section 9 and the First and Fifth Amendments to the Constitution of the United States.

18. Venue is proper in this court pursuant to 28 USC, section 1391(a)(2) and 28 USC, Section 1391(e)(2) due to the fact that many of the actions, transactions, misconduct by Defendants have taken place in the Eastern U.S. District of New York. Further, one of

the Plaintiffs' principal places of business is in Brooklyn, New York, in the Eastern District.

## PARTIES

**Plaintiffs**

19.   Plaintiff Association of Community Organizations for Reform Now, commonly known as "ACORN," (hereafter "ACORN") is a non-profit Arkansas corporation which exists for the purpose of organizing low- and moderate-income people to achieve social and economic justice.  It has 500,000 members located in 75 cities across the United States. ACORN's national offices are located at 2 Nevins Street, Brooklyn, New York.  It also has offices in Washington, D.C.  and New Orleans, Louisiana.

20.   Since the continuing resolution, Sec. 163, was originally passed by Congress, ACORN has experienced, and continues to experience, the following:

    **a.**  ACORN has had to lay off employees;

    **b.**  ACORN has closed offices and drastically reduced services to low and moderate income people across the United States;

    **c.**  ACORN programs have been slashed.  For example, in September 2009, the New York first time homebuyer education classes enrolled 100 first time homebuyers.  In October, due to budget and staff cutbacks, it enrolled 7 people.

    **d.**  ACORN has been penalized by Congress without an investigation.  ACORN was never even the subject of a hearing in Congress.   ACORN has not given any notice that the organization had to do anything or take any action before funds would be terminated.  ACORN funds were just cutoff by Congress.

e.  Many organizations partnering with ACORN cut off relationships with ACORN for fear of being tainted by association with ACORN.  ACORN has been advised that other organizations are concerned about the federal cutoff language which prohibits funds to "ACORN or any of its affiliates, subsidiaries or allied organizations" being interpreted to include non affiliated organizations which are independent but work with ACORN even though no federal funds are distributed to ACORN through the relationship.

21.  Plaintiff ACORN Institute, Inc. (hereafter "AI") is a not-for-profit corporation, incorporated in Louisiana, certified by the Internal Revenue Service as tax-exempt under Section 501(c)(3) of the Internal Revenue Code.

a.  AI works on civil rights, employment, housing, and social service issues in low-income communities.

b.  AI has a separate corporate existence from ACORN, with a separate board of directors and separate management. There is no overlap between the governing board of directors of AI and ACORN except that one of the members of AI's Board is also an alternate national director of ACORN' board. Only AI's board has the power to hire and fire its Executive Director.

c.  In practice, the AI and ACORN collaborate closely and AI gets many grants which it contracts with ACORN to carry out. For example, in conjunction with ACORN, AI operates a countrywide network of "ACORN" Centers which provide free tax preparation, benefits enrollment, and foreclosure prevention services.

d.   Among the grants it has received are Resident Opportunities and Supportive
     Service ("ROSS") grants administered by the U.S. Department of Housing and
     Urban Development ("HUD")

e.   Under these grants, AI, through ACORN, performs outreach and education
     activities in public housing projects, including financial literacy training.

f.   Through this training, public housing residents learn how to build good credit,
     avoid predatory lenders, and develop immediate and long-term money
     management skills.

g.   AI has also received grants under the HUD Fair Housing Initiative Program.

h.   AI's offices are located at 2609 Canal Street, New Orleans, Louisiana.

i.   No grant which AI has received and administrated has ever been alleged to have
     been involved in any misconduct or illegal conduct. AI has never been indicted
     of any crime, nor has any AI employee ever been indicted of a crime in
     conjunction with any work they have done for AI. AI has never been denied any
     grant from any federal agency due to alleged misconduct.

j.   As a result of the actions of the Defendants herein, taken pursuant to Section 163
     and adverse to the Plaintiffs herein, extensive funding for AI's activities,
     numerous contracts and contract opportunities have all been cancelled or
     withdrawn (see below for specific examples).

k.   Further, as a result of the actions of the Defendants herein, adverse to the
     Plaintiffs herein, the cut off of all federal funds pursuant to Section 163 has
     decimated AI. As of September 2009 AI employed 20 employees. As of today, a

8

little over a month later, AI has two or three employees. It has been forced to layoff close to 85% of its employees.

22. Plaintiff NEW YORK ACORN HOUSING CO., INC. (hereafter "HOUSING) is organized as a not-for-profit corporation in New York, and has tax-exempt status under Section 501(c) of the Internal Revenue Code. It does the following:

    a.  NYAHC owns, develops and manages housing affordable to low income families. It controls or manages over 140 buildings with over 1200 apartments in all boroughs of New York except Staten Island.

    b.  At no time has NYHAC ever been accused, let alone convicted of any crime. Nor has any employee or agent of NYHAC ever charged or convicted of a crime while acting within the scope of their employment;

    c.  As a result of the suspension of funding to ACORN and ACORN affiliates resulting from the passage of Continuing Appropriations Resolution, 2010, Division B of Public Law No. 111-68 (Section 163) NYAHC has been forced to suspend all new intakes of first time home buyers and mortgage foreclosure cases due to: Suspension or withdrawal of funding for the ACORN Housing Corporation First Time Homebuyer Education Program and the Housing Mortgage Foreclosure Counseling (HMFC) Program; and Suspension or withdrawal of funding and programs from partner banks (Citibank, Chase, Bank of America) that had provided mortgage and financing assistance for ACORN Housing Corporation clients.

