# EXHIBIT G

# Proskauer»

| | |
|---|---|
| **Re:** | An Independent Governance Assessment of ACORN: The Path To Meaningful Reform |
| **To:** | ACORN Leadership |
| **From:** | Scott Harshbarger<br>Amy Crafts |
| **Date:** | December 7, 2009 |

# Memorandum

## I.  SCOPE OF WORK

Proskauer was retained by the leadership of the Association of Community Organizations for Reform Now ("ACORN") on September 21, 2009 to:

- Conduct an independent inquiry into circumstances surrounding certain videos (the "videos") filmed by two individuals in or around July 2009 at several ACORN office locations;

- Evaluate the management and governance reforms that ACORN's new leadership (the "reform leadership") has developed since June 2008 (when news surfaced of embezzlement by a relative of ACORN's founder, Wade Rathke) and the effectiveness of ongoing efforts to implement those reforms; and

- Propose short- and long-term recommendations regarding ACORN management, oversight and governance.

## II.  METHODOLOGY

In order to evaluate the management and governance challenges facing ACORN, we sought to maximize our understanding of the organization in the first six weeks of our inquiry, drawing upon an extensive document review, interviews with a broad range of people and our

Proskauer»

deep experience in criminal and civil litigation, investigations, independent inquiries, ethics and governance.  We have set forth in <u>Appendix A</u> our investigative methodology and work plan.

III.    EXECUTIVE SUMMARY

We were invited by ACORN to conduct an independent analysis not just of the videos that caused this summer's uproar but also of the entire organization, its core weaknesses and inherent strengths. The hidden camera controversy is perceived by many as a third strike against ACORN on the heels of the disclosure in June 2008 of an embezzlement cover-up, which triggered the firing of ACORN's founder, and the allegations of voter registration fraud during the 2008 election, done in collaboration with Project Vote.[1]  It erupted just as ACORN's reform leadership was about to complete an ambitious and professionally directed organizational and cultural transformation designed to revisit its mission, reshape its scope and charter, and meet squarely its legal, governance and compliance responsibilities.

The serious management challenges detailed in our report are the fault of ACORN's founder and a cadre of leaders who, in their drive for growth, failed to commit the organization to the basic, appropriate standards of governance and accountability. As a result, ACORN not only fell short of living its principles but also left itself vulnerable to public embarrassment.

This hidden camera controversy is an apt example. While some of the advice and counsel given by ACORN employees and volunteers was clearly inappropriate and unprofessional, we

---

[1] Proskauer was not retained to investigate allegations of fraud relating to Project Vote, an associated but separate entity which helped 1.2 million low-income people register to vote prior to the 2008 election.  These efforts came under scrutiny due to the size of the voter registration effort, and the fact that certain registration cards secured by ACORN employees and volunteers contained bogus names.  Higher ranking ACORN officials maintain that the requirements of the law were followed – they reviewed each voter registration card prior to submitting it to various local city/county election offices and secretaries of state, and notified those authorities of any suspicions of fraudulent activity.  Several U.S. attorneys found no legal basis upon which to investigate ACORN's voter registration efforts.

# Proskauer≫

did not find a pattern of intentional, illegal conduct by ACORN staff; in fact, there is no evidence that action, illegal or otherwise, was taken by any ACORN employee on behalf of the videographers. Instead, the videos represent the byproduct of ACORN's longstanding management weaknesses, including a lack of training, a lack of procedures, and a lack of on-site supervision.

ACORN's current leadership understands full well what must be done. If nothing else, the organization's recent crisis and turmoil has educated its leadership and staff about the importance of prevention.

With our recommendations in hand, ACORN now has a roadmap for reform. Our experience tells us that these recommendations, acted on with a sense of urgency, are crucial to reclaim, maintain and strengthen ACORN's ability to serve its members and constituents.

The following nine (9) recommendations, discussed in detail in Section VII, are neither an epitaph nor an absolution for ACORN, but are a roadmap to reform and renewal, if implemented in their entirety in concert with other measures to regain the public's trust.

1. ACORN should return its organizational focus to its core competency – community organizing and citizen engagement empowerment, with related services – and transition away from the provision of services that may be provided more effectively and efficiently by others.

2. ACORN should consolidate, simplify and centralize its local and national organizational staffing, monitoring and supervision.

3. ACORN should develop a simplified national organization and board structure consisting of just two entities – a 501(c)(3) for charitable, non-profit fundraising, advocacy and education with a majority of independent members,

Proskauer≫

and a 501(c)(4) for support of ACORN community organization and political activity, with at least one-third independent members.

4. ACORN should continue to implement the comprehensive internal governance program and strategy, including internal controls, compliance and codes of ethics, designed to educate and guide staff, volunteers and board members, that was recommended and has been adopted within the past year.

5. ACORN should recruit an independent ethics officer and/or independent inspector general to oversee and implement the governance and compliance program at the national level, and an independent member of the national board should chair a board-level ethics and governance committee.

6. ACORN should hire an appropriately qualified and experienced chief operating and financial officer, comptroller and in-house auditing staff.

7. ACORN should continue to strengthen its legal capacity to guide its governance reforms, coordinate the dissolution of all extraneous ACORN organizations and represent the organization's interests in litigation and investigations.

8. ACORN should require all of its state and local affiliates to agree to oversight by the national staff and board, and to adhere to appropriate national standards, including financial audits, training and supervision.

9. ACORN should formalize a strong, independent national advisory group and charge it with the responsibility to report within six months, and thereafter annually for two years, to the national board on the progress of the reform action plan.

Proskauer≫

ACORN's transformation may succeed if its current leaders move rapidly to implement effective legal, best practices and appropriate regulatory compliance and governance systems. ACORN will then be in a position to regain and reinforce the trust and credibility required to successfully pursue a mission on which hundreds of thousands of citizens depend.

The roadmap for reform is clear, but it will not occur overnight and will require perseverance and patience.

IV.     OVERVIEW OF ACORN

To understand our recommendations and the direction we suggest for ACORN's future, it is helpful to review ACORN's founding and history, including its strengths, weaknesses, successes and failures. The following provides an overview of ACORN generally, in addition to its organizing and service functions, synthesizing the results of the interviews we have conducted and documents we have reviewed.

1.     Governance and Structure

Founded in 1970, ACORN is the largest grassroots community organization of low and moderate income people, with more than 400,000 member families organized into more than 1,200 neighborhood chapters in about 75 cities across the country.  The national organization is currently based in Washington, D.C. and serves a functional purpose with respect to finances and governance, and also coordinates national issues-based campaigns and voter registration drives.

ACORN evolved from a grassroots, community-based organization with a mission of advocacy for the poor and powerless into, in recent years, a major national entity both in scope and ambition.  Historically, ACORN has, as part of its community-organizing mission, provided a range of services for its constituency, including citizen engagement, lobbying, political mobilization, voter registration, and advocacy about foreclosure prevention, fair wage laws,

Proskauer≫

affordable housing, first-time home ownership, predatory lending reform, mortgage protection and services, and welfare and earned income tax credit counseling.

The legal and governance structure of ACORN (the "ACORN Family") is incredibly complex, with a number of separate but interrelated components that at one point was estimated at approximately 200 entities, but now consists of 29 entities, including, *inter alia*:

- CCI, which provides back-office support to the national entity and local affiliates;

- ACORN Housing, a separately incorporated organization (not a subsidiary or affiliate) with which ACORN contracts for homebuyer and foreclosure programs;

- ACORN Institute and ACORN Institute for Social Justice, entities through which charitable donations are made and which act as fiscal agents;

- Citizen Services, Inc., which engages in political advocacy and related work;

- Project Vote, a separate, associated organization with which ACORN has implemented voter registration efforts since 2004; and

- A myriad of separate corporations, each holding individual real estate or commercial properties.

