UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

--------------------------------------x

ASSOCIATION OF COMMUNITY : Civil Action No.
ORGANIZATIONS FOR REFORM : 09-CV-4888 (NG)
NOW, et al., :
:
Plaintiffs, :
: (Gershon, J.)
vs. : (Bloom, M.J.)
:
UNITED STATES OF AMERICA, et al., :
:
Defendants. :

--------------------------------------x

## FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO MODIFY OR AMEND THE PRELIMINARY INJUNCTION

### INTRODUCTION

On December 17, 2009, plaintiffs filed a motion to amend the Court's December 11, 2009 Preliminary Injunction to include the prohibitions on funding ACORN and its affiliates found in the recently enacted Consolidated Appropriations Act, 2010 (H.R. 3288) (Consolidated Appropriations Act) and the previously enacted Department of Interior, Environmental, and Related Agencies Appropriations Act, 2010 (Pub.L.No. 111-88). Plaintiffs ask this Court to further extend an impermissibly broad reading of the Bill of Attainder Clause well beyond its historical meaning.

This Court should reject plaintiffs' requests for at least three reasons. First, as this Court has explicitly recognized, neither the United States Supreme Court nor the Court of Appeals for the Second Circuit has ever found a temporary Congressional restriction on an organization's opportunity to apply for discretionary federal funds to be punishment for purposes of the Bill of Attainder Clause. For the reasons previously advanced by the Government, as well as those below,

1

a temporary restriction on an organization's access to federal funds is not punishment.

Second, the terms and legislative history of the newly enacted Consolidated Appropriations Act confirm what the government has previously explained: the temporary restrictions at issue in this case serve a valid, important, non-punitive purpose, and they are not unconstitutional punishment. Congress has mandated that the Comptroller General audit and review ACORN's potential misuse of Federal funds and report back to Congress in 180 days, while suspending ACORN's eligibility for federal funding until after that investigation is concluded. That provision confirms that the funding restrictions here are not punishment. Instead, it is part of an effort to protect, for a temporary time period, against the potential fraud, waste and abuse of public funds while a more thorough analysis of any misuse of federal funds by plaintiffs is conducted.

Third, the constitutionality of the congressional decision that a temporary cessation of funding is appropriate is particularly clear given the findings of the investigative report commissioned by ACORN itself and authored by the former Attorney General of Massachusetts, Scott Harshbarger (the "Harshbarger Report"). This independent analysis amply documents ACORN's "longstanding management weaknesses" and "obvious" "internal potential for fraud." ACORN's own self-examination reinforces the non-punitive basis for the funding restriction

In short, a temporary restriction on grants or contracts to allow a full congressional investigation of what appear on their face to be major problems with a grantee – serious and credible allegations of fraud and abuse as well as serious management and accountability problems that have been identified as a result – is not equivalent to a bar on pursuing one's profession and is not punishment. Accordingly, plaintiffs' motion should be denied in full.

In the alternative, if this Court does amend or modify the preliminary injunction issued on

December 11, 2009, plaintiffs should be required under Rule 65(c) to give security for the costs that the Department of Housing and Urban Development (HUD), or any other agency, would incur in complying with the injunction. This bond would be forfeited if it should later be determined that the Agency was wrongfully enjoined.

## STANDARD OF REVIEW

Plaintiffs seek an order modifying or amending the Court's preliminary injunction pursuant to Fed.R.Civ.P. 59(e). Rule 59(e) states that "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Although the Rule "does not [necessarily] prescribe specific grounds for granting a motion to alter or amend an otherwise final judgment," Munafo v. Metropolitan Transp. Authority, 381 F.3d 99, 105 (2d Cir. 2004), "district courts may alter or amend a judgment 'to correct a clear error of law or prevent manifest injustice.'" Id. (quoting Collison v. Int'l Chem. Workers Union, Local 217, 34 F.3d 233, 236 (4th Cir.1994)).