    d.  The CR has also caused the banks with which we have consistently worked (list, etc and describe the work) to, in turn, suspend their funding of our

programs, as set forth below.  The reason that these banks have given for

suspending these programs is that ACORN Housing Corporation has no

"pipeline" of new clients in need of mortgage and financial assistance due to

the reduction in ACORN operations brought about as a result of the budget

suspension (Section 163) of federal funds.

e.  Since NYAHC's operations have been suspended it no longer has the names

of, or relationship with people whom it represents, in need of mortgages or

financing assistance.  It therefore no longer has a "pipeline" and cannot seek

participation from the aforementioned banks.

f.  In addition, these banks have stated that they fear being prevented from

participating in programs financed, in whole and in part, by the federal

government.  They state hat these fears are derived from the Federal ban on

any entity that is "affiliated" with or "allied" to ACORN, such as NYAHC.

Therefore they tell us, they have discontinued any  relationship, including

funding and joint programs, with NYAHC.

g.  Furthermore, grants that NYHAC has in the past received from the Center for

New York City – over the past two years, totaling approximately $340,000 -

have been suspended.  This sum is comprised of close to $250,000 to pay for

loan counselors and $90,000 for outreach.  As a consequence, NYHAC will,

in the very near future , be forced to take the following steps, adverse to our

program and mission:  NYAHC supervised staff will have to be laid off; The

over 2,000 families that NYAHC counsels will now have the following

problems and issues: They will be at risk for predatory and subprime lending

scams; They will not have the benefit of NYAHC's default counseling program and will be more susceptible to the risk of foreclosure. (Ironically, this will especially adversely effect those referenced in Paragraph 10(b)(i) above, who have fallen prey to unethical lending scams due to the discontinuation of NYAHC funding.) They will receive no counseling to prepare them for homeownership; They will not have the opportunity to obtain special products that will assist  them to become new home buyers including PMI (Private Mortgage Insurance); lower interest rates; grants to assist with down;

h.   NYAHC's current counseling pipeline, which now has over 1,500 cases will have to be shut off and *those* families will be forced into a *Catch 22* – either negotiate directly with the banks for a modification or go to the costly and ineffective private sector (or just lose their homes).

i.  Over the past ten years, NYAHC has purchased 3 separate housing developments from HUD and, as a result, saved 345 apartments and residents from eviction, relocation and/or escalating rents. Two of these three developments have Housing Assistance Program (HAP) contracts for project based Section 8 to help very low income families pay the rent. As a result of the aforementioned funding suspensions and threatened funding suspensions, above referenced, the ability of NYAHC to maintain these developments, is gravely endangered.  Almost all of these buildings (close to 150) have some HOME (federal funds that are passed through the city/municipality) mortgages – 0% or 1% mortgages.  These mortgages allow NYAHC to

develop housing that is affordable to very low income families, and allow NYAHC to keep this housing affordable indefinitely. We have buildings in our pipeline, that were developed and rehabilitated as far back as 1989 and that are now endangered, in that they may no longer be a part of this program.

j.   NYAHC had been awarded a grant from the Division of Housing and Community Renewal of the State of New York (DHCR), for another significant foreclosure prevention project.   Much of this grant was for outreach.  This outreach project consisted of phone calling, door knocking and other forms of outreach to identify homeowners in default or at risk of foreclosure .This funding has currently been suspended.

k.   The New York State Housing Finance Agency (HFA) – had/has also subcontracted with NYAHC to do work designed to prevent foreclosures. This has allowed NYAHC to pay additional staff to do the necessary counseling. These funds have now been suspended due to the federal funding suspension of the activities of ACORN and ACORN affiliates.  As a result the foreclosure work previously done on behalf of numerous families has been indefinitely discontinued.

## Defendants

23.   The UNITED STATES OF AMERICA is made a defendant in that the actions and inactions complained of herein are the result of unconstitutional actions of members of Congress in passing an unlawful bill of attainder.

24.   Defendant SHAUN DONOVAN is the Secretary of Housing and Urban Development. As such he is sued in his official capacity.

25.   Defendant PETER ORSZAG is the Director of Office of Management and Budget of the United States. As such, he is sued in his official capacity.

26.   Defendant TIMOTHY GEITHNER is Secretary of the Treasury of the United States, he is sued in his official capacity.

## STATEMENT OF FACTS

27.   Since 2003, ACORN has helped over two million people register to vote. It has advocated raising the minimum wage to a living wage in dozens of communities across the country. It works against predatory lending and to stop foreclosures. It has helped over 150,000 people file their tax returns. It has worked on thousands of issues that arise from the predicaments and problems of the poor, the homeless, the underpaid, the hungry and the sick, on the local, state and national level through direct action, negotiation, legislative advocacy and voter participation.

28.   As with all large organizations, undoubtedly some agents, members and employees of ACORN have, over time, made mistakes, most of which have victimized ACORN itself and not the public.