Of particular importance is the relationship between ACORN and ACORN Housing, which, in the video controversy, were inaccurately blended into one. ACORN and ACORN Housing, while united broadly in purpose, are separate entities with separate management. For example, Bertha Lewis, the Chief Executive Officer of ACORN, has no connection whatsoever to ACORN Housing. The two entities have separate office space in every location. ACORN Housing, based in Chicago, has a separate 501(c)(3) board, staff, and funding sources. It is a service entity and, as such, has different training, supervision and reporting systems, designed in part to ensure that there is a physical, operational and fiscal separation from ACORN.

Proskauer≫

Since the termination of founder Wade Rathke following the disclosure of his eight-year

cover-up of an embezzlement by his brother, the then Chief Executive Officer of CCI, and the

subsequent appointment of Ms. Lewis as Chief Executive Officer of ACORN in June 2008, the

national organization has pursued a significant effort to evaluate and reform its financial and

governance structures.  It has retained reputable legal and financial professionals to assist in this

effort, and has had the benefit of an executive consultant, on loan from a major foundation, who

serves as interim Chief Operating Officer; training assistance from outside audit and training

programs; and outside counsel, seconded as in-house general counsel.  It has implemented, or is

implementing, the recommendations made by these consultants.

ACORN is governed by a national board that consists of two representatives of each state

board.  There currently are no independent members on the national board, meaning that each

national board member is affiliated with ACORN in some way other than board membership.

Each local chapter is overseen by a local board, consisting of local members, that has the ability

to hire and fire at the local level.  Local chapters are typically run on a cash flow basis and, as a

result, are quite fluid.  If funding no longer exists, that particular chapter may be closed.

Fundraising is achieved both locally and nationally.  Historically, the national

organization has received grants from major foundations like the Ford Foundation, Open Society

Institute and Sandler Foundation, while local funding has been provided largely by local

organizations (with the exception of The Needmor Fund, which funds local affiliates through

ACORN Institute) and members.  Until this fall, 10 percent of ACORN's funding derived from

federal government grants.

The success of local operations relies largely on fundraising at the local level.  States

without an organizer who has strong fundraising capabilities are typically more challenged than

# Proskauer»

others.  Some states operate only with national funding, but tend not to be as sustainable.  While local chapters are largely responsible for raising sufficient funds, and control of each state's funds lies with the local board, all financial controls are maintained by CCI, which is based in New Orleans.  For example, while the local organizations must ensure that they have raised enough money to survive, they must rely on CCI to perform basic financial functions, such as paying rent.

2.    Organizing

For much of the past four decades, ACORN was dedicated solely to community organizing at the city and state level.  Giving priority to a "bottoms-up" approach, it determined issues of relevance to low and moderate income families, and organized those families to effect change.  Organizing is ACORN's core competency.  ACORN historically has been able to recruit and retain smart, capable organizers, motivated by a desire to effect political and social change, who have run a series of successful campaigns related to a variety of issues.  Despite low pay and long hours, these employees show tremendous loyalty to ACORN, and many stay for a number of years.  ACORN's organizing function has had a record of success for almost 40 years on both national and local issues, many of which are listed above.

Each office is run by a head organizer who is responsible for all activities that occur in that particular office and city.  If more than one ACORN office is located in a particular state, the various offices in that state are overseen by a state organizer.  In addition, each region of the country is overseen by a regional organizer, who is a member of the national staff.

Most local offices have a small staff often hired from the community, as well as a range of volunteers from the community. The offices tend to be very influenced by the person running that office. The individual's strengths and weaknesses are reflected in the way that particular

# Proskauer»

office is run, largely due to an informal and loose local, state and national operational structure. ACORN believes that maintaining a minimal infrastructure maximizes the financial resources devoted to the people it serves.

  3. <u>Services</u>

  Many ACORN offices provide services to their members, including services related to taxes, food stamps, housing foreclosure and citizenship applications.  Services provided by ACORN typically spring from its organizing activities.  A description of many of these services is attached as <u>Appendix B</u>.

## V. FINDINGS: GOVERNANCE AND MANAGEMENT

  As part of our investigation, we examined and evaluated ACORN's management, administration and governance.  ACORN's governance and managerial weaknesses are deeply rooted in the policy and philosophy of the founder and his leadership team, and stem from the errors and poor judgments they made.  The reform leadership, many of whom also served in the Rathke era, is now reaping what Rathke sowed, in combination with the fallout from their own failure to question or challenge him, and their inability to transform ACORN quickly and completely after taking over.

  There is a general consensus among leaders, organizers and observers that, under the prior administration, ACORN grew too large too quickly, and efforts were not made to grow in a reasonable, cautious manner or with an adequate infrastructure.  This growth applies to organizing and services, although the most dramatic growth occurred in instituting and expanding the services function within the past five years.

  ACORN leadership at every level is thin (though ACORN would describe it as being "lean and mean"); the infrastructure needed to manage and oversee a sprawling federation has

# Proskauer≫

not been developed; and key policing mechanisms and staffing, such as a chief financial officer, or independent members of boards of trustees, have not been integrated into the organization. However, in the post-Rathke period, ACORN's leadership has made reforms in finances and governance a priority, including developing detailed bylaws, whistle-blower and document-retention policies, and implementing independent auditing, codes of conduct and ethics, uniform and basic human resources and employment policies, and intensive board education and selection criteria.  These reforms are explained in more detail in Appendix C.

This focus, however, has not yet been matched by a similar attention to key management, human resources and field operation functions, creating vulnerabilities for the entire organization.  Most local offices still tend to be overly influenced by the person running that office, largely due to the organization's informal and loose operational structure. Supervision also appears to be ad-hoc, if not lax, in part due to a continued belief that minimal infrastructure is the best way to maximize the resources that go to the individuals served by the organization. Employees routinely are charged with responsibilities beyond their experience.  In addition, promotions appear to be awarded based on effective organizing, not on management, skills.

City and state organizers are expected not only to oversee organizing functions, but also to oversee the services that ACORN provides to its members. However, many organizers acknowledge that they lack a passion for or interest in service programs, or are not trained to supervise services and often rely on others to perform these functions.

The ACORN leadership is aware of these issues, and has initiated action steps to remedy them.  Organization leaders appear committed to effect reform and are on their way to preserving ACORN and its mission in a reduced size and scope.  But ACORN leadership must continue to demonstrate, with a sense of urgency, that it truly understands this legitimate critique, and that it

Proskauer≫

will continue to do the hard work required to establish and maintain core compliance with not only all the legal and regulatory requirements expected of any nonprofit or advocacy organization, but also appropriate best practices.

A major transformation of the ACORN governance culture, including a significant infusion of professional oversight and more transparent management, may restore and strengthen the trust and credibility the organization requires to successfully pursue its mission.

## VI.   FINDINGS: THE VIDEOS

Utilizing a deliberatively planned, sting-like operation, James O'Keefe and Hannah Giles (collectively, the "videographers") either separately or together visited eight ACORN or ACORN Housing offices during July and August 2009, pretending to seek assistance with illegal matters, including prostitution and human trafficking.  In each instance, Mr. O'Keefe or Ms. Giles wore a hidden camera, the presence of which was not disclosed to ACORN or ACORN Housing employees.  The videographers visited ACORN or ACORN Housing offices in Baltimore, Brooklyn, Los Angeles, Miami, Philadelphia, San Bernardino, San Diego and Washington D.C.