## ARGUMENT

A.  **A Temporary Restriction On The Opportunity To Apply For Discretionary Government Funds, Based On Admitted Financial Wrongdoing, Is Not An Unconstitutional Legislative Punishment**

As this Court acknowledged, the "idea that the deprivation of the opportunity to apply for discretionary federal funds is 'punitive' within the meaning of the attainder clause seems implausible. Neither the Supreme Court nor the Second Circuit has been faced with such a claim." Opinion and Order ("Opinion") at 9. Indeed, the historical meaning of legislative punishment "originally connoted a parliamentary Act sentencing a named individual or identifiable members of a group to death," and at the time of the Founding was also applied to

3

such indubitably punitive measures as imprisonment, banishment, and the punitive confiscation of property. Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 473-74 (1977). Since the Constitution's enactment, the Supreme Court has found only a few statutes to be unconstitutionally punitive, and all of those exceptional enactments have been outright, permanent "legislative bars to participation by individuals or groups in specific employments or professions." Selective Serv. Sys. v. Minn. Pub. Interest Research Group, 468 U.S. 841, 852 (1984). Neither the history nor the Court's cases suggest that Congress is forbidden from temporarily restricting eligibility to apply for discretionary federal funds on the theory that the restriction "punishes" the restricted organization.[1] Cf. Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 587-88 (1998) (making clear that in issuing grants, Congress enjoys considerable constitutional latitude). Nonetheless, plaintiffs ask the Court to take a dramatic further step to stretch the meaning of historical punishment by amending its injunction.

Analyzing the historical meaning of legislative punishment, this Court found United States v. Lovett, 328 U.S. 303 (1946), "particularly instructive," and concluded "the Court in Lovett did not base its decision on a property rights analysis." Opinion at 9, 10. But in Lovett, the law held to be a bill of attainder cut off salaries to three named federal civil servants who "had been for several years working for the Government." Lovett, 328 U.S. at 304. Moreover,

---

[1] This Court also refers to an unpublished district court decision in another Circuit which concluded that a state restriction on funding of a particular contractor was an unconstitutional bill of attainder. See Fla. Youth Conservation Corps., Inc. v. Stutler, 2006 WL 1835967, at *2 (N.D. Fla. June 30, 2006). However, that same Circuit subsequently upheld in a precedential opinion legislative restrictions preventing certain groups from access to discretionary government funding, concluding that those restrictions did not inflict punishment but instead furthered "the non-punitive goal of allocating resources." See Houston v. Williams, 547 F.3d 1357, 1360-61, 1364 (11th Cir. 2008).

the statute was not a simple restriction on the funds appropriated for a single fiscal year, but rather applied indefinitely into the future, to "any appropriation . . . which is hereafter made." Id. at 305 n.1. Its purpose "was not merely to cut off [the employees'] compensation through regular disbursing channels but permanently to bar them from government service." Id. at 313. "Over the protest of those employing agencies," Congress nonetheless barred the use of federal funds to pay the respondents. Id. at 305.

The parties have assumed in this Court that the Bill of Attainder Clause protects corporations as well as individuals, an issue that has not been resolved by the Supreme Court but is addressed by controlling precedent in the Second Circuit.[2] See Consol. Edison Co. of New York v. Pataki, 292 F.3d 338, 349 (2d Cir. 2002). But even assuming the Clause does apply to corporations, "it is obvious that there are differences between a corporation and an individual under the law," and, therefore, "any analogy between prior cases that have involved individuals and this case, which involves a corporation, must necessarily take into account this difference." BellSouth Corp. v. FCC, 162 F.3d 678, 683-84 (D.C. Cir. 1998); see also Con. Ed., 292 F.3d at 354 ("There may well be actions that would be considered punitive if taken against an individual, but not if taken against a corporation."). Even if the Supreme Court in Lovett did not solely base its decision on whether the respondents there had a "vested property right," a lifetime bar on all government employment for an individual civil servant already in government employment is a far cry from a temporary bar on an organization's receipt of discretionary federal funds for a month or even a year.

---

[2] Defendants expressly reserve the right to challenge the applicability of the Bill of Attainder Clause to corporations in any subsequent appellate proceedings in this case.

Further distinguishing Lovett, the statute in that case was based on an express congressional determination that the three government employees were guilty of having subversive beliefs and associations. That determination followed hearings before "a special subcommittee of the Appropriations Committee . . . in secret executive session" from which even counsel for the employing federal agencies were barred. Id. at 310-11. The Court determined that the "permanent proscription of any opportunity to serve the Government is punishment, and of a most severe type," and "is a type of punishment which Congress has only invoked for special types of odious and dangerous crimes." Id. at 316. No such proceedings, adjudication or permanent proscription took place in the case at bar.