29.   ACORN has responded to these mistakes by terminating staff who engaged in misconduct, has re-organized its board of directors, reorganized its national staff, hired new counsel, and even hired the former Attorney General of the state of Massachusetts to conduct an internal investigation. ACORN has continually responded to legitimate criticism by putting its financial and administrative house in order.

30.  The two million people ACORN registered to vote since 2003 have largely resided in minority communities.   Without the work of the Plaintiff, ACORN, these people would be otherwise disenfranchised and would not have voted in the last presidential election.

31.  Precisely because these previously disenfranchised voters participated in recent elections, ACORN earned the animosity of political forces who are dedicated to the proposition that the fewer poor people who vote the better.

32.  Section 163 was passed in large part due to a public relations campaign orchestrated by political forces that have persistently attacked and defamed the Plaintiff ACORN, its members, affiliates and allies (other Plaintiffs herein), motivated by their hostility toward the Plaintiffs' tireless commitment to registering voters, particularly those poor and working Americans who have been consistently disenfranchised and excluded from the American political system.

33.  On September 9, 2008, these same political forces released edited hidden-camera videos in which the videographers posed as a prostitute and her boyfriend in order to elicit responses from ACORN employees (and employees of separate corporations) in several cities regarding home loans, taxes and, what they described as underage sex workers trafficked from outside the U.S.

34.  ACORN immediately responded to the videos by launching an internal investigation conducted by the former Attorney General of Massachusetts; and it fired the employees who were featured in the videos.  Indeed, on December 7, 2009, former Attorney General Harshbarger released the final report of his investigation, which includes, among others, the following conclusion regarding the hidden-camera videos which were reviewed in their entirety:

a.  "[I]n fact, there is no evidence that action, illegal or otherwise, was taken by any ACORN employee on behalf of the videographers." (Harshbarger Memo, Appendix D, attached hereto as Ex. G)

35.   Certain members of Congress, immediately after the public release of selected excerpts from the video, undertook a program to punish Plaintiff ACORN, other unnamed "affiliated and allied organizations," and the other Plaintiffs in this action.

36.   Despite numerous press reports and congressional, independent, and other governmental investigations of many other scandals involving serious misconduct such as fraud or corruption among government contractors, some of which involved corporations which were convicted of serious crimes, Congress has thus far enacted no laws singling out for suspension or debarment any government contractor, other than the Plaintiffs, herein and their affiliates and allies.

37.   Indeed, in the past few years, Congress has specifically refused to enact proposed legislation that would generally bar from federal contracts and funding, corporations with criminal convictions or pending indictments.

38.   This punitive intent against ACORN is evident from the legislative context which led to the passage of Section 163, Section 427 and Sections 418, 534 and 511, set forth, by way of example, as recited, in part, below:

a.   On September 14, 2009, in proposing ACORN defunding legislation passed by the Senate, Senator Mike Johanns (R-NE) said:  "Somebody has to go after ACORN. Well, I suggest today, on the floor of the Senate, that 'somebody' is each and every U.S. Senator."

b.   Senator Johanns requested that the Executive Summary of a Minority report of one House committee, which was never even adopted by the committee, the deeply

flawed report  entitled *"Is ACORN Intentionally Structured as a Criminal Enterprise?"* be made a part of the Congressional Record.   This report was authored by the minority staff of a committee for Rep. Darrell Issa, who has been attacking ACORN for years.

c.   This 88-page report was prepared for Representative Darrell Issa on behalf of the minority members of one House committee.  The "Issa Report", though never adopted or approved by any House committee, much less the House itself, has played a major and influential role during the Congressional debate surrounding and regarding the passage of the "Defund Acorn Act" and Section 163, referenced above,

d.   That Report states that "ACORN has committed a conspiracy to defraud the United States."

e.   The report contains the following bullet points, among others:

    i.   "ACORN launders federal money in order to pursue a partisan political agenda and to manipulate the American electorate."

    ii.   "Under the Obama administration, ACORN stands to $8.5 billion in available stimulus funds.

    iii.   ACORN is a "shell game."

    iv.   Somebody has to "go after" ACORN.

    v.   ACORN is guilty of a conspiracy to "defraud" the United States

f.   Also on September 14, 2009, in the House of Representatives, Representative Dan Burton (R-IN), in an obvious effort to implicate President Obama, said that "[i]t's really interesting to find out that ACORN, which helped the President get elected,

was such a strong force for him and whom he congratulated on the support they gave him . . . So he's so very close to ACORN."

g.   On September 16, 2009, the day before the House passed the "Defund ACORN Act," Representatives Steve King (R-IA) and Todd Akin (R-MO) accused ACORN of using millions of taxpayer dollars "to advertise for a political candidate" based on the fact that there was a poster of President Obama poster hanging in ACORN headquarters and called it "a Jeremiah Wright moment."

h.   On September 17, 2009, after proposing the Defund ACORN Act in the House on September 17, 2009, Representative Darrell Issa (R-CA) says the purpose of the legislation was "to put an immediate stop to Federal funding to this crooked bunch" and to "enact a comprehensive ban on Federal funding for this corrupt and criminal organization."