The publicly released versions of the videos show ACORN or ACORN Housing employees apparently willing to offer ways to effect illegal schemes involving tax advice, misuse of public funds and illegal trafficking in children, and feed the impression that ACORN believes it is above the law.  The videos were distributed on or about September 10, 2009 on BigGovernment.com, triggering a period of intense coverage and commentary in traditional and social media.

The unedited videos have never been made public. The videos that have been released appear to have been edited, in some cases substantially, including the insertion of a substitute

Proskauer≫

voiceover for significant portions of Mr. O'Keefe's and Ms.Giles's comments, which makes it difficult to determine the questions to which ACORN employees are responding. A comparison of the publicly available transcripts[2] to the released videos confirms that large portions of the original video have been omitted from the released versions. To date, the videographers have declined or ignored our interview requests.

We have described what we have been told were the specific circumstances of each visit in narratives attached hereto as Appendix D, which stem from interviews of ACORN employees, many of whom did not have direct knowledge of the events but who spoke with the individuals captured on video, or with employees who had been approached by the videographers. We did not interview the employees captured on video, since we were satisfied there was no question that the visits occurred and the comments were made. In addition, we could not offer them – or our notes – confidentiality or privileged communication status. Hence, all our knowledge about the videos is largely circumstantial and secondhand. It is important to note that none of the ACORN offices visited has any written record of the visits, nor did ACORN know that it was a systematic campaign until the videos aired.

Based on our investigation, we offer the following comments:

1. Three of the six videos – Brooklyn, Los Angeles and Washington, D.C. – involved only ACORN Housing employees, over which ACORN has no control.

2. The released videos offer no evidence of a pattern of illegal conduct by ACORN employees. In fact, out of the three videos involving ACORN employees, at least two involve extenuating circumstances.

---

[2] For purposes of comparing the video transcripts to the released videos, note that the videographers have posted what they allege are the complete transcripts at www.biggovernment.com.

Proskauer≫

3. The ACORN employees captured on video were members or part-time staff. They were not organizers or supervisory level employees.

4. None of the individuals captured on video consented to being video- or audio-taped, and four of the states where the videos were recorded appear to prohibit such taping without consent.

5. In offices where the videographers spoke with organizers, videos were not released.

6. Police reports regarding the video incidents were filed in Philadelphia and San Diego.

7. The released videos were edited or manipulated by the videographers and/or individual(s) acting on their behalf.

8. There is no evidence that any action, illegal or otherwise, was taken by ACORN employees on behalf of the videographers.

9. Experienced forensic investigators would be able to determine the extent to which the released videos have been manipulated to distort, rather than merely shape, the facts and the conversations, as ACORN alleges.

Viewed from the perspective of managerial oversight, the videos stand as a symbol of ACORN's organizational and supervisory weakness. The disparate ways in which ACORN staff handled the videographers' visits highlight the organization's failure to deploy best practices at the grassroots level to ensure proper screening and intake processes, supervision and training. In addition, ACORN itself failed to adequately investigate the totality of the circumstances of the visits prior to taking action against its own employees and, hence, was in no position to defend itself.

# Proskauer≫

## VII.   RECOMMENDATIONS

Based upon our inquiry, we offer the following nine (9) managerial and governance recommendations. We view all of these steps as interrelated; they should not be addressed individually.  Our experience tells us that these recommendations, acted on with a sense of urgency, are crucial to any strategy to reclaim, maintain and strengthen ACORN's ability to serve its members and constituents.

1. ACORN should return its organizational focus to its core competency – community-organizing and citizen engagement empowerment, with related services – and transition away from the provision of services that may be provided more effectively and efficiently by others.

Local ACORN offices may be self-sufficient and self-governed, but they must exist within the overall framework of a national organizational structure. ACORN's expansion into the services arena occurred without any significant investment in or prioritization of training, supervision, professional development, financial controls, human resources, or other appropriate infrastructure.

There is significant evidence to support the proposition that the services provided by ACORN – including its political efforts on voter registration – were legitimate and effective. However, the type of involvement and staffing needed to provide these service programs is significantly different from the community-organizer skills, culture, selection process and success model.  While organizations must be funded adequately, a disproportionate focus on "command and control" fundraising – even in the pursuit of legitimate goals and objectives – implicitly devalues mission-related capabilities and skills.

Proskauer≫

The culture of hands-off management that was a hallmark of the ACORN organizing model is inappropriate and risky when applied to service delivery under governmental contracts and other legal and regulatory requirements.

2.  ACORN should consolidate, simplify and centralize its local and national organizational staffing, monitoring and supervision.

By failing to provide a core infrastructure designed to maximize quality control and professionalism, ACORN invited vulnerability, risk and mistakes, and let down its core membership and constituents.

Far too many responsibilities and expectations fall on the shoulders of the head organizer and community boards of volunteers in most of the local offices.  The potential for failure and managerial weakness must be weighed against the potential benefits of flexible, "lean and mean," independent local organizations.  In addition, far too much responsibility, without oversight and support, is delegated to younger, inexperienced staff, volunteers and others.  The opportunity for external mischief, let alone the internal potential for fraud due to the lack of checks and balances and oversight, is obvious regardless of the loyalty, good faith, commitment and competence of the vast majority of ACORN employees, volunteers and members.

3.  ACORN should develop a simplified national organization and board structure consisting of just two entities – a 501(c)(3) for charitable, non-profit fundraising, advocacy and education with a majority of independent members, and a 501(c)(4) for support of ACORN community organization and political activity, with at least one-third independent members.

The national 501(c)(3) board should consist of a majority of independent individuals, with significant external validation, who oversee the core national staff, as well as the federation

Proskauer≫

and/or any affiliates. The 501(c)(4) board should consist of at least one-third independent members.

Operating without a proactive national oversight and defense capacity can and will result in a failure to focus on prevention as the best and least expensive form of protection of organizational integrity. ACORN's power, opportunity and strength can continue to be rooted at the local level, but a national organization, even if it is a federation of state and local organizations, must have appropriate governance and compliance controls from the top. One of the major roles of these boards and staff is to serve as a template for, and educator of, state and local organizations, and provide core services in an efficient, economical and standard way.

4. ACORN should continue to implement the comprehensive internal governance program and strategy, including internal controls, compliance and codes of ethics, designed to educate and guide staff, volunteers and board members, that was recommended and has been adopted within the past year.

Organizational self-policing is essential. Program elements include education of the board of directors regarding the compliance process; training of all appropriate personnel; systematic risk assessment; promotion of human resources policies that are consistently enforced; anonymous and confidential reporting of compliance concerns; and continuous monitoring. Such a program not only will foster positive conduct, education, training, supervision, and evaluation, but will also give ACORN the ability to be the first to know about issues, whatever they may be, and to be the first responder – not a reactor after the fact or as a result of external criticism.

5. ACORN should recruit an independent ethics officer and/or independent inspector general to oversee and implement the governance and compliance

Proskauer≫

program at the national level, and an independent member of the national

board should chair a board-level ethics and governance committee.

Ideally, there should be an equivalent position at each operational level and on each

board of ACORN, its affiliate or its federation.  Since it is highly unlikely that each organization

can afford an appropriate ethics officer or inspector general, the national position is a priority if

this concept is to be taken seriously by those inside ACORN or its affiliates.

6.   ACORN should hire an appropriately qualified and experienced chief

operating and financial officer, comptroller and in-house auditing staff.

Previous professional reports demonstrate major flaws and weaknesses in all aspects of

the ACORN financial and operational systems, and the steps needed to remedy them.  We

commend ACORN on the progress it has made thus far with respect to financial and governance

reforms.   For reasons set forth above, these efforts must be continued.

7.   ACORN should continue to strengthen its legal capacity to guide its

governance reforms, coordinate the dissolution of all extraneous ACORN

organizations and represent the organization's interests in litigation and

investigations.