Indeed, quite to the contrary, the provisions of the Consolidated Appropriations Act reinforce the valid and non-punitive public purpose that underlies the temporary restriction at issue in this case. Rather than adjudicating ACORN's guilt, Congress has directed the Government Accountability Office (GAO) to conduct an investigation into the possible misuse of any federal funds. Section 535 of Division B of the Consolidated Appropriations Act requires the Comptroller General of the United States (who is the head of the GAO) to conduct "a review and audit of Federal funds received by the Association of Community Organizations for Reform Now ... or any subsidiary or affiliate of ACORN" to determine:

> (1) whether any federal funds were misused and, if so, the total amount of Federal funds involved and how such funds were misused; (2) what steps, if any, have been taken to recover any Federal funds that were misused; (3) what steps should be taken to prevent the misuse of any Federal funds; and (4) whether all necessary steps have been taken to prevent the misuse of any Federal funds.

H.R. 3288, 111th Cong. Div. B., § 535(a) (enacted Dec. 16, 2009).

Nor is Section 535 the only evidence of Congress' desire to gather the relevant facts. Members of Congress called for an investigation of ACORN and intended for an audit or review to be conducted.[3] On September 23, 2009, two days before the House of Representatives passed the Continuing Resolution, Congressman Lamar Smith (R-TX), Ranking Member of the Committee on the Judiciary, and Congressman Darrell E. Issa (R-CA), Ranking Member on the Committee on Oversight and Government Reform, wrote a letter to the GAO. See Exhibit 1, Letter from Congressmen Smith and Issa to The Honorable Gene Dodaro, Acting Comptroller General, September 23, 2009. After describing a series of allegations of fraud, waste and abuse by ACORN, the Congressmen wrote:

> Members of Congress have a responsibility to ensure that taxpayer dollars are used according to the purpose for which they are appropriated. When faced with numerous allegations of fraudulent and criminal conduct by a federal grantee, such as those that now face ACORN, it is important that Congress understand the extent to which ACORN *may have defrauded* the American people so that future Congresses can take steps to ensure that such blatant misuse of funds does not occur again and that wrong-doers are prosecuted.

Id. at 2 (emphasis added). As the Congressmen emphasized, a GAO investigation was necessary "to determine *whether* the organization misused congressionally appropriated funds." Id. at 1 (emphasis added). Likewise, on the same day, 20 Senators wrote a separate letter to the GAO requesting an investigation into ACORN's use of federal funds. See Exhibit 2, Letter from

---

[3] Moreover, this call for a GAO investigation was intertwined with Congress' assessment of the anticipated ACORN internal investigation, see Mem. in Supp. of Defs. Mot for Recons. at 3 n.3 (Dock. No. 11). The Harshbarger Report confirmed that "[t]he culture of hands-off management that was a hallmark of the ACORN organizing model is inappropriate and risky when applied to service delivery under governmental contracts and other legal and regulatory requirements." Pl. Exh. G at 15. This potential misuse of government funds was only exacerbated by "[t]he internal potential for fraud due to the lack of checks and balances and oversight . . . ." Id.

7

Twenty Senators to The Honorable Gene Dodaro, Acting Comptroller General, September 23, 2009. Again, the Senators emphasized the need to gather facts, writing:

> Current voter fraud investigations in several states, prior fraud convictions, and new videos showing apparent illegal activity by ACORN employees suggest that at the very least the organization warrants a top to bottom investigation on behalf of the taxpayer. Taxpayers deserve nothing less than a thorough and transparent accounting of ACORN's activities.

Id. at 1.

On December 7, 2009, the GAO accepted that the proposed investigation was within its authority, and responded to the Congressmen that it planned to combine the various requests, including a separate request by Representative Rush Holt (D-NJ), into one engagement. See Exhibit 3, Letter from Ralph Dawn, Managing Director of Congressional Relations to Congressman Smith, December 7, 2009. The Comptroller General also agreed to contact relevant agency Inspectors General (IG), so as to avoid duplication of work. Id. at 1; see, e.g., Exhibit 4, Review of Department of Justice Grants to the Association of Community Organizations for Reform Now, Inc. (ACORN) and its Affiliated Organizations (DOJ IG Report). These various IG investigations, such as the investigation performed by the Justice Department's OIG, have also been done at the behest of Congress. See, e.g., Exhibit 4, DOJ IG Report at 1.

The contrast to Lovett thus could not be more clear. Rather than making legislative judgments as to guilt as was the situation in cases such as Lovett, Congress has expressly refrained from passing any such judgment, and has instead sought to put a temporary freeze on the dispersal of federal funds to allow the federal government to gather more information on the

allegations of fraud, waste, and abuse. The concerns about "star chamber" proceedings that underlie both the Bill of Attainder Clause and cases like <u>Lovett</u> are thus absent here.