39.   The charges leveled against ACORN by members of Congress such as that it is a "criminal enterprise", or a "corrupt and criminal organization", or a "crooked bunch" are false.

40.   On October 1, 2009, Public Law 111-68 was approved.  Included in that law was Division B- Continuing Appropriations Resolution, 2010.  In that resolution, the Section applied to ACORN is Section 163. It reads:

"Sec.163. None of the funds made available by this joint resolution or any prior Act may be provided to the Association of Community Organizations for Reform Now (ACORN), or any of its affiliates, subsidiaries, or allied organizations."

41.   The aforementioned Continuing Resolution, including Section 163 was amended to remain in force until December 18,2009 pursuant to a law known as  Further Continuing

Appropriations Resolution, 2010, H.R. 2996, 111th Cong. (2009) (enacted), Division B of Pub. L. No. 111-88. The prohibition contained in Section 163 therefore continues in effect until December 18, 2009. Therefore, for purposes of clarity, within this Complaint, this legislation will continue to be designated as "Section 163."

42.     On October 29, 2009, at the same time that it extended Section 163 of the Continuing Resolution until December 18, 2009, Congress also passed Section 427 of the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010, in effect for the full fiscal year of 2010, ("Section 427"), Division A of Pub. L. No. 111-88, which was signed into law by President Obama on October 30, 2009.

43.     On December 13, 2009, two days after this Court declared Section 163 to be an unconstitutional bill of attainder, Congress passed Sections 418 (Departments of Transportation and HUD), 534 (Departments of Commerce, Justice and Science) and 511 (Departments of Military and Veterans Affairs), of the full Consolidated Appropriations Act of 2010, H.R. 3288 ("Sections 418, 534 and 511"), all in effect for the full fiscal year of 2010. On December 16, 2009, President Obama signed this bill into law.

44.     Dozens of members of the U.S. House of Representatives and of the U.S. Senate – legislators have who refused to even authorize an investigation into federally funded organizations and corporations whose employees are charged with murder or to vote for a bill which would root out fraud in defense contracts where major corporations have been found to have committed upwards of 18 acts of misconduct -- have unconstitutionally voted to summarily strip ACORN and all of its affiliates, subsidiaries, and "allied organizations" of all federal funds, thereby essentially eviscerating this critical advocate for poor and working peoples' rights.

18

45.   In response to Section 163 and the actions of Congress, Defendant ORSZAG, acting in

his official and in concert with the other Defendants herein, has enforced the

unconstitutional Section 163 during its implementation and will continue to do so by

ordering that federal executive departments and agencies do the following:

a.   that they may not obligate or award any Federal funds during future periods to

ACORN, or any of its affiliates, subsidiaries or allied organizations during the

period of the implementation of Section 163;

b.   that the prohibitions of Section 163 to apply not only to the funding that is made

available by the Continuing Resolution, but also to the funding that *was* made

available by previously enacted statutes;

c.   therefore, to the extent that any such agency or executive department has

already determined that there is an obligation to fund ACORN or its affiliates

but has not yet entered into any agreement to provide such funds to ACORN or

any of its affiliates, that agency may not provide such funds, or enter into any

such agreements to do so;

d.   that grant and contractual payments for work already done, and that

performance of all obligations, including payment of federal funds, be

immediately suspended;

e.   Because Section 163 broadly requires that no funds may be "provided,"

departments and agencies are to assure and take steps so that no federal funds

awarded to other entities are awarded or obligated by such grantees or

contractors to ACORN or its affiliates, as subgrantees, subcontractors, or other

subrecipients;

**f.**     that the departments and agencies are to notify all Federal grant and contract recipients of the prohibition contained in Section 163, and provide them with a copy of the guidance document prepared by Defendant ORSZAG, which details the sanctions and prohibitions, set forth in this paragraph;

**g.**     that the departments and agencies must advise all, Federal grant and contract recipients:

**h.**     not to provide Federal funds to ACORN or its affiliates as subgrantees, subcontractors or other subrecipients, consistent with the guidance document prepared by Defendant ORSZAG, which details the sanctions and prohibitions, set forth in this paragraph; and

**.i.**     to notify them (the Agency or Department) of any *existing* subgrants, subcontracts or other subrecipient agreements with ACORN or its affiliates; and

**j.**     that the departments and agencies require their grantee or contractor to advise them as to how that grantee or contractor is planning to comply with the prohibitions of Section 163 with respect to those subgrants, subcontracts or subrecipient agreements.