Regardless of the strategic decisions being made as to the status and future of ACORN,

counsel is needed to protect and defend ACORN, its affiliates and its agents.  Counsel must

pursue appropriate legal and law enforcement remedies with regard to the video transcriptions,

publications and disseminations, as well as the actions of state and federal agencies, and take any

additional actions needed to sever ties with its founder, his external allies, as well as any ongoing

board and/or staff litigation. It is unrealistic to believe that a rearrangement of the boxes, and

Proskauer≫

even a return to core functions and local communities and identity, will preclude or terminate ongoing inquiries, disputes, attacks and scrutiny.

8.   ACORN should require all of its state and local affiliates to agree to oversight by the national staff and board, and adhere to appropriate national standards, including financial audits, training and supervision.

Just as the national entity must exist to support the independent strengths of the state and local organizations, boards and staff, the local organizations also must understand, accept and support the need for national oversight, education and standards in order to achieve the benefit of synergies and economies of scale, and improved effectiveness of fulfilling the organization's advocacy mission.

9.   ACORN should formalize a strong, independent national advisory group and charge it with the responsibility to report within six months, and thereafter annually for two years, to the national board on the progress of the reform action plan.

In support of the ongoing internal organizational policy and management reforms, an external monitor/advisory group is essential. Credible, strong, independent advisors can be a useful sounding board for both internal and external stakeholders, can serve as an important vehicle for conflict resolution in the course of the organizational transformation effort and can be an objective monitor and reporter.

Proskauer≫

## APPENDIX A – INVESTIGATIVE METHODOLOGY

We have reviewed an extensive collection of documents, including, by way of example, ACORN (and ACORN Housing, Project Vote, ACORN Institute, among other ACORN related entities) staff policies and organizing manuals; descriptions of the organizational structure of ACORN boards, chapters, affiliates, and corporate entities; ACORN and academic/media articles regarding ACORN's various national issue and advocacy campaigns; ACORN related human resources and staff management policies; internal reporting requirements; project and services quality control methods; board administration and governance guidelines; and software information. These documents total more than 7,000 pages.

In addition, we have obtained reports from, and interviewed consultants retained by, ACORN since June 2008 to review its finances, organizational structure and board governance. We have reviewed selected court materials; media coverage and commentary; several Congressional Committee reports; materials available from and on relevant websites; and a range of individual comments received, pro and con, regarding ACORN.

We also interviewed a variety of ACORN national, regional, state and local staff, members of the national advisory board, board members of ACORN Institute, and outside observers. We reviewed the videos and the transcripts of the videos. A complete list of the documents, interviews, and organizations are set forth below.

Proskauer»

## LIST OF INDIVIDUALS INTERVIEWED

| NAME | TITLE/ORGANIZATION | LOCATION |
|---|---|---|
| Matthew Arnold | SW Regional Director ACORN | New Mexico, Arizona, Colorado and Nevada and Oklahoma |
| David Beckwith National Advisory Board ("NAB") | Executive Director The Needmor Fund | Toledo, OH |
| America Canas | ACORN | Brooklyn, NY |
| Henry Cisneros NAB | Executive Chairman CityView | San Antonio, TX |
| Clare Crawford | Political Field Director ACORN | San Diego, CA |
| Pablo Eisenberg | Georgetown Public Policy Institute | Washington, D.C. |
| Eric Eve NAB | Senior VP of Global Consumer Group, Citigroup | New York |
| Ethan Fletcher | The Management Company | Washington, D.C. |
| Katy Gall | National Field Director ACORN | Boston, MA |
| Ginny Goodman | Texas Head Organizer ACORN | Houston, TX |
| Mark Gritton | Interim Chief Operating Officer ACORN | Southlake, TX |
| Jerry Hauser | The Management Company | Washington, D.C. |
| Carole Hemingway | ACORN Board Member | Philadelphia, PA |
| Maude Hurd | ACORN Board Member | Boston, MA |
| Tanya Johnson | Tax Preparer ACORN | Washington, D.C. |
| Jeff Karlson | Director of Tax Program ACORN | New Orleans, LA |
| Stuart Katzenberg | Maryland Head Organizer ACORN | Baltimore, MD |
| Steve Kest | Executive Director ACORN | Brooklyn, NY |
| Brian Kettenring | Deputy Director, National Operations, ACORN | Washington, D.C. |
| Beth Kingsley | Partner Harmon, Curran, Spielberg & Eisenberg LLP | Washington, D.C. |
| Bertha Lewis | Chief Executive Officer ACORN | Brooklyn, NY |
| Bob Long | Senior Consultant for Investigations | Boston, MA |

Proskauer≫

| NAME | TITLE/ORGANIZATION | LOCATION |
|---|---|---|
| | Andrews International | |
| Shannon McDonald | Head Organizer<br>ACORN | Providence, RI |
| Tim McFeeley | Isaacson Miller | Washington, D.C. |
| Brian Mellor | General Counsel<br>Project Vote | Chicago |
| Arnie Miller | Isaacson Miller | Washington, D.C. |
| James Mintz | Founder and Principal Partner<br>The Mintz Group | New York |
| Jeff Odowner | Midwest Regional Director<br>ACORN | St. Louis, Missouri |
| Ian Phillips | Legislative Director<br>ACORN | Philadelphia, PA |
| Robert Phillips | The California Endowment | Oakland, CA |
| John Podesta<br>NAB | President, CEO<br>Center for American Progress | Washington, D.C. |
| Stephanie Porta | Head Organizer<br>ACORN | Orlando, Florida |
| Mimi Ramos | Massachusetts Head Organizer<br>ACORN | Boston, MA |
| Shaina Ross | Head Organizer<br>ACORN | Washington, D.C. |
| Amy Schur | CA Head Organizer<br>ACORN | California |
| Arthur Schwartz | Partner<br>Schwartz, Lichten & Bright | New York, NY |
| Andrew Stern<br>NAB | President<br>SEIU | Washington, D.C. |
| Christine Sturgis | President<br>ACORN Institute Board of<br>Directors | Arizona |
| Madeline Talbott | Lead Organizer<br>Action Now | Chicago, IL |
| Josh Watler | Washington State<br>Head Organizer, ACORN | Washington |
| Kevin Whelan | Deputy Political Director<br>ACORN | St. Paul, Minnesota |
| Daniel Zingale | The California Endowment | Oakland, CA |

Proskauer》

## DOCUMENTS REVIEWED AND RELIED UPON

| EMPLOYEE AND VOLUNTEER DOCUMENTS, MANUALS, TRAINING MATERIALS AND JOB DESCRIPTIONS | | |
|---|---|---|
| | 1. | ACORN Center Volunteer Opportunities |
| | 2. | ACORN Site Coordinator Training Handbook |
| | 3. | Administrator Guide: How to Conduct Job Interviews |
| | 4. | Administrator Guide: Week One Tasks for a New Employee |
| | 5. | Associate Member Canvass Training Guide |
| | 6. | Benefits Specialist Job Description and Requirements |
| | 7. | CFO Resume – David Oates |
| | 8. | COO Resume – Mark Gritton |
| | 9. | Community Organizer Job Description |
| | 10. | Executive Director Job Description |
| | 11. | Greeter Job Description and Requirements |
| | 12. | Head Organizer Administrative Manual |
| | 13. | Invitation to Apply for the Position of Chief Financial and Operating Officer |
| | 14. | Job Application for the Tax and Benefit Access Center |
| | 15. | Policy on Contracting with Volunteers |
| | 16. | Policy on Keeping Volunteers Happy |