More broadly, the text – and indeed the very existence – of Section 535 further confirms the absence of punitive intent. As the Supreme Court explained in <u>Flemming v. Nestor</u>, "[i]n determining whether legislation which bases a disqualification on the happening of a certain past event imposes a punishment, the Court has sought to discern the objects on which the enactment in question was focused." 363 U.S. at 613-14. And "[w]here the source of legislative concern can be thought to be the activity or status from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected." <u>Id.</u> at 614.

Here, both the text of and legislative history behind Section 535 reinforce the conclusion that the ACORN-related provisions advance the non-punitive purpose of devising a means for safeguarding Federal funds for a brief period of time to allow completion of the GAO inquiry. Section 535 focuses the inquiry on "whether any Federal funds were misused" and what steps must be taken "to recover any Federal funds that were misused," H.R. 3288, 111th Cong., § 535(a)(1)-(2), and it requires the Comptroller General "[n]ot later than 180 days after the date of enactment of this Act" to submit to Congress "a report on the results of the audit" along with "recommendations for Federal agency reforms." <u>Id.</u>; § 535(b). Section 535 thus requires that the Comptroller General report to Congress with a set of recommendations, so that Congress can then determine, based on its own judgment, where and how to allocate these discretionary funds. And while plaintiffs complain that the absence of a date certain for a restoration of funds undermines the non-punitive purposes evidenced by Section 535, <u>see</u> Pl. Mem. at 5 n.3, the creation of a relatively short time frame for the completion of the investigation indicates a

9

congressional desire for a rapid resolution of the ACORN situation, and is entirely consistent with the non-punitive purposes of the legislation. See Flemming v. Nestor, 363 U.S. 603, 617 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed.").

Moreover, the 180-day time frame of the GAO investigation is consistent with the appropriations cycle. Congress necessarily appropriates funds for an entire fiscal year; conditions attached to the current year's funding are not permanent, do not automatically carry over to the next year's funding, and must be renewed if Congress wishes them to continue.[4] Here, the GAO as the investigation will be done in time to allow Congress to decide whether to include similar ACORN-related restrictions in Fiscal Year 2011 appropriations acts. Plaintiffs object that the funding restriction does not expire when the GAO report is complete; that is simply a consequence of the fact that the GAO is performing an investigative function; whatever conclusions for next year's appropriations are warranted based on the investigative findings are for Congress to draw, not the Comptroller General alone.

---

[4] Congress certainly can and does provide for permanent conditions that apply each year without further Congressional action, but it chose not to do so here. See, e.g., Pub. L. No. 97-102, § 402, 95 Stat. 1442, 1465 (1981) (providing that "none of the funds in this or any other Act shall hereafter be used" to approve certain railroad abandonments) (construed as a permanent restriction in 70 Comp. Gen. 351 (Mar. 22, 1991)); Cella v. United States, 208 F.2d 783, 790 (7th Cir. 1954) ("Congress has the power to enact permanent legislation in an appropriation act. The use of the word 'hereafter' by Congress as a method of making legislation permanent is a well-known practice.") (internal citation omitted). As noted above, the restriction in Lovett took that permanent form. See 328 U.S. at 306 n.1 (restriction applied to appropriations "hereafter made").

The legislative history behind the enactment of Section 535 provides additional evidence of Congress' lack of punitive intent. Section 535 originated when Senator Richard Durbin (D-IL) proposed Amendment No. 2647 to H.R. 2847, which was the appropriations bill for Commerce, Justice, Science, and Related Agencies before it was folded into the Consolidated Appropriations Act. In explaining the rationale for this provision, Senator Durbin stated, in pertinent part, as follows:

> First, we should find out the facts. I know ACORN is unpopular right now, and much of that scorn they deserve, but ACORN has a number of affiliated organizations. . . . To my knowledge, we have not yet seen any review or analysis of whether the misconduct was the work of a few employees or whether the entire organization and all of its affiliates should be held responsible. . . .
>
> That is why I am proposing that we get to the bottom of this by having a thorough investigation; that Congress direct the Government Accountability Office to review and report back to us within 180 days on whether any Federal funds have been misused by ACORN or its affiliates; and, if so, in what amounts and in what ways. . . .
>
> The report I have called for should also identify the steps necessary to correct any deficiencies, along with an assessment of whether all necessary steps have been taken to prevent any future misuse of Federal funds. The GAO will be able to conduct a government-wide review-not just one agency-looking at any funds ACORN or its affiliates have received from any Federal agency. It will be a complete and comprehensive review and investigation.