46.     As a result of the passage of Sections 163, 427, 418, 534 and 511, and the actions of the Defendants in enforcing them, as set forth above, the Plaintiffs have suffered and will continue to suffer the loss of income, contracts and contract opportunities, specifically:

    a.     Plaintiffs' applications for contracts with federal agencies have been and will continue to be summarily rejected. For example:

       i     An application with the Environmental Protection Agency for a three year $780,000 grant for outreach to poor communities, to raise

awareness of and educate about the lung disease asthma was rejected. UCLA was to be the project coordinator and the work would have been done by ACORN staff.

ii An application to set up public computer centers in five different cities to train poor people on basic computer skills was rejected.

b. One of the Plaintiffs, AI, had a grant with FEMA to conduct home fire safety assessments in private homes to determine whether the homes were protected, and if not, provide free of charge, to poor people living in those homes, various devices to ensure that their houses would be safe. The same work had been done by plaintiffs during the past year and FEMA had awarded slightly less than $1,000,000 for past and ongoing work in the future, including the current period, and beyond. AI was informed on September 25, 2009 that it had been awarded that grant. In early October 2009, before AI had a chance to draw down on the funds, it was informed by FEMA that it had suspended the contract and that AI would not be permitted to start the work previously agreed upon. Because of this suspension, AI had to layoff six employees who were engaged in the home fire safety assessments.

c. Plaintiffs, including AI, had various existing contracts and agreements with HUD which have been suspended and/or terminated as a result of the CR and Defendant Orszag's OMB memo. Those grants and OMB circular A-110 that they reference provide for agency termination or suspension only for justifiable cause, such as if the grantee materially fails to comply with the terms or conditions of the award. For example, plaintiffs had agreements with HUD under which they conduct tax preparation and leadership development classes for public housing

21

residents to obtain GED degrees. Plaintiffs had been operating these programs to the satisfaction of HUD, with no complaints or allegations of misconduct concerning Plaintiffs' work on these contracts. Nonetheless, in violation fo plaintiffs rights under their contractual agreements and under the applicable regulations, HUD immediately terminated and /or suspended these contracts in early October pursuant to the CR and Defendant Orszag's memo.

d.      AI obtained reimbursement on these contracts by first doing the work and then drawing down the funds in the grant by accessing an automated system and putting in its password which allows it to obtain funds to pay workers who have done the work. As of the beginning of October, 2009, $8 – 9,000 was owed Plaintiffs for work done on these contracts. At that time, reimbursement was terminated. As a result, Plaintiffs have been forced to cancel GED classes in the middle of the class and is unable to do any of the work for these public housing residents.

e.   In several cases, Plaintiffs had applied for grants as subcontractors with groups that already had federal funding. Plaintiffs had been informed by those groups that they, the Plaintiffs would likely receive the grant upon the signing of the contract. However, due to Section 163, Plaintiffs were informed in early October that they would not be permitted to sign such contracts or enter into such subcontracts. For example:

     i.  One of these grants was for a United States Department of Agriculture grant to do work in the state of Washington so as to outreach to poor people to inform them of their eligibility for food stamps and

supplemental nutrition assistance. For that program, the contractor ("Reach") subcontracted with Plaintiff AI to do approximately $90,000 worth of work. Plaintiff AI had been subcontracted to do this work during the past year and had done the work to the satisfaction of the contractor and the government agency in question. Thus the contractor had decided to continue to subcontract with the Plaintiff to continue this work for the coming year. Before the Plaintiff could sign the continuation contract for 2009, however, in early October, they were informed that the agreement to have AI do the work had to be cancelled because of Section 163 and the consequent ac. As a result, Plaintiff had to lay off the employees who would have carried out this work.

ii. Plaintiffs had an agreement with a contractor in California, for about $150,000, to do work on the same type of program, as referenced in Paragraph 41(e)(i) above. Again, the contractor and the agency were satisfied with the Plaintiffs' performance and were poised to sign a new contract. However, due to Section 163 and the actions of the Defendants, Plaintiffs were not allowed to continue the project for the following year, 2009.

47. As set forth above, the executive branch of the federal government is legally obligated, authorized and mandated to ensure the integrity of federal programs by conducting business with responsible parties. The law provides a variety of methods and mechanisms for so doing, to wit:

23

a. Government contractors can be debarred or suspended under federal statutes or under the Federal Acquisition Regulation, an administrative rule which governs contracting by executive agencies.

b. Federal agencies maintain oversight over the competitive federal grant process and maintain full oversight for each disbursement of federal grant funds.

c. There is a competitive grant process in place with a framework both of government-wide and agency specific regulations by which the government can exclude contractors from receiving federal funding.

d. The Code of Federal Regulations (CFR) provides the Office of Management and Budget (OMB) extensive regulation and guidance for federal agencies regarding government-wide debarment and suspension of eligibility for government grants.

e. Under the CFR guidelines, an agency may impose suspension or debarment based on a variety of bases including when it determines that there has been an indictment, conviction, civil judgment, or official finding by federal, state, or local bodies that determine factual and/or legal matters, and immediate action is necessary to protect the public interest.

f. The regulatory process includes notice, adequate investigation, and an opportunity to contest, and may result in suspension or debarment for a specified period of time or until there is compliance with the specific finding.

48. The actions that led up to and included the passage of Section 163, Section 427 and Sections 419, 534 and 511 as referenced above, all share the following characteristics:

a. they are devoid of impartiality and lack general applicability;

24

b. they have targeted and singled out the Plaintiffs, and are therefore do not partake of generality in application and impact - indeed they are specifically tailored and designed to effect and/or punish the Plaintiffs and only the Plaintiffs, in that they specify the group and/or groups of people upon whom the prescribed sanction is to be levied;

c. they are inconsistent with the Federal Regulations set forth above and with the remedial intent and framework that those regulations are premised upon;

d. they are propelled by and enacted as a result of punitive intent;

e. they are infused with punitive impact and effect; and

f. they arrogate the task of adjudication to Congress rather than leaving it, as it must be left, to other tribunals.