Proskauer»

| | 17. | Political Organizer Training Manual |
|---|---|---|
| | 18. | Project Vote's Organizing Call Center and Voter Registration Quality Control Manual by Brian Mellor (containing select excerpts from Project Vote training manuals) |
| | 19. | Site Coordinator Training Guidelines |
| | 20. | Site Coordinator Training Schedule |
| | 21. | Site Supervisor Job Description and Qualifications/ Requirements for the Tax and Benefit Access Center |
| | 22. | Summary of Staff Policies – for Full and Part- Time Employees |
| | 23. | Tax Preparer Job Description and Requirements |
| | 24. | Termination Memo Regarding Exit Interviews |
| | 25. | Training Materials on ACORN FTP Website |
| | 26. | Volunteer Award |
| | 27. | Volunteer Contract |
| | 28. | Volunteer Job Description for the Tax and Benefit Access Center |
| | 29. | Volunteer Recruitment Documents |
| | 30. | Volunteer Return Preparation Program: Quality Review Plan for 2009 |
| **GOVERNANCE AND ORGANIZATIONAL DOCUMENTS AND POLICIES** | 31. | ACORN National Bylaws Adopted December 13, 2008 |
| | 32. | ACORN Board of Directors Auditing Policy |

Proskauer》

| | | |
|---|---|---|
| | 33. | ACORN Board of Directors Conflict of Interest Policy |
| | 34. | ACORN Board of Directors Document Retention Policy |
| | 35. | ACORN Board of Directors Whistle-blower Policy |
| | 36. | Acorn Corporate Structure |
| | 37. | Acorn Institute Organization Chart |
| | 38. | Advisory Committee Contact List |
| | 39. | Audit Finance Committee Training Materials (PowerPoint Presentation) |
| | 40. | Directory of ACORN Board Members |
| | 41. | President Contact List by State |
| **TAX SERVICES PROGRAM DOCUMENTS** | 42. | ACORN 2009 Filing Season Readiness Action Plan |
| | 43. | ACORN Centers Support Numbers |
| | 44. | ACORN Centers Tax Preparation Participant's Guide |
| | 45. | Consent Forms, Tax Preparation |
| | 46. | Statistical Compilations of Anonymous Tax Return Information |
| | 47. | Doing Individual Taxpayer Identification Numbers at Your ACORN Site  (Web Resources) |
| | 48. | Doing Individual Taxpayer Identification Numbers at Your ACORN Site  (Instructions) |

Proskauer»

| | 49. | Doing Individual Taxpayer Identification Numbers at Your ACORN Site (IRS W7 form) |
|---|---|---|
| | 50. | Doing Individual Taxpayer Identification Numbers at Your ACORN Site (Spanish) |
| | 51. | Doing Individual Taxpayer Identification Numbers at Your ACORN Site (Presentation) |
| | 52. | Earned Income Tax Credit Resources |
| | 53. | End of Tax Season Procedures |
| | 54. | Example of Client Intake Log |
| | 55. | Example of Site Tax Status Report |
| | 56. | Example of Tax Intake Log |
| | 57. | TaxWorks Guide |
| | 58. | Guide on Revision of Tax Returns Rejected by IRS |
| | 59. | IRS and VITA Confidentiality Guidelines |
| | 60. | IRS or ACORN Tax Preparation Flow Charts |
| | 61. | IRS Policies |
| | 62. | IRS Policies (Spanish) |
| | 63. | IRS Refund Schedule |
| | 64. | IRS Tax Preparation Guide for Individuals |
| | 65. | IRS Volunteer Agreement Standards of Conduct Form |

Proskauer»

| | | |
|---|---|---|
| | 66. | Power Point Presentation Summarizing IRS Requirements |
| | 67. | Privacy Policy for Tax Preparation |
| | 68. | Quality and Accuracy Policy for Tax Returns |
| | 69. | Required Documents for Tax Preparation Appointment |
| | 70. | Site Coordinator Handbook for Partners Participating in the VITA/TCE Program |
| | 71. | Site Coordinator Training Handbook for the Tax and Benefit Access Center |
| | 72. | Strategies for Targeted Outreach to EITC/ Food Stamps/ Benefits Eligible Clients |
| | 73. | Tax and Benefit Center Result Summary |
| | 74. | Tax Client Intake Guidelines |
| | 75. | Tax Client Intake Questionnaire |
| | 76. | Tax Client Intake Questionnaire (Spanish) |
| | 77. | Tax Preparation Consent Flow Chart |
| | 78. | Tax Preparation FAQ's and Answers |
| | 79. | Tax Preparation Guide - Sample Screen Shots from Online Tax Stats Database |
| | 80. | Tax Preparer Webinar Training |
| | 81. | Tax Quality Review Guide |
| | 82. | Training for Volunteer Tax Return Preparation Program |
| | 83. | VITA/TCE Quality Site Requirements |

**Proskauer»**

| OTHER SERVICES PROGRAM DOCUMENTS | 84. | ACORN Housing Quality Review Master |
|---|---|---|
| | 85. | Benefits Screening Questionnaire |
| | 86. | Client Intake Form for Benefits Preparation |
| | 87. | Client Tracker Form for Benefits Preparation |
| | 88. | Employee Benefit Termination Application |
| | 89. | Information on the Client Tracker Tool for Benefits Preparation |
| | 90. | Quality Review Checklist, Benefit Applications |
| | 91. | Step-by-Step Food Stamp and Application Assistance Guidelines |
| GENERAL CAMPAIGN AND POLICY DOCUMENTS | 92. | ACORN Center – Office Fundraising Plan Worksheet |
| | 93. | ACORN Centers Website Overview |
| | 94. | Client List |
| | 95. | State Partnering Forms |
| | 96. | Loan Origination Software Guide |
| | 97. | Neighborworks Administration List |
| | 98. | Neighborworks Training |
| | 99. | Staff Voter Registration Affirmation re: Fraud |
| | 100. | Strategy for Targeted Outreach |
| | 101. | "Talking With State Agencies about Benefit Screening" |

Proskauer≫

| ADVERTISEMENTS AND FLIERS | 102. | ACORN Advocacy for Justice Flier |
|---|---|---|
| | 103. | ACORN Flier - ACORN 2006 Civic Engagement Program: The People Speak |
| | 104. | ACORN Flier: "All Hands on Deck to Fight Foreclosures" |
| | 105. | ACORN Flier: "Road to Rescue: How the Philadelphia Model Can Reduce Foreclosures Across the Country" |
| | 106. | ACORN Voter Registration Flier |
| | 107. | Advertisement - Free Tax Filing and Benefits Screening Flyer |
| | 108. | Advertisement - Free Tax Filing and Benefits Screening Flyer (Spanish) |
| ACORN PRESS RELEASES, ADVISORIES, AND MEMORANDA | 109. | 2006 Message from ACORN's National President |
| | 110. | ACORN Memo, December 8, 2008: "ACORN's Voter Registration Drive: Myths and Realities" |
| | 111. | 2009 ACORN Organizational Transformation Accomplishments |
| | 112. | 2009 ACORN Moving Forward |
| | 113. | ACORN Recess Work – Unity 2009 |
| | 114. | "Strengthening Democracy: Voter Registration and the American Electorate" by Maude Hurd, dated March 10, 2009 |
| | 115. | ACORN Press Release dated June 20, 2009: "ACORN Home Defenders to Confront 'HomeWrecker'" |