155 Cong. Rec. S10181, S10211-12 (daily ed. Oct. 7, 2009) (statement of Sen. Durbin).

Likewise supporting the legislation's non-punitive purpose of preventing ACORN's misuse of federal funds is the Harshbarger Report, addressed in the Government's motion for reconsideration. The Report sets forth nine recommendations for improvement arising from numerous criticisms of ACORN as it currently exists, but recognizes that reform "will not occur

11

overnight." Report at 5.[5] The findings regarding ACORN's management and internal controls reinforce Congress' concern with the misuse of federal funds. Considering ACORN's organizational structure, the Report finds that "ACORN leadership at every level is thin . . . the infrastructure needed to manage and oversee a sprawling federation has not been developed; and key policing mechanisms and staffing, such as a chief financial officer, or independent members of boards of trustees, have not been integrated into the organization." Id. at 9-10. The Report concludes that these pervasive organizational weaknesses have been exacerbated as ACORN has evolved from an organization dedicated to community organizing to one that provides services related to taxes, food stamps, housing foreclosure, and citizenship applications, the same types of services for which plaintiffs apply for federal grants to provide. Moreover, "[t]he culture of hands-off management that was a hallmark of the ACORN organizing model is inappropriate and risky when applied to service delivery under governmental contracts and other legal and regulatory requirements." Id. at 15. Finally, "[t]he internal potential for fraud due to the lack of checks and balances and oversight, is obvious . . . ." Id. By their own admission, plaintiffs derive significant portions of their funding from the federal government. Given the admitted complexities of ACORN's structure Congress can reasonably regard all misuse of ACORN funds as directly related to the potentially improper expenditure of federal funds.[6]

---

[5] Although the Report also identifies areas where ACORN has focused on reform, it finds "[t]his focus, however, has not yet been matched by a similar attention to key management, human resources and field operation functions, creating vulnerabilities for the entire organization." Report at 10. Moreover, it notes that "[p]revious professional reports demonstrate major flaws and weaknesses in all aspects of the ACORN financial and operational systems, and the steps needed to remedy them." Id. at 17.

[6] The Harshbarger Report notes that "[t]he legal and governance structure of ACORN (the "ACORN Family") is incredibly complex, with a number of separate but interrelated

The Harshbarger Report, paid for by ACORN itself, concludes that ACORN has suffered through years of "serious management challenges[.]" "The hidden camera controversy is perceived by many as a third strike against ACORN on the heels of the disclosure in June 2008 of an embezzlement cover-up, which triggered the firing of ACORN's founder,[7] and the allegations of voter registration fraud during the 2008 election, done in collaboration with Project Vote." Report at 2. The Harshbarger Report thus confirms that Congress could reasonably have been concerned about the prospect of the misuse of public funds, and that the legislation challenged by plaintiffs should be seen as a desire to investigate that potential misuse, and to stop potential misuse pending that investigation, rather than as an attempt to impose punishment.

In short, and at core, a temporary restriction on grants or contracts to allow a full congressional investigation of what appear on their face to be serious and credible allegations of fraud and abuse is not equivalent to a bar on pursuing one's profession and, given the historical meaning of legislative punishment, is not punishment. As the Supreme Court has repeatedly recognized, "'th[is] sanction is the mere denial of a noncontractual governmental benefit. No affirmative disability or restraint is imposed,' and Congress has inflicted 'nothing approaching the 'infamous punishment of imprisonment' or other disabilities historically associated with punishment." Selective Service Sys., 468 U.S. at 853 (quoting Flemming v. Nestor, 363 U.S.

---

components that at one point was estimated at approximately 200 entities, but now consists of 29 entities . . . ." Report at 6. The Report identifies both Plaintiff ACORN Institute and Acorn Housing Corporation (the umbrella organization for Plaintiff New York Acorn Housing Company, Inc.) as part of the "ACORN Family." Id.

[7] The Report was commissioned in part to "[e]valuate the management and governance reforms that ACORN's new leadership" developed "[s]ince the termination of founder Wade Rathke following the disclosure of his eight-year cover-up of an embezzlement by his brother, the then Chief Executive Officer of CCI." Report at 1, 7.