## CLAIMS

### COUNT I Article I, § 9, Cl. 3 Bill of Attainder

49. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 47 as if fully set forth herein.

50. Article I, Section 9, cl. 3 of the Constitution of the United States is one of the crown jewels of the founding instrument of our nation. It explicitly provides that "No bill of attainder or ex post facto law shall be passed."

51. While its concerns are addressed more generally, in spirit, by other provisions of the Constitution, such as the due process clause of the Fifth Amendment (see below), the prohibition against bills of attainder was specifically incorporated *before* the Bill of Rights was drafted due to the founders' very concrete concerns and fears of the

possibility of legislative tyranny, which they had personally experienced while still British colonists.

52.    The prohibition against bills of attainder contained in clause, Art. I, §9, cl. 3, along with its companion prohibition against *ex post facto* laws, was enacted to ensure that Congress not single out individuals or groups and declare them guilty, nor inflict punishment after trial by legislature. Rather the Constitution sought to secure some degree of certainty, uniformity and fairness in our government and in our governmental process.

53.    As noted above, there are already significant existing regulations which set forth careful guidelines for determining whether, and how, specified federally-funded entities can be excluded from various government programs.

54.    By enacting Section 163, Section 427 and Sections 418, 534 and 511, Congress has adjudged ACORN *guilty* of the allegations of fraud, misconduct and other illegal conduct.. By extending its funding ban not only to ACORN but to all "affiliated" and "allied" organizations, Congress has adjudged those organizations *guilty* as well.

55.    Further, Section 163, Section 427 and Sections 418, 534 and 511's total bar to funding allows no mechanism for the Plaintiffs to demonstrate that they have cured or corrected any alleged wrongdoing.

56.    Congress, in enacting Section 163, Section 427 and Sections 418, 534 and 511, bypassed the regulations and acted in a manner inconsistent with those regulations. The legislation and the system which it puts in place, lack the following:

     a.   consistency with fed regulations;

     b.   any semblance of due process;

> c. any regard, appreciation or understanding that separate groups and organizations have separate identities, interests, structures and characteristics;
>
> d. any discretion to give the any of the affected organizations, including the Plaintiff organizations herein, an opportunity to correct or cure any alleged misconduct or wrongdoing;
>
> e. a mechanism, appeal or ability to reevaluate this determination of debarment and suspension.

57. The system, described above, contradicts the system of agency due process also set forth above and is in direct conflict with that system.

58. Given this disregard, contradiction and conflict, the only conclusion that can reasonably be drawn, within both the legislative context and the ignored regulatory context, is that the functional purpose of Section 163, Section 427 and Sections 418, 534 and 511 is to punish ACORN and the other Plaintiffs herein.

59. Thus the punitive nature of this legislation indelibly taints it as an unconstitutional and unlawful bill of attainder. The punitive nature of the legislation can also be seen in the legislative process that led to its adoption outlined above.

60. As a proximate result of the enactment of this bill of attainder, Section 163, Section 427 and Sections 418, 534 and 511, and the actions of the Defendants pursuant thereto and complained of herein, all in violation of Article I, Section 9, cl. 3 of the U.S. Constitution, Plaintiffs herein are imminently and irreparably harmed, including but not limited to the following:

> a. Extensive funding of Plaintiffs' activities has been cut off;

b. numerous contracts and contract opportunities have all been cancelled or withdrawn;

c. Plaintiffs' pending applications for federal grants are nullified and will not be reviewed;

d. Plaintiffs' ability to even prepare or file an application with any agency or department of the federal government has been impaired;

e. Similarly, past, present and future relationships with companies, corporations and other groups, which enter into contracts with agencies of the federal government, have been terminated, disrupted, eliminated and impaired;

f. Other groups, organizations or corporations such as banks and foundations that plaintiffs have dealt with in the past have suspended or terminated their ties with plaintiffs for fear of being tainted by their association with plaintiffs;

g. The Plaintiffs have been forced to discontinue some operations and activities,; and

h. Plaintiffs have been forced to cut payroll, laying off some of their employees.

**COUNT II: First Amendment Freedom of Speech and Association**

61. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 59 as if fully set forth herein.

62. Nowhere in the legislation in question is there any definition, whatsoever, for any of the relationships set forth in the statutes, specifically: "affiliates," "subsidiaries" and "allied organizations."

63.   Plaintiffs associate with each other and with other groups or organizations for expressive
      purposes of furthering their civil rights and social justice goals.

64.     As such the legislation adversely affects the well being, operations and activities –
      indeed, the very survival -- of the Plaintiffs which are not ACORN in this action.  In this
      respect, Section 163,  Section 427 and Sections 418, 534 and 511 suffer  from a variety of
      constitutional infirmities, including but not limited to:

      a.     Overbreadth – This legislation is facially overbroad in that it is does not limit its
            aim at evils that the government is constitutionally allowed to address but rather
            sweeps within its ambit a broad array of activities that constitute an exercise of
            protected expressive and associational activities; and

      b.     Vagueness – This legislation, due to its indefiniteness (i.e. lack of definition) and
            its uncertainty, provides no way for these Plaintiffs, or any person of common
            intelligence, to calculate which of their activities may subject them to debarment
            from the federally funded programs governed by Sec. 163,  Section 427 and
            Sections 418, 534 and 511, thus causing the following unconstitutional
            conditions:

            i.   Affected organizations which are not ACORN, ("affiliates, subsidiaries and
                 allied organizations") must necessarily guess as to its meaning and differ as
                 to its application; and

            ii.  It is so vague they cannot determine whether, when and under what
                 circumstances their actions may render them "affiliates," "subsidiaries" or
                 "allied organizations" with ACORN.