Proskauer≫

| | | |
|---|---|---|
| | 116. | ACORN Report dated July 28, 2009: "Improving Outcomes in the Obama Administration's Home Affordable Modification Program" by Brenda Muniz, Legislative Director |
| | 117. | ACORN Press Release dated September 17, 2009: "Recent media publicity involving the Association of Community Organizations for Reform Now" |
| | 118. | ACORN Press Release dated November 6, 2009: "ACORN Comments on Louisiana Attorney General Investigation" |
| | 119. | "ACORN and John McCain: The Real Story of the Financial Crisis 1999 to 2008," by Austin King, ACORN New Orleans |
| | 120. | ACORN Article: "Acorn's Campaign Against Household Finance" by Maude Hurd and Lisa Donner |
| | 121. | ACORN Legislative Campaign Capacity – State by State |
| | 122. | ACORN Press Release: "ACORN's 'Home Wrecker' Campaign Moves to Phase 2 |
| | 123. | ACORN Report: "Victories in the Fight Against Predatory Mortgage Lending" from the ACORN New Orleans office |
| | 124. | Press Advisory – ACORN tax benefits services |
| | 125. | Project Vote, "The Politics of Voter Fraud" by Lorraine C. Minnite |

**Proskauer»**

| | | |
|---|---|---|
| | 126. | Public Service Announcement Regarding ACORN Tax Services Programs |
| **THIRD-PARTY REPORTS** | 127. | Final Evaluation of ACORN's Accelerated Income Redistribution Project (covering the period of March 1, 2004 through February 28, 2005) by Fred Brooks, Ph.D., presented to the Marguerite Casey Foundation in Seattle, Washington on April 1, 2005 |
| | 128. | Social Work, Volume 50, Number 3, "Resolving the Dilemma between Organizing and Services: Los Angeles ACORN's Welfare Advocacy" by Fred Brooks, July 2005 |
| | 129. | Research on Social Work Practice, "ACORN's Accelerated Income Redistribution Project: A Program Evaluation," by Fred Brooks, 2006. |
| | 130. | Letter from IRS evaluating ACORN's tax sites, dated October 4, 2007 |
| | 131. | Project Vote Final Voter Participation Program Report for 2008 |
| | 132. | Beth Kingsley (Harmon, Curran, Spielberg & Eisenberg LLP) Final Report on Organizational Review, dated July 17, 2008 |
| | 133. | Beth Kingsley (Harmon, Curran, Spielberg & Eisenberg LLP) Final Corporate Review, dated April 9, 2009 |
| | 134. | Tatum, LLC Summary Report – Internal Controls Review for ACORN Institute, dated July 17, 2009 |

Proskauer»

| | 135. | Beth Kingsley (Harmon, Curran, Spielberg & Eisenberg LLP) Final Report – Supplement, dated July 25, 2009 |
|---|---|---|
| | 136. | Tatum, LLC Summary Report – Internal Controls Review for ACORN Institute, dated July 28, 2009 |
| | 137. | "Manipulating the Public Agenda: Why ACORN Was in the News, and What the News Got Wrong," by Peter Dreier and Christopher R. Martin, dated September 2009 |
| | 138. | Report to Senator Grassley, dated September 22, 2009, "Review of ACORN Tax-exempt Status" |
| | 139. | ACORN Center Site Status Reports |
| **PRESS ARTICLES AND MEDIA COVERAGE** | 140. | NYSBA Journal, November/December 2007, "How Not to Govern: Lessons From the Report to the Board of Regents of the Smithsonian Institution," by Lesley Friedman Rosenthal |
| *\*\*We have monitored and reviewed a vast number of blogs, news articles, televised newscasts, and opinion editorials concerning ACORN throughout our investigation. Those listed here are a sampling. We have regularly consulted websites ranging from www.biggovernment.com to www.huffingtonpost.com, as well as blogs discussing ACORN to maintain ongoing awareness of comments, critiques and suggestions provided by numerous people across a spectrum of political and personal opinions and values.* | 141. | Nonprofit Quarterly, "ACORN's Dilemma and Ours," by Rick Cohen, dated July 25, 2008 |

Proskauer»

| | | |
|---|---|---|
| | 142. | New York Times Article "The Myth of Voter Fraud," dated May 13, 2008 |
| | 143. | New York Times Article "The Acorn Story," dated October 17, 2008 |
| | 144. | New York Times Op-Ed "The Real Scandal," dated October 21, 2008 |
| | 145. | Open Left, "Why the Congressional Dems' Attack on ACORN Is An Attack On Us All," by Paul Rosenberg, dated September 20, 2009 |
| | 146. | Political Intelligence, "Congress Slaps ACORN Again," by Foon Rhee, dated September 25, 2009 |
| | 147. | Daily Kos, State of the Nation: "Video Don't Lie ~ or Does it?..." by Shanikka, dated September 28, 2009, available at http://shanikka.dailykos.com |
| | 148. | CNN Article: "ACORN Chief Says Videos 'Made My Stomach Turn,'" dated October 6, 2009 |
| | 149. | The Chronicle of Philanthropy, "Opinion: Attacks on Acorn Signal a Bigger Problem for Charities Dealing With Controversial Issues," by Pablo Eisenberg, dated October 21, 2009 |
| | 150. | Videos and Corresponding Transcripts, available at www.biggovernment.com |
| | 151. | "A Rush to Judgment: The Truth About ACORN," by John Atlas and Peter Dreier |

Proskauer»

| MISCELLANEOUS | 152. | Complaint: *In re: Association of Community Organizations for Reform Now,* filed on January 7, 2009 |
|---|---|---|
| | 153. | Wade Rathke Settlement Agreement, dated June 2009 |
| | 154. | WipFli LLP Engagement Letter to ACORN New Orleans, dated June 17, 2009 |
| | 155. | Letter from Arthur Schwartz to Karen Inman and Marcel Reid, dated July 2, 2009 |
| | 156. | Affidavit of Tresa Marie Kaelki, former ACORN San Bernadino employee, dated September 15, 2009 |
| | 157. | Letter from Senator Grassley to John Berry, Director of the U.S. Office of Personnel Management, dated September 22, 2009 |
| | 158. | Letter from Senator Grassley to IRS Commissioner Douglas Shulman, dated September 24, 2009 |
| | 159. | Letter from Arthur Schwartz to Congressional Research Service, dated October 5, 2009, re: "Request for List of Entities 'Affiliated' with ACORN" |
| | 160. | Complaint: *Acorn, et al. v. United States of America, et al.*, filed in the Eastern District of New York on November 12, 2009 |
| | 161. | Kappa Alpha Psi Federal Credit Union Agreement |
| | 162. | Philadelphia Police Complaint or Incident Report regarding James O'Keefe |
| | 163. | Pictures and Descriptions on ACORN Leaders |

Proskauer≫

| | | |
|---|---|---|
| | 164. | Pleadings and Other Documents regarding *Association of Community Organizations for Reform Now v. Wade Rathke, et al.*, filed in New Orleans, LA (and since dismissed) |

Proskauer»

## APPENDIX B – OVERVIEW OF SERVICES

The following provides a brief overview of some of the services provided by ACORN to its members.

### Tax Services

ACORN's tax preparation activities deserve some detail since they came under scrutiny in the video controversy. ACORN had been the second largest tax preparer in the country, second only to the military. It maintained 73 active sites during the 2009 tax season.

Its tax sites are Volunteer Income Tax Assistance ("VITA") sites, which are overseen and evaluated by the Internal Revenue Service, specifically by Stakeholder, Partnerships, Education, and Communication ("SPEC"), which is the Outreach and Education function of the IRS Wage and Investment Division. SPEC trains and certifies volunteers to administer the VITA Tax Counseling for the Elderly ("TCE") programs using free IRS tax preparation software. In addition to the IRS training, ACORN requires tax preparers to meet additional benchmarks, attend webinars and watch training DVDs. ACORN also provides training for site coordinators. Most ACORN employees who provide tax preparation assistance are part-time; many are only employed during tax season or spend minimal time at ACORN offices during the off-season.