13

603, 617 (1960)). Accordingly, this Court should not modify or amend its preliminary injunction to include these four additional ACORN provisions.

**B.      The Court Should Require Plaintiffs To Post A Bond Under Rule 65(c)**

If, as requested by the plaintiffs, this Court amends or modifies the preliminary injunction issued on December 11, 2009, plaintiffs should be required to give security for the costs that HUD (or any other agency named in the injunction) would incur in complying with the injunction. This bond would be forfeited if it should later be determined that the defendants were wrongfully enjoined. Rule 65(c) provides in pertinent part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

"The purpose of requiring security prior to issuance of an injunction or a temporary restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." Interlink Int'l Fin. Servs., Inc. v. Block, 145 F. Supp. 2d 312, 314 (S.D.N.Y. 2001) (internal citation and quotations omitted). The public interest in resolving the constitutional question has to be balanced with HUD's mission to provide services to public housing residents through the HOPE VI Community and Supportive Services. See Declaration of Ronald T. Ashford, dated November 30, 2009 ("Ashford Decl.") ¶¶ 1-2 (attached as Exhibit A to Def. Opp.). Courts have required parties making challenges to government programs to provide a security where the government program would suffer losses if the injunction was later found to be wrongfully entered. See, e.g., Maryland Dep't of Human Resources v. U.S. Dep't of Agriculture, 976 F.2d 1462, 1483 (4th Cir. 1992) (preliminary injunction regarding food stamp

14

funds exposed Department of Agriculture to financial losses).

Under the proposed modification of the preliminary injunction to include Section 418 of Division of the Consolidated Appropriations Act, HUD could be requested to begin providing funds to ACORN Institute. As one example, under the terms of the ROSS agreements, HUD has stated that $558,853.41 remain undisbursed to ACORN Institute. See Ashford Decl. ¶ 8. If an ACORN entity were to receive monies under this particular grant agreement and this Court and/or the Second Circuit were later to find that those monies had been expended unlawfully, HUD might not be able to recoup those funds so they could be expended for a lawful purpose. Thus, in keeping with the purpose of Rule 65(c), plaintiffs should be required to post a bond in the amount of any projected payments under ROSS grants, and under any other grants that ACORN anticipates receiving from HUD or any other agency as a result of the entry of a preliminary injunction in this matter.[8] This bond would be forfeited (in whole or in part) upon a later determination that those payments had been unlawful.

## CONCLUSION

WHEREFORE, for good cause shown, Defendants respectfully request the Court deny Plaintiffs' Motion to Modify or Amend the Preliminary Injunction (Dock. No. 15) and instead grant Defendants' Motion to Reconsider or Amend its December 11, 2009 Opinion and Order

---

[8] If plaintiffs – who are in the best position to know from which agencies they receive federal funds – wish to contend that they are entitled to injunctive relief against the heads of agencies other than those plaintiffs named in the complaint, they must move for leave to amend their complaint to add those officials as parties. See Mem. in Supp. of Defs. Mot for Recons. at 7-8. While the OMB Director is a named party, the Director does not have independent authority to direct or authorize Federal agencies to disregard the ACORN appropriations prohibitions at issue here. Accordingly, plaintiffs cannot circumvent their obligation to name the officials who are allegedly causing them prospective injury by asking this Court to treat an injunction against the Director as an injunction against the entire United States government.

(Dock. No. 11).

Dated: December 18, 2009                    Respectfully Submitted,


TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

BENTON J. CAMPBELL
United States Attorney

F. FRANKLIN AMANAT
Assistant United States Attorney

<u>/s/ Peter D. Leary</u>
PETER D. LEARY, Virginia Bar #71196
MICHAEL SITCOV, D.C. Bar # 308682
BRADLEY H. COHEN, D.C. Bar #495145
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W. Room 7322
P.O. Box 883
Washington, D.C. 20044
(202) 514-3313
(202) 616-8470 (fax)
Email: <u>Peter.Leary@usdoj.gov</u>

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I, Peter D. Leary, hereby certify under penalty of perjury that on this 18th day of December, 2009, I did cause true and correct copies of the above and foregoing instrument, Federal Defendants' Response to Plaintiffs' Motion to Modify or Amend the Preliminary Injunction, to be served electronically on counsel for plaintiffs.

/s/ Peter D. Leary
PETER D. LEARY
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
P.O. Box 883
Washington, D.C. 20044
(202) 514-3313
(202) 616-8470 (fax)
Email: peter.leary@usdoj.gov