65.   As a result, these terms prevent political, social, economic, or community based actions or positions that may be viewed as affiliation or alliance with ACORN, whether on a specific or particular issue or position or more generally.

66.   Therefore, Sec. 163, Section 427 and Sections 418, 534 and 511, will undoubtedly and substantially deter and chill the non-ACORN Plaintiffs herein from any activity that is likely to associate them, in any way with ACORN.

67.   As such they are designed to chill the non-ACORN Plaintiffs' rights with regard to political, social economic speech, expression and association, including on national local, regional and community concerns.

68.   In addition to their *design*, Sec. 163,  Section 427 and Sections 418, 534 and 511, have the clear and objective effect of chilling the non-ACORN Plaintiffs' rights with regard to political, social and economic speech, expression and association, including on national local, regional and community concerns.

69.   They also chill the actions of Plaintiff ACORN in that, since its positions, statements and campaigns may cause it to align, affiliate and associate with other groups, it can no longer do so because those groups are no longer able or willing to so align, associate or affiliate with ACORN, thereby rendering it less capable of expressing itself with regard to political, social economic speech, expression and association, including on national local, regional and community concerns.

70.   Sec. 163,  Section 427 and Sections 418, 534 and 511 also *punish* the Plaintiff ACORN in that, since its positions, statements and campaigns may cause it to align, affiliate and associate with other groups, it can no longer do so because those groups are no longer able or willing to so align, associate or affiliate with ACORN, thereby rendering it less

capable of expression with regard to political, social economic speech, expression and association, including on national local, regional and community concerns.

71.   The actions described herein, leading to and including the enactment of Sec. 163, Section 427 and Sections 418, 534 and 511, as well as the past and future actions of the Defendants in carrying out the requirements, mandates and their responsibilities pursuant to and under Sec. 163, Section 427 and Sections 418, 534 and 511, constitute a violation of the Plaintiffs' rights to freedom of speech and association as secured by the First Amendment of the United States constitution.

72.   As a proximate result of the enactment of this legislation in violation of First Amendment of the Constitution of the United States, Plaintiffs herein are imminently and irreparably harmed, including but not limited to the following:

      a.   extensive funding of Plaintiffs' activities has been cut off;

      b.   numerous contracts and contract opportunities have all been cancelled or withdrawn;

      c.   Plaintiffs' pending applications for federal grants are nullified and will not be reviewed;

      d.   Plaintiffs' ability to even prepare or file an application with any agency or department of the federal government has been impaired;

      e.   Similarly, past, present and future relationships with companies, corporations and other groups, which enter into contracts with agencies of the federal government, have been terminated, disrupted, eliminated and impaired;

      f.   The Plaintiffs have been forced to discontinue some operations and activities; and

g. Plaintiffs have been forced to cut payroll by laying off some of their employees.

### COUNT III: Fifth Amendment Due process

73. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 71 as if fully set forth herein.

74. For reasons specifically set forth above and specifically in Paragraph 63, all re-alleged herein, Sec. 163, Section 427 and Sections 418, 534 and 511, is overly broad and vague. Thus, the actions, past and future, of the Defendants in enforcing this legislation, are in furtherance of the overbreadth and vagueness that are inherent in Section 163, Section 427 and Sections 418, 534 and 511.

75. Further, as already alleged, there are already pertinent and substantive existing regulations which set forth careful guidelines for determining whether, and how, specified federally-funded entities can be excluded and/or debarred from various government programs.

76. These mechanisms and regulations provide for due process in determining whether and how such entities may be excluded, debarred and/or prohibited from funding for such programs.

77. The breadth of the government-wide ban on contracting and providing grants to ACORN and its affiliates, subsidiaries and allies contained in Sec. 163, Section 427 and Sections 418, 534 and 511, completely fails to provide the due process protection, required by the Constitution and provided in the aforementioned regulatory framework.

78. As a result of these considerations, the Defendants have violated and will continue to violate the rights of the Plaintiffs secured by the due process clause of the Fifth Amendment of the United States Constitution.

79. Furthermore, Section 163, Section 427 and Sections 418, 534 and 511 and the actions of the Defendants stigmatize the Plaintiffs in ways already set forth herein. Because this stigmatization and as set forth herein, the Plaintiffs have been injured and impaired in their ability to enter into and carry out contracts. As such, the actions of the Defendants in suspending or debarring plaintiffs from all government contracts or grant awards on the basis of stigmatizing allegations have deprived them of liberty protected by the Due Process Clause of the Amendment. In addition, the suspension and/or termination of the contractual agreements that plaintiffs had with HUD and other federal agencies on the basis of stigmatizing allegations deprives plaintiffs of liberty protected by the Due Process Clause of the Fifth Amendment.