ACORN's free tax clinic developed as a result of ACORN's challenge to H&R Block's instant refund program, which provided immediate refunds to clients in exchange for an excessive fee. As part of a legal settlement with H&R Block, ACORN received resources to set up free tax clinics in a number of its offices. ACORN used H&R Block tax preparation software with H&R Block technical support for the first year of the program. Other VITA programs used IRS software.

Proskauer>>

The tax program began with just three pilot tax sites, and grew to 87 at its peak. It was overseen by a national employee, who was responsible for establishing policies and procedures, securing funding, creating training programs and setting compensation levels. This national employee had no authority to hire/fire staff at the local level, and the quality of staff varied at the local level. While the VITA tax preparers had to be certified by the IRS in order to participate, it is unclear whether SPEC representatives confirmed that staff at various sites had the appropriate certification, attained by taking an online test through the IRS.

Before individual tax returns are filed with the IRS, each must be reviewed by a supervisor. In some instances, the office's head organizer will review the tax return, while in other instances, a consultant will review the tax return. Consultants are often members of certain coalitions that partner with ACORN to provide free tax services, and typically have extensive experience in tax preparation services, unrelated to ACORN.

In annual reporting done at the national SPEC level, ACORN consistently won praise for its tax preparation programming. No taxes will be prepared by ACORN in 2010 because the IRS terminated its relationship at the end of September 2009, in the wake of the controversy surrounding the videos.

Proskauer»

## Other Services

ACORN also provides its members with other services, which are overseen by each office's head organizer. For example, ACORN provides benefits counseling, determining in particular whether members are eligible for food stamps. This service relies upon information included on certain websites, and is typically provided by organizers. ACORN also provides foreclosure clinics, which are evening seminars given by organizers which generally discuss what to do in the event of imminent foreclosure. Documentation is collected during these clinics, and, pursuant to contract, is passed along to ACORN Housing, which then works with individuals to address their particular situations. ACORN also assists its members with citizenship applications, by providing assistance with completing applications and providing classes to prepare with the corresponding tests.

Proskauer≫

## <u>APPENDIX C – ONGOING GOVERNANCE REFORMS</u>

In the past year, ACORN has received solid, credible and independent advice and counsel on its financial systems and controls, and its corporate structure, governance and management, including financial systems guidance from Mesirow Financial and Tatum, LLC; operational guidance from Mark Gritton, interim Chief Operating Officer; corporate counsel from Beth Kingsley of Harmon, Curran, Spielberg & Eisenberg LLP and Arthur Schwartz of Schwartz, Lichten & Bright P.C.; and executive recruitment from Isaacson, Miller.

ACORN has been aggressively implementing the changes recommended, as demonstrated by the periodic accounting/auditing progress reports; the legal dissolution of several entities (200 down to 29 now); the restructuring of the 501(c)(3) ACORN Institute board; and the creation of an independent national advisory group.

### <u>The Kingsley Report</u>

As documented in the Kingsley report, the universe of organizations affiliated with ACORN is large.  Although many entities once considered affiliates are now dissolved or dormant, a substantial number – about 29 entities – still exist.  These organizations vary in their individual corporate structures as well as their mission and purpose, ranging from the national ACORN organization to various national and local 501(c)(3)s, building corporations, service providers, benefits plans, ballot committees, PACs, government grant recipients, media and others.  Kingsley recommended simplifying and reducing the number of corporations while maintaining flexibility, and developing common governance models for similar types of corporations, ensuring maintenance of corporate formalities and records.

**Proskauer»**

As to the national 501(c)(3)s, ACORN Institute and American Institute for Social Justice (both of which serve basically the same purpose), the Kingsley Report recommends that these two organizations be consolidated into one, with ACORN appointing 1/3 of each board.

For local 501(c)(3)s, governance should be consolidated under a national organization, or ACORN Institute should have the power to appoint at least 1/3 of the board or have a position reserved for an ACORN representative. Kingsley recommends that building corporations be consolidated under a single parent, and that ACORN have official representatives on the board of each of its service providers. As the legal structure of political entities depends on state campaign finance laws, Kingsley recognizes that legal counsel should be consulted in advance of setting up any political entity, and that grant-receiving organizations be consolidated where possible and a clear ACORN-related governance link established, including for the two remaining radio stations which are governed by local boards independently because of FCC requirements.

The board adopted all of the Kingsley recommendations in the Fall of 2008.

<u>Report by Tatum, LLC on Internal Control Review of ACORN Institute</u>

On July 17, 2009, Tatum, LLC issued a report assessing the project plan developed and implemented by ACORN Institute ("AI") under guidance from Tatum. The goal of the project plan was to address material internal control weaknesses identified in the report made by Mesirow Financial to improve AI's financial reporting process, as well as the processes utilized by the related entities of AI.

After being retained to assess ACORN's ability to satisfy funder requirements by demonstrating improvement in the control environment regarding grant project tracking, national and local review of project time and expense, benchmarks and project reporting, and cash

Proskauer≫

controls, Tatum's initial assessment of AI was made on June 11, 2009. Tatum remained committed to validating ACORN's progress in implementing the project plan it developed, and to reassessing ACORN's overall commitment to effecting the change it sought.

Tatum's report indicated progress in all of the four key funder areas. It also found that progress was ongoing and significant enhancements could be expected to take place through the fall of 2009. At the time of its report, Tatum found that ACORN could properly track grant expenses, review national and local project time and expenses prior to allocation or payment of grant funds, meet basic funder requirements for benchmark and project reporting, and safeguard cash from material misappropriation while also providing complete and accurate record keeping. Although work remains to be done, Tatum concluded that ACORN was on the right track, and progressing as planned.

<u>Isaacson, Miller's Invitation to Apply for the Position of Chief Financial & Operating Officer</u>

Recognizing the need for financial and internal management direction and expertise, search firm Isaacson, Miller ("Isaacson") was retained to develop the criteria for the ideal CF/OO to oversee ACORN and AI. Acknowledging the challenge faced by ACORN as it marks forty years of advocacy with a new leadership team, Isaacson's invitation seeks a reform-minded candidate with a "record of achievement as a superior organizational executive with a solid skill-set in management, financial and business practices." Further, ACORN's CF/OO must be a team builder and leader, committed to an agenda of social justice, and willing to work in a complex, dynamic organization.

The invitation also acknowledges the major transitions occurring at ACORN, including governance reforms, senior management reforms, financial reforms, structural reforms, and staff investments. The invitation refers to ACORN's reforms as a plan to "organize the organizers."

**Proskauer»**

ACORN's CF/OO, recognized as a key ingredient for ACORN's reform, should expect to accomplish significant progress in the next few years, which should include ensuring the integrity and utility of financial reports, building internal management capacity, and constructing consensus for a culture of continuous improvement and accountability.

Proskauer≫

## <u>APPENDIX D – VIDEO NARRATIVES</u>

We offer here an overview of the circumstances surrounding the videos, as they have been relayed to us by various ACORN employees.  We did not speak directly with those employees who were captured on video in part because we were satisfied there was no question that the visits occurred and the comments were made.  In addition, we could not offer them – or our own notes – confidentiality or privileged communications status.  We also did not have the opportunity to speak with the videographers.  In fact, they either declined or ignored our requests.

Therefore, while we have formed opinions about the videos, and have offered our findings and comments to the extent we felt it appropriate to do so, the following narratives (except for the Philadelphia office) are based on hearsay alone – albeit reflecting the perspective of the ACORN employees and volunteers, and their supervisors.