80. Defendants have violated the Fifth Amendment by depriving plaintiffs of a liberty interest without according them notification of the reasons for the deprivation or any opportunity to contest the deprivation.

81. By terminating ongoing contracts and agreements with plaintiffs that could only be terminated for cause, by refusing to reimburse plaintiffs for expenditures incurred by plaintiffs in connection with work done on these contracts prior to suspension or termination, and by suspending and/or debarring plaintiffs from government contracting, defendants have deprived plaintiffs of a property right without due process of law in violation of the Fifth Amendment.

82.   As a proximate result of the enactment of this legislation and the actions of the

Defendants herein, in violation of Fifth Amendment of the Constitution of the United

States, Plaintiffs herein are imminently and irreparably harmed, including but not limited

to the following:

   a.  extensive funding of Plaintiffs' activities has been cut off;

   b.  numerous contracts and contract opportunities have all been cancelled or

       withdrawn;

   c.  Plaintiffs' pending applications for federal grants are nullified and will not be

       reviewed;

   d.  Plaintiffs' ability to even prepare or file an application with any agency or

       department of the federal government has been impaired;

   e.  Similarly, past, present and future relationships with companies, corporations

       and other groups, which enter into contracts with agencies of the federal

       government, have been terminated, disrupted, eliminated and impaired;

   f.  The Plaintiffs have been forced to discontinue some operations and activities;

       and

   g.  Plaintiffs have been forced to cut payroll by laying off some of their

       employees.

## IRREPARABLE HARM

83.   Plaintiffs incorporate by reference the allegations set forth in previous paragraphs as if

fully set forth herein.

84.   The actions by Congress violate the United States Constitution in several ways.

Violations of the U.S. Constitution constitute irreparable harm to the plaintiffs.

85. The funding cutoff, and the manner in which the legislation has been framed has chilled ACORN's ability to associate with numerous organizations and undercut the ability of ACORN, and associated organizations, to express views, arguments and opinions about issues facing the U.S. electorate.

86. Unless this court declares the actions of Defendants, past and future, unconstitutional, and orders Defendants to reinstitute federal funds with all the regulatory due process protections to which they are lawfully entitled, ACORN and the other Plaintiffs have suffered, continue to suffer and will suffer in the future irreparable harm.

## PRAYER FOR RELIEF

87. WHEREFORE, plaintiffs respectfully request that the court enter judgment as follows:

   a. Issuing a temporary restraining order, a preliminary and permanent injunction restraining Defendants, and all their officers, agents, servants, employees and attorneys from violating the U.S. Constitution by enforcing: Section 163 of the Continuing Resolution; Section 427 of the Department of the Interior, Environment, and Related Agencies Appropriations Act of 2010; or Sections 418, 534, and 511 of the Consolidated Appropriations Act of 2010, HR 3288;

   b. Enter judgment ordering Defendants to cease their illegal conduct and reinstitute federal funds for plaintiffs;

   c. Enter judgment ordering that Defendant Orszag immediately rescind the OMB memo dated October 7, 2009 and promulgate a memo instructing all federal agencies that there is no bar to the payment of federal funds to ACORN or any ACORN subsidiary, affiliated or allied organization.

d.   Issue a Temporary Restraining Order restraining defendants from approving the award of any grant or contract which plaintiffs applied for, but had their application refused or denied because of Defendant's Orszag's aforementioned memo, until plaintiff's motion for preliminary injunction is decided by the Court.

e.   Declare and determine that the actions of defendants are unconstitutional, illegal and null and void;

f.   Award reasonable costs and attorney fees in this matter; and

g.   Order any other such relief as the Court considers equitable, proper and just under the circumstances.

Date:   December 17, 2009, New York, NY

Respectfully submitted,

Darius Charney (DC1619)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6475
dcharney@ccrjustice.org

William Quigley
Center for Constitutional Rights
Legal Director
666 Broadway, 7th floor
New York, NY 10012
bquigley@ccrjustice.org
212.614.6427

Jules Lobel (admitted in NY and this court JL8780)

36

CCR Cooperating Attorney
3900 Forbes Avenue
Pittsburgh, PA 15260

Goodman & Hurwitz, P.C.
William Goodman (admitted in NY and this court WG1241)
Julie H. Hurwitz
CCR cooperating attorneys
1394 East Jefferson
Detroit, Michigan 48207
313.567.6170

Arthur Z. Schwartz (AZ52683)
Schwartz, Lichten & Bright
275 Seventh Avenue
New York, NY 10001
212.228.6329

## VERIFICATION

I, Bertha Lewis, am a resident of Brooklyn, NY, and I am the CEO and Chief Organizer of ACORN, Inc., the Association of Community Organizations for Reform Now. I have read this First Amended Complaint and I do hereby swear that all of the facts contained in this are true and correct to the best of my knowledge.

Date: 12/17/0 09

Bertha Lewis

Sworn to before me this 17 day of December, 2009.

Notary Public

MARCIA MASON
Notary Public, State of New York
No. 01MA5048558
Qualified in Kings County
Commission Expires August 28, 2013.

37