### Baltimore Office

The videographers initially spoke with a part-time ACORN employee. This employee had been a member of Baltimore ACORN for 10 years and, at the time, worked in the Baltimore office as a receptionist and greeter.  The videographers represented that they needed help and had been turned down elsewhere, and that Ms. Giles was a dancer and Mr. O'Keefe was a college student trying to help her.  Although Mr. O'Keefe appeared in all videos dressed as a pimp, in fact, when he appeared at each and every office, he was dressed like a college student – in slacks and a button down shirt.  Ms. Giles, however, was dressed as she appears in the videos.

The ACORN employee reportedly was concerned for Ms. Giles' safety because she knows people in her community with similar issues.  She enlisted the assistance of another part-time employee who works in ACORN's free tax clinic. The tax employee noted that she

Proskauer》

considered Ms. Giles to be her client, not Mr. O'Keefe, since Ms. Giles was the individual

needing help.  Ms. Giles represented that she was an exotic dancer. Mr. O'Keefe said she was a

prostitute. The tax employee relied only upon the statements made by Ms. Giles.  In addition, the

tax employee noted that she did not intend to, nor did she, file any tax returns on Ms. Giles

behalf.

    The office's supervisor reported that that no supervisor was present at the time of the

visit. He said no one reported the incident to him and that he first heard about it when the media

called to alert him that a video would be aired shortly.  Both employees involved were

immediately terminated and are quite contrite and apologetic.

Brooklyn Office

    Both employees featured in the Brooklyn video were employees of ACORN Housing, a

separate entity from ACORN.  One was a counselor who worked on foreclosure mitigation.  The

other was an administrative assistant.  ACORN and ACORN Housing are located on the second

floor of the same building in Brooklyn, and the floor has an open floor plan, with cubicles.

Visitors are greeted by a receptionist employed by New York Organizing and Support Center

("NYOSCI") in a separate reception area.  Depending on what a visitor requests, the receptionist

directs the visitor to ACORN or ACORN Housing.

    According to an employee in the Brooklyn office, ACORN and ACORN Housing work

closely together, and have the same belief in working to help low-income communities. One side

of the room works to empower members and get them to change their own lives, and the other

side helps with home ownership.  Each organization has its own payroll and bookkeeper.

    When Mr. O'Keefe and Ms. Giles entered the Brooklyn office, the ACORN Housing

employee noted that it is a place of business, and Ms. Giles would have to go home and change

Proskauer»

into more appropriate clothing.  Ms. Giles responded that if she went home, her pimp would beat

her up. She said she had a quick question, and would then be on her way.  The ACORN

employee agreed to speak privately with Ms. Giles, who said she had an abusive pimp and

wanted to get away.  Ms. Giles stated that the pimp recruited 13-year-old girls to prostitution.

Ms. Giles said she wanted to buy a house to protect them.

The ACORN Housing employee responded that Ms. Giles could not buy a house because

her income derived from illegal activities.  She also told Ms. Giles that she needed to get out of

this situation and be smarter than this.  The ACORN Housing employee has represented to her

former colleagues that she felt sorry for Ms. Giles.

Employees in the Brooklyn office considered the incident a hoax because Ms. Giles was

dressed like a stereotypical prostitute and, while claiming to fear her abusive pimp, proceeded to

speak openly to strangers about her circumstances.

<u>Los Angeles Office</u>

A video of an ACORN Housing employee was released on November 17, 2009.  Because

this individual is not employed by ACORN, we did not have the opportunity to learn the

circumstances surrounding this video. The one ACORN employee captured on video declined to

speak with the videographers.

<u>Miami Offices</u>

Ms. Giles, without Mr. O'Keefe, visited the Miami ACORN office and the Miami

ACORN Housing office.  At the Miami ACORN office, Ms. Giles was asked whether she

needed assistance with foreclosure or first-time home buying.  Ms. Giles insisted that she speak

with the counselor privately.  When the counselor agreed, Ms. Giles represented herself as a

prostitute.  The counselor responded by stating that everyone deserves a second chance, and

Proskauer≫

provided Ms. Giles with a list of domestic violence shelters.  Ms. Giles responded that she

needed to have a house. The counselor noted that Ms. Giles needed three years of tax returns and

that, since she hadn't paid taxes, she needed to straighten things out with the IRS. The counselor

then ended the conversation.  Before leaving, Ms. Giles pleaded with the counselor not to call the

police or security, to which the counselor responded that perhaps ACORN Housing could help.

Ms. Giles, again without Mr. O'Keefe, then visited the ACORN Housing office. It is not

clear whether this occurred on the same day. She was described as being dressed in a short skirt

and revealing shirt.  Ms. Giles said she needed a place to stay, or a house. She was given a list of

shelters to call.

Philadelphia Office

Mr. O'Keefe called the Philadelphia office to make an appointment, stating that he was

interested in running for Congress in the future.  The call was transferred to the Philadelphia

office's Legislative Director, who reported the following set of events: when told that ACORN

could not help him with his political aspirations, Mr. O'Keefe stated that he also needed help

with housing.  This, combined with the fact that Mr. O'Keefe called from a New Jersey number

(listed under the name of his mother) raised ACORN's suspicions. Mr. O'Keefe was told to call

back at 3 p.m. Through an Internet search, the Legislative Director quickly identified Mr.

O'Keefe and his blog, including his previous involvement in a campaign against Planned

Parenthood.

Later that day, Mr. O'Keefe and Ms. Giles arrived on a different floor of the ACORN

office, and spoke with members of Philadelphia ACORN. They claimed they were referred to the

office for help by the Legislative Director. When a staff member used a text message to alert the

Proskauer»

Legislative Director, the Legislative Director came downstairs. At that point, O'Keefe and Giles

had left the office.  The police were notified and arrived shortly thereafter.

The Legislative Director attempted to contact a fellow employee in the Washington, D.C.

office to alert him to these events, but at the time, ACORN's email system was not working.

While no video of this visit was released, some of the released videos contain scenes of

the sign of the Philadelphia ACORN office and shots of Philadelphia's head organizer with no

audio.

<u>San Bernardino Office</u>

In San Bernardino, a female ACORN employee was alone in the office when the

videographers arrived. The videographers were accompanied by another male individual who has

not been identified.  According to an affidavit prepared by the ACORN employee, she was

suspicious of the videographers and their story; was scared for her safety; and responded to their

comments with outrageous statements, including that she had killed her husband and had

previously run an escort service.  In fact, her former husbands are alive.   She eventually

encouraged the videographers to leave the office and meet a neighbor.  The ACORN employee

then left the videographers with the neighbor, closed and locked the office, and left.

<u>San Diego Office</u>

In San Diego, the ACORN employee who met with the videographers does not speak

English as his first language. His colleagues usually converse with him in Spanish.  In the

released video, his participation amounts mostly to nodding or saying "OK." It is difficult to

determine what this employee is responding to because the videographers statements are

obscured by a voiceover inserted later.  At one point during the meeting, the ACORN employee

attempted to call the police.  At other points, he attempted to take pictures of the videographers

Proskauer》

with his cell phone.  Following the interview, he called a relative in the National City police

department to report the incident.  According to a statement released by the National City Police

Department:

"On August 20, 2009, an ACORN employee contacted his cousin, a National City Police

Detective, to ask him general advice regarding information he had received about possible

human smuggling.  In response, the Detective contacted a law enforcement officer serving on a

federal task force that specifically deals with human smuggling.  The task force officer said he

needed more specific details to move forward.  This message was related to the ACORN

employee.  The ACORN employee responded several days later and explained to the Detective

that police assistance was not needed because the information he initially received was not true

and what had happened to him was a ruse."

<u>Washington, D.C. Office</u>

Two of the individuals included in the Washington, D.C. video were employees of

ACORN Housing.  The third individual is an unaffiliated real estate broker who happened to be

in the office at the time.  Because these employees work for ACORN Housing, we have no

knowledge of the circumstances surrounding this visit.