Exhibit 4

U.S. Department of Justice
Office of the Inspector General

# Review of Department of Justice Grants to the Association of Community Organizations for Reform Now, Inc. (ACORN) and its Affiliated Organizations



## November 2009

# Review of Department of Justice Grants to the Association of Community Organizations for Reform Now, Inc. (ACORN) and its Affiliated Organizations

In response to a congressional request, the Office of the Inspector General (OIG) conducted this review to determine whether the Department of Justice (DOJ) had provided grants to the Association of Community Organizations for Reform Now, Inc. (ACORN).  In our review, we examined whether:  (1) ACORN applied for federal funds through DOJ-administered grant programs, (2) ACORN received federal funds through DOJ-administered grant programs, (3) controls were placed on the use of DOJ grant funds awarded to ACORN, and (4) DOJ conducted any reviews or audits of the use of DOJ grant funds awarded to ACORN.  We also conducted the same analysis for organizations we determined to be ACORN affiliates.

Our review did not find any direct DOJ grants to ACORN during the past 7 years.  However, as described below, we found that one recipient of DOJ grant funds entered into a sub-agreement with ACORN for program activities.  In addition, we identified one direct grant of DOJ funds to an affiliate of ACORN.  We also identified three instances in which a DOJ grantee entered into a sub-award with an ACORN affiliate.  Thus, in total, we found that ACORN and its affiliates received one direct grant and four sub-awards totaling approximately $200,000 between fiscal years (FY) 2002 and 2009.  In addition, during this period we determined that ACORN affiliates submitted five applications for DOJ grant funds that were denied.

Specifically, with respect to the sub-award received by ACORN, we determined that a DOJ grant recipient, Citizens Committee for New York City, Inc. (CCNYC), entered into a sub-award agreement with ACORN in September 2008.  CCNYC had received a congressionally mandated DOJ grant (earmark) of $290,663 to run a Crime Stoppers Program in New York City.  CCNYC subcontracted with 21 organizations (including ACORN) for services related to this program.  ACORN received a $20,000 sub-award to perform activities in coordination with local law enforcement authorities intended to create safer neighborhoods, such as participating in monthly community meetings with law enforcement officials and working with community members to create plans that targeted concentrated pockets of criminal activity.  However, we determined that as of November 12, 2009, no funds have been paid to ACORN by the CCNYC under that agreement because ACORN submitted a reimbursement request for costs outside the scope of the agreement.  According to DOJ, CCNYC is awaiting documentation from ACORN before disbursing the funds.

In addition, we identified one direct grant of DOJ funds to an ACORN affiliate, the New York Agency for Community Affairs, Inc. (NYACA).  We considered NYACA to be an affiliate of ACORN because it acted as a fiscal agent for ACORN, engaged in substantial financial transactions with ACORN, and DOJ grant documentation showed that ACORN was a major partner in the grant program being funded.  In FY 2005, NYACA received a grant of $138,130 resulting from a congressional earmark.  The purposes of the grant to NYACA were to provide youth leadership training to students at select New York City schools; form "ACORN Youth Union" chapters; and coordinate student campaigns to address issues such as school funding, neighborhood safety, and school governance.

We also determined that three DOJ grantees entered into sub-agreements with ACORN affiliates.  First, in December 2007 the ACORN Institute, Inc., received a $13,000 sub-award from a $200,000 grant to Operation Weed and Seed – St. Louis, Inc., to canvass designated neighborhoods in the St. Louis area in an effort to recruit community members to participate in Weed and Seed program activities.

Second, another DOJ grantee, the city of Phoenix's Neighborhood Services Department, entered into a sub-award agreement with the ACORN Institute to receive $8,539 from its $150,000 Weed and Seed grant to canvass residents and increase awareness of the Earned Income Tax Credit and free tax preparation for residents of designated neighborhoods in the city of Phoenix.  However, as of November 16, 2009, the city of Phoenix had not paid any of the sub-award funds to the ACORN Institute and had put the sub-award on hold due to poor reporting by the ACORN Institute regarding another project not related to DOJ grant funds.  According to the DOJ's Office of Justice Programs (OJP), the city of Phoenix was planning to seek approval from its steering committee to terminate the sub-award with the ACORN Institute and use the funds for other program needs.

Third, in July 2002 another DOJ grantee, the National Training and Information Center (NTIC) in Chicago, Illinois, entered into a $20,000 sub-award agreement with an ACORN affiliate, the American Institute for Social Justice (AISJ).  The grant program was called the Community Justice Empowerment Project and, according to grant documents, the congressional earmark award to NTIC was to provide training, technical assistance, and funding to community-based organizations nationwide to address problems of crime, violence, and substance abuse, and to assist in the revitalization and redevelopment of communities.  NTIC paid AISJ the full sub-award amount of $20,000.  However, neither NTIC nor AISJ provided evidence of what specific activities the sub-award was expected to fund or the purposes for which the funds were ultimately used.

We determined that DOJ components that issued the grants had not audited or otherwise reviewed the use of funds awarded to and disbursed to ACORN or their affiliates.  However, the OIG issued an audit in 2008 of the grant to NTIC.  The OIG audit found that the NTIC did not properly manage the grant and did not adequately monitor some of its 36 sub-grantees, including the AISJ.  We included the $20,000 sub-award to the AISJ in the total amount of questioned costs identified in our audit.

Finally, we identified five applications for DOJ grant funds submitted to DOJ components by ACORN affiliates from FY 2003 to FY 2009 that were denied.

The details of our review are provided in the remainder of this report.

**BACKGROUND**

According to its website, ACORN is a non-profit social justice organization with national headquarters in New York, New Orleans, and Washington, D.C., and more than 1,200 neighborhood chapters in about 75 cities across the country.  The website states that ACORN provides assistance with voter registration, free preparation of tax returns, first-time homeowner mortgage counseling, foreclosure prevention assistance, and low income housing development.

ACORN received widespread attention in September 2009 as a result of disclosure of hidden camera videos allegedly depicting ACORN employees providing advice on operating an illegal business, tax evasion, and money laundering.[1]  Following disclosure of the videos:

- The U.S. Census Bureau terminated its partnership with ACORN for the 2010 census.

- The Internal Revenue Service (IRS) released a statement that it had removed ACORN from its Volunteer Income Tax Assistance Program.

- Some states and localities, including New York and Maryland, initiated reviews or investigations of ACORN, while others terminated business relations with the organization.

---

[1]  The videos were of events in Baltimore, Maryland; Washington, D.C.; Brooklyn, New York; San Diego, California; and San Bernardino, California.  According to ACORN press releases, ACORN terminated the employees involved in the events depicted in the videos.

- Congress included in the Continuing Appropriations Resolution, 2010, a provision that bars providing federal funds to ACORN and its "affiliates, subsidiaries, or allied organizations."[2]

On September 15, 2009, Congressman Lamar Smith, the Ranking Member on the House Judiciary Committee, wrote to the OIG asking us to initiate a review to determine whether any DOJ grant funds had been applied for or received by ACORN, what types of controls were placed on DOJ funds received by ACORN, and whether the DOJ had audited or reviewed ACORN's use of these funds. In a letter to the Congressman dated September 21, 2009, we agreed to conduct such a review.

## SCOPE AND METHODOLOGY OF OIG REVIEW

The objectives of our review were to determine whether: (1) ACORN or any of its affiliates applied for federal funds through DOJ-administered grant programs, (2) ACORN or its affiliates received federal funds through DOJ-administered grant programs, (3) controls were placed on the use of DOJ grant funds awarded to ACORN or its affiliates, and (4) DOJ conducted any reviews or audits of the use of DOJ grant funds awarded to ACORN or its affiliates.[3]

*Time Period Covered*

The time period covered by our review depended somewhat on the records retained by the DOJ components that make grants. At a minimum, our review was designed to identify: (1) grant applications submitted by ACORN and its affiliates from FY 2003 through FY 2009; (2) awards made directly to ACORN or an affiliate from FY 2003 through FY 2009; (3) the awarding of DOJ grant funds by a direct grant recipient of DOJ funds to ACORN or to an ACORN affiliate (a sub-grant or sub-award) for all grants that remained open as of October 2009 and for all grants closed in FY 2007

---

[2] Pub. L. No. 111-068 (2009). The Office of Management and Budget (OMB) subsequently issued guidance to federal agencies on how to comply with this requirement (OMB Memorandum M-10-02 issued October 7, 2009).

[3] In this report, the term "grant" includes cooperative agreements awarded by DOJ components, and these types of agreements were encompassed within the scope of our review. Unlike grants of funds, federal agencies awarding cooperative agreements expect "substantial involvement" in carrying out the activity contemplated in the agreement, such as an award for training and technical assistance.

through FY 2009;[4] and (4) any DOJ audits and reviews of the direct grants and sub-awards made to ACORN and its affiliates that we identified.[5]

*ACORN and its Affiliates*

To determine possible ACORN affiliates, we constructed a broad list with information compiled from a variety of sources including state corporate records, trademark information, IRS Forms 990, websites, and searches of public records databases.[6]  We also obtained information about the financial relationships and transactions between ACORN and possible affiliates, Employer Identification Numbers, Data Universal Numbering System (DUNS) numbers, names of organizations, addresses, telephone numbers, and website domain information.

However, we determined that this broad list was over-inclusive and included organizations that were likely not actual ACORN affiliates. Nevertheless, we provided this list to DOJ grant-making components to improve the likelihood of identifying DOJ grants awarded to an organization with some affiliation to ACORN.  We asked the DOJ grant-giving components to search their records for grant applications and direct grant awards to the organizations on the list of possible ACORN affiliates.

---

[4]  Each award has a time period during which the project is to be implemented, known as a "project period."  An award is "open" during the project period and, following the end of the project period, until various administrative requirements are satisfied, at which point the award is closed.  Sub-awards are defined for purposes of this report as DOJ grant funds provided to sub-recipients by the original award recipient.  These sub-awards are usually in the form of contracts, memoranda of understanding, or other agreements signed between the recipient and sub-recipient and are sometimes referred to as sub-grants, sub-agreements, or sub-contracts.

[5]  Some DOJ grant-making components retained records of direct grant awards before FY 2003.  For example, the Office of Community Oriented Policing Services' (COPS) database retained application and direct award records from FY 1994 through the present. The Office of Justice Programs (OJP) informed us that its electronic records of applications and direct awards may not be complete for FYs 2003 to 2005.  Those components that had information prior to FY 2003 searched their records that were readily accessible without any time-period restrictions.  For sub-awards, DOJ grant-making components searched their open grants and those that had closed within the past 3 fiscal years, because gathering such information about sub-grants required the components to contact thousands of DOJ grantees.

[6]  "ACORN affiliate" is a term that, while used often in connection with issues concerning ACORN funding, has not been defined in connection with the reviews requested or the legislation enacted by Congress.  IRS Forms 990 (Return of Organization Exempt from Income Tax) are publicly available annual reporting returns that certain federally tax-exempt organizations must file with the Internal Revenue Service.

In addition, we asked the DOJ grant-making components to identify whether ACORN or its affiliates had received any DOJ grant funds as a sub-recipient.  Specifically, we asked the components to contact all of their active grantees and recipients of awards that were closed within the past 3 years to determine if any sub-awards were provided to ACORN or any of its affiliates.[7]

*DOJ Components*

We gathered information about any grants to ACORN or its affiliates from the following DOJ grant-making components.[8]

- The **Office of Justice Programs (OJP)** awards a broad range of grants relating to crime prevention and control, improving justice systems, increasing knowledge about crime, and assisting crime victims.  In FY 2008, OJP awarded over 3,000 grants totaling over $1.7 billion.

- The **Office of Community Oriented Policing Services (COPS)** awards grants to state, local, territory, and tribal law enforcement agencies to hire and train community policing professionals, acquire and deploy crime-fighting technologies, and develop and test policing strategies.  COPS funding also provides training and technical assistance to community members, local government leaders, and law enforcement.  COPS provided approximately 1,000 grants totaling about $300 million in FY 2008.

- The **Office on Violence Against Women (OVW)** awards grants to provide assistance to communities that are developing programs, policies, and practices aimed at ending domestic violence, dating violence, sexual assault, and stalking.  Throughout FY 2008, OVW made 655 grant awards totaling over $330 million.

- The **Federal Bureau of Prisons (BOP) National Institute of Corrections (NIC)** awards funds for cooperative agreements to organizations that provide training, technical assistance, information services, and policy/program development assistance to federal, state, and local corrections agencies.  NIC awarded 41 cooperative agreements during FY 2008 totaling over $6.5 million.

---

[7] Some awarding agencies were already planning to or in the process of contacting active grantees in accordance with the guidance in OMB Memorandum M-10-02.

[8] The descriptions of the types of grants these agencies awarded were obtained from their websites.

- The **Civil Rights Division Office of Special Counsel for Immigration-Related Unfair Employment Practices** provides grants to organizations that assist discrimination victims; conduct seminars for workers, employers, and immigration service providers; distribute educational materials in various languages; and place advertisements in local communities to educate workers and employers about their rights.  The Civil Rights Division Office of Special Counsel for Immigration-Related Unfair Employment Practices provided over $700,000 in grant awards in FY 2008 to 11 organizations.

*Quality of the Searches*

In our review, we required the components to certify that they performed a thorough search of records to identify ACORN applications, grants, and sub-awards.  All of the components provided this certification to us.[9]

The OIG also performed independent searches of data sources identifying DOJ grantees, such as OJP's Grant Management System, for grants to ACORN or possible ACORN affiliates.  In addition, we searched the Federal Audit Clearinghouse database to identify any "single audits" of possible ACORN affiliates.[10]  We obtained from the Federal Audit Clearinghouse single audits of those organizations that we identified as possible ACORN affiliates, and we reviewed these audits to determine if the organizations had received DOJ grant funds.  In a further effort to identify any DOJ audits or reviews of the use of DOJ funds by these organizations, we searched OIG databases and records, searched OJP's Grant Management

---

[9]  The list of possible ACORN affiliates we provided to the components included several organizations unrelated to ACORN that we knew had received DOJ awards.  We included these names in the list to verify the quality of the components' searches for grantees from the list we provided.  The components accurately identified these records, which is an indication that they performed a thorough search for grantees on the list.

[10]  The Federal Audit Clearinghouse within the U.S. Census Bureau administers a database of single audits that have been conducted.  Single audits are performed by public accountants or a federal, state or local government audit organization in accordance with generally accepted government auditing standards.  They are intended to determine whether the financial statements and schedule of expenditures of federal awards are presented fairly, to test internal controls over major programs, to determine whether the grant recipient is in compliance with requirements that may have a direct and material effect on each of its major programs, and to follow up on prior audit findings.  These audits are required to be performed for organizations that expend $500,000 or more in federal awards in accordance with the Single Audit Act of 1984, as amended, and Office of Management and Budget (OMB) Circular A-133.

System, and asked DOJ components to identify any reviews they had performed of the grants identified.

## RESULTS

Exhibit 1 shows the applications, grants, and sub-awards we identified that relate to ACORN and its affiliates.  As discussed in the following sections, OJP and the Civil Rights Division were the only DOJ components that received applications from or made grants, directly or indirectly, to ACORN or its affiliates.

### EXHIBIT 1:  SUMMARY OF RESULTS

| Organization and Type of Grant | City, State | Amount | Year |
|---|---|---|---|
| **Association of Community Organizations for Reform Now, Inc.** | | | |
| - Sub-award from OJP Grant[11] | New York, NY | $ 20,000 | FY 2009 |
| **New York Agency for Community Affairs, Inc.** | | | |
| - Direct OJP Grant | New York, NY | $138,130 | FY 2005 |
| **ACORN Institute, Inc.** | | | |
| - Sub-award from OJP Weed and Seed Grant | St. Louis, MO | $ 13,000 | FY 2007 |
| - Sub-award from OJP Weed and Seed Grant[12] | Phoenix, AZ | $8,539 | FY 2009 |
| - Application Denied for OJP Recovery Act Grant | Washington, DC | $ 790,087 | FY 2009 |
| - Application Denied for Civil Rights Division Grant | Granite, IN | $ 80,000 | FY 2003 |
| - Application Denied for Civil Rights Division Grant | New Orleans, LA | $ 73,412 | FY 2004 |
| - Application Denied for Civil Rights Division Grant | New Orleans, LA | $ 73,412 | FY 2004 |
| **American Institute for Social Justice, Inc.** | | | |
| - Sub-award from OJP Grant | Washington, DC | $20,000 | FY 2002 |
| **ACORN Housing Corporation, Inc.** | | | |
| - Application Denied for Civil Rights Division Grant[13] | Chicago, IL | Not Available | FY 2003 |

The grants or sub-grants to each of these organizations, and the applications for such grants, are discussed in detail below, including an analysis of the funds applied for and received and the association of each organization with ACORN.

---

[11]  As discussed below, a sub-award agreement was entered into in September 2008, but as of November 12, 2009, the funds have not been provided to ACORN.

[12]  As discussed below, while the sub-award contract has been agreed to and signed, as of November 16, 2009, the funds have not been paid to ACORN Institute, Inc.  OJP informed us that the grantee was seeking authorization to use the funds for another purpose.

[13]  The Civil Rights Division identified this application to us but could not locate or provide us with the application document or the amount of funds requested.

## Sub-Award of DOJ Grant Funds to the Association of Organizations for Reform Now, Inc. (ACORN)

In our review, we identified one instance in which ACORN itself received DOJ grant funds through a sub-award.

*ACORN's Sub-Award from an OJP "Byrne Discretionary" Grant in 2008*

According to OJP grant documents, the Citizens Committee for New York City, Inc. (CCNYC), received a congressionally mandated award (earmark) under OJP's Bureau of Justice Assistance (BJA) "Byrne Discretionary" program in FY 2008.[14]  The amount of the grant was $290,663, and the project period is from July 2008 through February 2010.[15]  The program for which CCNYC received grant funds was called the "Community Crime Stoppers Program."

Most of the funding ($230,000 of $290,663) was designated for sub-awards, ranging from $5,000 to $20,000, to 21 organizations.  Under the program, the CCNYC planned to partner with the sub-award organizations to develop anti-crime/community improvement activities in New York City communities.  For example, one organization proposed patrols around a neighborhood skate park to watch for crime, drug use, and vandalism. Another organization stated it would provide counseling, legal assistance, emergency shelter referrals, and advocacy on behalf of crime and abuse victims.  A third organization planned to create an after-school program for at-risk elementary school children. The CCNYC grant program narrative submitted with its application stated that it planned to monitor the work of the 21 organizations identified in the application, one of which was ACORN. The program narrative also stated that CCNYC's goal was to support the 21 organizations and help increase their effectiveness in an effort, together with local law enforcement and other service providers, to create safer neighborhoods.

According to information provided by OJP, CCNYC entered into a sub-award agreement with ACORN in September 2008 for $20,000.  The sub-award contract between ACORN and the CCNYC provided that the $20,000 in sub-award funds was to be used to pay 70 percent of the ACORN Project

---

[14]  According to its website, CCNYC is a non-profit organization that "stimulates and supports self-help and civic action to improve the quality of life in New York City and its neighborhoods."

[15]  OJP grant number 2008-DD-BX-0508.

Coordinator's salary for one year, from July 1, 2008, to June 30, 2009.[16] The Project Coordinator's duties according to the contract were to attend monthly meetings and work with law enforcement in New York City to identify problematic locations that require increased police presence; work with community affairs officers, detectives, and local residents to create plans that target concentrated pockets of drug activity and violence; establish a unique protocol for ACORN members to report incidents in order to improve police response time; and consent to the use of ACORN's name for publicity and advertising purposes.

The sub-award agreement signed between ACORN and CCNYC required ACORN to submit to CCNYC financial status reports quarterly and progress reports on a semi-annual basis. According to the CCNYC's grant progress report to OJP for the period January through June 2009, ACORN contributed to the grant program by identifying several "core issues" that affected the target community, such as fixing elevators, wheelchair accessibility, and installing security cameras; "nurturing grassroots infrastructure"; and "organizing tenants to realize their goals."[17]

The CCNYC agreement allowed CCNYC to exercise control over sub-contract payments proposed by ACORN, including requirements that ACORN be reimbursed only for expenses in accordance with the budget attached to the agreement, that ACORN submit proper documentation and reimbursement requests to CCNYC, that ACORN deliver the required services within the grant period, and that budget modifications be approved by DOJ.

OJP officials told the OIG that as of November 12, 2009, the CCNYC had not provided the sub-grant funds to ACORN because ACORN submitted a reimbursement request that included costs outside the scope of the agreement. According to OJP, ACORN asked that it be reimbursed with grant funds for its payments of "fringe benefits" for the Project Coordinator.[18] However, ACORN's sub-award agreement only provided for payment from grant funds for the salary of the Project Coordinator. OJP told

---

[16] The sub-award identified the New York Agency for Community Affairs (NYACA) as ACORN's fiscal agent. NYACA received a separate direct DOJ grant discussed later in this report.

[17] OJP grants generally require grantees on a semi-annual basis to submit progress reports identifying grant accomplishments.

[18] The IRS defines fringe benefits as a form of compensation for the performance of services in addition to salary or rate of pay. Unfunded fringe benefits listed on ACORN's sub-award agreement with CCNYC included employer payments for Federal Insurance Contributions Act taxes (Social Security and Medicare), state unemployment insurance, and workers' compensation insurance.

us that, according to CCNYC, CCNYC had informed ACORN either to remove the fringe benefit cost from the reimbursement request or amend its budget to include the fringe benefits. OJP also told the OIG that it understood that CCNYC intended to provide ACORN with the grant funds if ACORN satisfied one of these requirements.

According to OJP's Grant Management System, OJP has not conducted any audits, financial reviews, or site visits relating to this grant.

## Direct Grant of DOJ Funds Awarded to an ACORN Affiliate, the New York Agency for Community Affairs

We identified one grant of DOJ funds directly to an ACORN affiliate, the New York Agency for Community Affairs, Inc. (NYACA). According to its financial statement, the mission of NYACA is to educate the public about rights, privileges, and opportunities in the area of housing. Its financial statement also stated that the NYACA is one of a number of nonprofit organizations run by independent boards of directors who share common functions, costs, and operate under "common controls by individuals who could exercise influence over their day-to-day decisions."

The OIG determined that NYACA was affiliated with ACORN based on the following information. First, the NYACA's 2005-2006 financial statement identified ACORN as an "affiliated organization." In addition, according to its IRS Form 990, in 2007 NYACA provided 97 percent of its $730,334 gross income to ACORN for "contractual services." The NYACA's 2005-2006 financial statement also stated that the NYACA acts as a fiscal agent for ACORN by remitting to ACORN certain gifts and grants that NYACA receives.[19]

---

[19] NYACA was also listed as the fiscal agent for ACORN on a sub-award agreement between the Citizens Committee for New York City, Inc., and ACORN as discussed previously in this report.

*NYACA's Grant from OJP in 2005*

We identified one direct grant from OJP to the NYACA.  A congressional earmark grant was provided by OJP to NYACA in 2005 for $138,130.[20]  The grant was awarded through OJP's Office of Juvenile Justice and Delinquency Prevention (OJJDP).[21]

The NYACA's program title identified in the grant award document was "ACORN Youth Organizing."  The award period for the grant was from September 1, 2005, to August 31, 2006.  The grant program narrative submitted with the application described the program's goals as: (1) building a base of trained student leaders, (2) winning specific improvements and policy changes, and (3) increasing post-high school opportunities for young people.

According to the budget detail submitted with the application, the award funds were to be used entirely for personnel and benefits for the following positions: (1) a part-time Executive Director, (2) a part-time Brooklyn Schools Organizer, (3) a part-time Brooklyn Lead Organizer, and (4) two full-time Youth Organizers.

According to OJP, NYACA received all the grant funds with the last draw-down in September 2006.  NYACA was required to submit to OJP quarterly Financial Status Reports and progress reports on a semi-annual basis.  The final Financial Status Report submitted by NYACA in March 2007 stated that it had incurred expenses for the grant program totaling the full amount of the award, $138,130.  NYACA submitted the last required semi-annual grant progress report in December 2006 for the period covering July 1, 2006, through August 31, 2006.

In the award document, NYACA agreed to abide by general award conditions, which included complying with the financial and administrative requirements set forth in the OJP Financial Guide; complying with the organizational audit requirements of OMB Circular A-133, Audits of States, Local Governments, and Non-Profit Organizations; and receiving prior

---

[20]  OJP grant number 2005-JL-FX-0044.  Award documentation identified the grant program as "FY 2005 OJJDP Congressional Earmark Programs."  Therefore, we considered this grant to be a congressional earmark.

[21]  While award documentation submitted by the grantee showed that its "legal name" is New York Agency for Community Affairs, Inc., the grantee's "organizational unit" for the grant was New York Association of Community Organizations for Reform Now (New York ACORN).

approval from OJJDP for any deviations from the timeline provided in the application or grant program implementation plan.

OJP has not conducted any audits, financial reviews, or site visits of this grant according to the information in OJP's Grant Management System. We identified a Single Audit Act report issued in April 29, 2008, of the NYACA for the years ended 2005 and 2006.[22]  That Single Audit Act audit did not identify any significant deficiencies regarding NYACA's use of DOJ funds.[23]

## Sub-Awards of DOJ Grant Funds to the ACORN Institute, Inc., and Four Applications for Grants by the ACORN Institute Denied

We also identified two sub-awards of DOJ grants funds to an ACORN Affiliate – the ACORN Institute, Inc.  On its website, the ACORN Institute stated that it is involved in projects such as free tax preparation, benefits enrollment, foreclosure prevention services, and the IRS Volunteer Income Tax Assistance Program.[24]

The OIG determined that the ACORN Institute is affiliated with ACORN based on the following.  The ACORN Institute website specifically states that it works in partnership with ACORN.  In addition, on ACORN's website it solicits "planned giving" donations for itself and the ACORN Institute.[25]  The

---

[22]  As previously described in footnote 10 of this report, organizations that expend $500,000 or more in federal awards must arrange for a "single audit" of its federal funds to be performed in accordance with generally accepted government auditing standards to provide assurance of accountability for federal awards.  The single audit covers NYACA's financial statements and schedule of expenditures of federal awards, internal controls over major programs, compliance with requirements that may have a direct and material effect on its major programs, and prior audit findings.  NYACA's major program for the single audit was a U.S. Department of Education award passed through the State of New York for $891,068.  A private certified public accounting firm in New Orleans, Louisiana, conducted this single audit.

[23]  The single audit identified a bookkeeping error with regard to NYACA's misclassification of income and expenses for a U.S. Department of Education grant passed through the state of New York.  While the auditors identified this as a significant deficiency in internal control over financial reporting, the auditors added an addendum to the report on May 1, 2008, stating that the bookkeeping error was an isolated incident due to the devastating impact of Hurricane Katrina, which in 2006 resulted in shortages in properly trained staff for the company that handles NYACA's accounting.

[24]  The IRS released a statement on September 23, 2009, that it terminated its relationship with ACORN.

[25]  ACORN website, http://acorn.org/index.php?id=9908, accessed October 20, 2009).

- 13 -

solicitation describes ACORN and the ACORN Institute as two separate but related legal entities, each with a different tax status.[26]  However, the ACORN Institute was listed as an "Allied Organization" on ACORN's website.[27]  ACORN's registered trademark appears on the ACORN Institute's website, indicating collective membership according to ACORN's trademark documentation maintained by the U.S. Patent and Trademark Office.[28]  The two organizations share a common address in New Orleans, Louisiana, according to the ACORN Institute's 2007 IRS Form 990 and ACORN's Louisiana state corporate records.  Moreover, according to the ACORN Institute's publicly available 2006 IRS Form 990, the ACORN Institute provided approximately $2.1 million of its $3.56 million gross income (59 percent) to ACORN and ACORN Services, Inc., in the form of grants and contracts.[29]  According to its 2007 IRS Form 990, the ACORN Institute gave 41 percent, approximately $1.15 million, of its $2.8 million gross income to ACORN and ACORN Services, Inc., as grants and payments for contract services.

We found that the ACORN Institute received two sub-awards of DOJ grant funds.  In addition, the ACORN Institute submitted four applications for DOJ funds that were denied.  These sub-awards and applications are discussed below.

---

[26]  The website describes ACORN as a non-profit organization with no special tax status that is free to participate in direct legislative lobbying; it notes that donations to ACORN are not tax-deductible.  The ACORN Institute, however, is described as a 501(c)(3) organization that is not involved in direct legislative lobbying and represents that all donations to the ACORN Institute are tax-deductible.

[27]  A cached version of an ACORN web address, http://www.acorn.org/news/index.php?id=12375, as it appeared on September 4, 2009, was accessed through a website caching service.  This website was not functional as of October 10, 2009.

[28]  The U.S. Patent and Trademark office defines a collective mark as a trademark or service mark used, or intended to be used, in commerce, by the members of a cooperative, an association, or other collective group or organization, including a mark that indicates membership in a union, an association, or other organization.

[29]  While we did not review the full extent of the association between ACORN Services, Inc., and ACORN, according to 2003 tax forms for ACORN available through the Arizona Corporation Commission Public Access System, ACORN identified ACORN Services, Inc., as a member of an affiliated group of corporations filing a consolidated return.

*ACORN Institute's Sub-Award from an OJP Weed and Seed Grant in 2007*

In FY 2007, Operation Weed and Seed – St. Louis, Inc. (St. Louis Weed and Seed), a non-profit organization located in St. Louis, Missouri, received a $200,000 Weed and Seed grant from OJP's Community Capacity Development Office (CCDO).[30]  The goals of the St. Louis Weed and Seed's project, entitled "Hamilton Heights Weed and Seed," included increasing neighborhood participation in prostitution reduction and identifying and reducing open drug activity.

St. Louis Weed and Seed's grant budget proposal identified approximately $34,000 for sub-awards to implement the "seeding" portion of the program.  Specifically, the sub-awards were to provide resources for efforts in prostitution intervention, increasing the number of active "block units" participating in the program, and the "clean-up program."[31]

In September 2007, St. Louis Weed and Seed provided a sub-award from this grant to the ACORN Institute for $13,000 of the $34,000 budgeted for sub-awards.  According to grant documentation, St. Louis Weed and Seed's sub-award recipients were required to follow procedures provided by St. Louis Weed and Seed, be reimbursed for only those expenses expended on a monthly basis, and complete semi-annual progress reports.  According to OJP, the Acorn Institute received the full amount of the sub-award, drawing its last payment in December 2008.

The agreement signed between St. Louis Weed and Seed and the ACORN Institute specified that the ACORN Institute was required to submit monthly financial reports, maintain an adequate system of accounting, and allow St. Louis Weed and Seed to conduct inspections.  In response to our requests for additional information, the St. Louis Weed and Seed Program Director told OJP in October 2009 that ACORN provided St. Louis Weed and

---

[30]  OJP Grant Number 2007-WS-Q7-0069. Weed and Seed is a DOJ program that according to the CCDO's website seeks to prevent, control, and reduce violent crime, drug abuse, and gang activity in designated high-crime neighborhoods across the country.  The two-pronged strategy involves law enforcement and prosecutors "weeding out" criminals while public agencies and community-based organizations "seed" the neighborhoods with human services.

[31]  According to St. Louis Weed and Seed's budget narrative submitted with its application, "Block Units" were created to reach out to residents and provide training to help monitor crime. Also according to the budget narrative, the "clean-up program" was intended to assist clean-up efforts in the alleys of Weed and Seed neighborhoods by removing debris blocking alleys and streets, and labeling garages and streets with addresses to improve access for residents and police patrols.

Seed with three progress reports and that ACORN's schedules for outreach, phone calls, and recruiting were approved by St. Louis Weed and Seed, as were materials used in outreach and recruiting campaigns.  St. Louis Weed and Seed also stated that it regularly polled attendees at its Neighborhood Residents Meeting to ensure that phone calls had been made and flyers had been distributed by ACORN.

St. Louis Weed and Seed's first progress report to OJP dated January 22, 2008, covering the reporting period October 2007 through December 2007 described activities the ACORN Institute engaged in to support St. Louis Weed and Seed's "Prevention, Intervention, and Treatment" activities.  Specifically, the report stated that the ACORN Institute personnel canvassed neighborhoods and engaged residents in interviews centering on information gathering, education, crime prevention, resident involvement, and identifying "Block Captains" for the program.  In its next two progress reports to OJP, St. Louis Weed and Seed stated that the resident involvement at monthly neighborhood meetings increased as a result of the ACORN Institute's efforts, that the ACORN Institute expanded the presence and role of Community Block Units in neighborhoods, and that the ACORN Institute had helped identify approximately 80 residents to be recruited as leaders and possible "Block Captains."

OJP has not conducted any audits, financial reviews, or site visits of this grant according to the information in OJP's Grant Management System.

*ACORN Institute's Sub-Award from an OJP Weed and Seed Grant in* 2008

According to grant documents, OJP's Community Capacity Development Office awarded a $150,000 Weed and Seed grant to the city of Phoenix's Neighborhood Services Department, with an award period of May 2008 through May 2010.[32]  The award to the city of Phoenix was to provide funding to implement Weed and Seed projects in the Phoenix Capitol Mall and Oakland University Park neighborhoods, including projects to address violent crime, drug activity, gang activity, prostitution activity, and car thefts.

As part of the project's neighborhood restoration strategy, the city of Phoenix planned to "build assets of low- and moderate-income workers, families and neighborhoods" by increasing awareness of Earned Income Tax Credits and free tax preparation.  The city of Phoenix agreed to provide a sub-award from that Weed and Seed grant to the ACORN Institute in the amount of $8,539 for services to be provided from November 2008 through

---

[32]  OJP grant number 2008-WS-QX-0126.

June 2009.  According to grant documents, under the sub-award the ACORN Institute was to canvass the neighborhood to recruit participants for the program and encourage them to obtain free tax preparation services.

OJP said that as of November 16, 2009, the city of Phoenix had not paid any of the sub-award funds to the ACORN Institute.  OJP told the OIG that the city of Phoenix had put the sub-award on hold due to poor reporting by the ACORN Institute regarding its activities on another project not related to DOJ grant funds, and was planning to seek approval from its steering committee to use the funds for other program needs.[33]

As discussed next, we found that the ACORN Institute applied for four other grants from DOJ components, including one for Recovery Act funds, but those grant applications were denied.

*ACORN Institute's Application to OJP in 2009 for Recovery Act Funds*

The ACORN Institute in Washington, D.C., applied in April 2009 for $790,087 in DOJ grant funds through OJP's Recovery Act Edward Byrne Memorial Competitive Grant Program.[34]  The specific program for which the ACORN Institute submitted its application was the Washington State Mortgage Fraud and Crime Prevention Task Force Category III:  Reducing Mortgage Fraud and Crime Related to Vacant Properties.[35]  In its application, the ACORN Institute stated that the proposed scope of work for the project was to operate a data-driven anti-foreclosure fraud campaign on a state-wide basis with an emphasis in activities in Tacoma and Seattle.  In its program narrative, the ACORN Institute stated that it and the "Washington ACORN (The Association of Community Organizations for Reform Now) have a history of awareness and effective action on the issues of fair housing, predatory lending, and fraud."

This application was denied.  The documented reason for OJP's denial was that the "competitive process selected other applicants."

---

[33] According to OJP, the ACORN Institute had a city-wide contract for the city's Volunteer Income Tax Assistance Program centers, but had little to no results in the Capitol Weed and Seed site.

[34] OJP application number 2009-G5460-DCSC.

[35] Category III is one of the eight programs available for funding through the Recovery Act Edward Byrne Memorial Competitive Grant Program.  Applications are solicited under Category III to increase the number of state and local investigators, prosecutors, and crime prevention practitioners, and to support innovative efforts such as regional mortgage fraud task forces that give states and localities additional tools to address mortgage fraud.

*ACORN Institute's Application to the Civil Rights Division in 2003*

The ACORN Institute located in Granite, Indiana, submitted an application in April 2003 for an $80,000 grant from the Civil Rights Division's Office of Special Counsel for Immigration-Related Unfair Employment Practices.[36] The ACORN Institute applied for the grant in connection with its "New Jersey Latino and Immigrant Employment Discrimination Education Project." The application proposed to conduct an education and outreach campaign to Latino and immigrant workers and their employers on rights and responsibilities under the anti-discrimination provisions of the Immigration and Nationality Act.

The application was denied. According to documents provided by the Civil Rights Division, applications were reviewed and evaluated on several factors, including the geographic scope of the proposed grant; a balanced mix of education targeted at workers, employers, and immigration service providers; broad demographic coverage; program design; administrative capabilities of the applicant; staff capability of the applicant; and a demonstration of similar, previously successful programs or work.

The Civil Rights Division told the OIG that the application was not selected for funding because it did not score high enough relative to other applications.

*ACORN Institute's Application to the Civil Rights Division in 2004*

In May 2004, the ACORN Institute located in New Orleans, Louisiana, submitted an application for a grant from the Civil Rights Division's Office of Special Counsel for Immigration-Related Unfair Employment Practices in the amount of $73,412.[37] The ACORN Institute's project title was the "Hispanic and Immigrant Employment Discrimination Outreach Project." The grant application targeted areas in Los Angeles and Orange County, California. This application sought to increase awareness in Hispanic and immigrant communities on anti-discrimination provisions in the Immigration and Nationality Act, in addition to preventing discrimination by employers.

The application was denied. The Civil Rights Division told the OIG that the application was not selected for funding because it did not score high enough relative to other applicants.

---

[36] Civil Rights Division application number OSC-03-46.

[37] Civil Rights Division application number OSC-04-48.

*ACORN Institute's Application to the Civil Rights Division in 2004*

Also in May 2004, the ACORN Institute located in New Orleans, Louisiana, submitted another application to the Civil Rights Division's Office of Special Counsel for Immigration-Related Unfair Employment Practices seeking the same amount of funding, $73,412.[38] This application was in connection with the ACORN Institute's "Maricopa County Hispanic and Immigrant Employment Discrimination Outreach Project," and the geographic target area for this application was Maricopa County, Arizona. According to the application, the ACORN Institute proposed to work in conjunction with Arizona ACORN in the project's implementation.

The application was denied. The Civil Rights Division stated that the application was not selected for funding because it did not score high enough relative to other applications.

## Sub-Award of DOJ Grant Funds to an ACORN Affiliate, the American Institute for Social Justice

We found that the American Institute for Social Justice (AISJ) received one sub-award from a DOJ grant.

According to its website, the American Institute for Social Justice (AISJ) provides training and technical assistance in organizing principles and methods and is a center for research and training on issues of concern to low and moderate income people.

The OIG determined that AISJ was affiliated with ACORN based on the following information. In 2002 when AISJ received the sub-grant described below, ACORN listed the AISJ on its website as being an ACORN affiliate. ACORN currently states on its website that it works with AISJ to provide training programs to transform poor communities.[39] AISJ's IRS Form 990 in 2002, the year AISJ received DOJ grant funds, showed that it had gross income of $2.529 million and provided ACORN with $1.684 million in grants, 67 percent of AISJ's gross income. More recently, in 2006 AISJ provided $4.95 million, 56 percent of its $8.84 million gross revenue, in grants to ACORN, and in 2007 $165,644 in contractual payments to ACORN.[40] In addition, the contact information for AISJ on its website shows that it has

---

[38] Civil Rights Division application number OSC-04-42.

[39] http://acorn.org/index.php?id=917 (accessed October 19, 2009).

[40] AISJ's 2007 IRS Form 990 identified $4.51 million in total grants, but did not identify the individual recipients of those grants.

the same address and fax number as the ACORN office in the District of Columbia. AISJ's addresses listed on its 2002, 2003, and 2006 IRS Forms 990 are the same as ACORN's address listed on its 2003 Tax Returns available on Arizona's corporate database. Similarly, AISJ's Louisiana state corporate records show as its principal business address the same address provided on ACORN's Louisiana state corporate records.

*AISJ's Sub-Award from an OJP grant in 2002*

We determined that between April 6, 2000, and December 31, 2003, OJP's Bureau of Justice Assistance awarded the National Training and Information Center (NTIC) in Chicago, Illinois, an initial earmark grant and three supplemental earmark grants totaling $3,162,580.[41] According to grant documents, the purpose of the grants was to provide training, technical assistance, and funding to community-based organizations through sub-awards nationwide to address problems of crime, violence, and substance abuse, and to assist in the revitalization and redevelopment of their communities. The program was called the Community Justice Empowerment Project.

On July 2, 2002, NTIC provided a sub-award to AISJ in the amount of $20,000. Although the contract for the sub-award was between NTIC and AISJ and payment of the funds was made to AISJ, NTIC documents identified "Toledo ACORN" as the recipient of this sub-award, which we determined to be the ACORN organization located in Toledo, Ohio.

NTIC's agreements with its sub-recipients required them to: (1) provide semi-annual financial reports or reimbursement requests that detailed how the money was spent, and (2) maintain supporting documentation at its place of business.

In March 2008, the DOJ OIG issued an audit report on the Community Justice Empowerment Project grant awarded by OJP to NTIC.[42] In brief, our audit revealed significant irregularities in NTIC's grant activities, significant weaknesses in NTIC's grant management practices and internal control system, and various instances of unallowable, unsupported, and unapproved

---

[41] OJP grant number 2000-DD-VX-0014. The conference reports that accompanied the FY 2000, 2001, and 2002 DOJ appropriation statutes (106-479, 106-1005, and 107-278, respectively) directed that NTIC receive these grant funds. We refer to these congressionally designated projects as "earmarks."

[42] U.S. Department of Justice Office of the Inspector General, *Community Justice Empowerment Project Grant Administered by the National Training and Information Center*, Audit Report GR-50-08-005 (March 2008).

expenses.  As a result of the significant grant irregularities, we questioned the entire award amount of $3,162,580.[43]  Due to the significance of our findings and the questionable nature of some of NTIC's activities, the OIG Investigations Division conducted a criminal and civil investigation related to this grant.

As a result of the criminal investigation, the Executive Director of NTIC pled guilty to intentionally misapplying federal funds and received a prison sentence of 5 months, 5 months of home confinement, 24 months of probation, a fine of $5,000, and a restitution order of approximately $46,000.  Pursuant to a subsequent False Claims Act case, NTIC paid $550,000 to the U.S. government.

The OIG's audit focused principally on NTIC's grant management, but it also reviewed NTIC's oversight of sub-recipients of grant funds.  During our review, in 2003 we attempted to contact NTIC's 36 sub-recipients by letters and telephone calls.  Only 2 of the 36 sub-recipients were not responsive to our efforts.  One of the two non-responsive sub-recipients was identified by NTIC as Toledo ACORN, although as noted above the written sub-award agreement was between NTIC and AISJ.

During our audit of NTIC, we found no evidence that NTIC officials had ever visited Toledo ACORN or AISJ.  Moreover, NTIC's files did not contain the required expenditure reports for Toledo ACORN or AISJ, and NTIC did not have any supporting documentation for the sub-recipient's expenditures.  Accordingly, our audit could not determine how the grant funds paid to AISJ were spent.  Because we were not able to contact Toledo ACORN, and their records were not available for audit, we questioned the total funds paid to this sub-recipient by NTIC, which amounted to $20,000.

## Application for DOJ Grant Funds by ACORN Housing Corporation, Inc., Denied

Our review found that one application from ACORN Housing Corporation, Inc. (ACORN Housing) in FY 2003 for a DOJ grant was denied.

ACORN Housing is a national non-profit organization providing free mortgage and housing counseling to low and moderate income home owners and prospective buyers.  Although ACORN Housing contains the acronym ACORN in its name, it has a different Employer Identification Number from

---

[43]  In some instances, we questioned costs for more than one reason, resulting in the total questioned costs being in excess of grant receipts.  Our total dollar-related findings amounted to $4,325,292.

ACORN and, unlike ACORN, is identified as a charitable organization by the IRS.

However, the OIG determined that ACORN Housing was affiliated with ACORN based on the following information.  According to ACORN Housing's website, it was established in 1986 by ACORN to build and preserve housing assets.  ACORN Housing refers to ACORN throughout its website as a partner and a sister organization.  Moreover, according to ACORN's 2006 Annual Report, ACORN Housing Corporation was listed as an example of the "Best of ACORN Organizing" in 2006.  Louisiana state corporate records show that ACORN Housing's domicile address matches the address at which ACORN maintains its principal business office.  The same office address was published on both the ACORN and ACORN Housing websites.

Financial documents of ACORN Housing identified ACORN as one of its "affiliated organizations" and showed that ACORN Housing received gifts and grants from ACORN totaling $216,316 in 2006.  The financial statement also identified gifts and grants from the "ACORN Partnership" totaling $244,500 for 2007 and $520,228 in 2006.  In addition, ACORN Housing's 2007 IRS Form 990 identified $119,509 in notes and loans receivable from ACORN.  ACORN Housing's financial statement also identified several transactions between ACORN Housing and the AISJ, another ACORN affiliate identified in our review.[44]  Specifically, ACORN Housing received $100,000 in gifts and grants from AISJ and provided $1.4 million in gifts and grants to AISJ between the 2 years covered by the financial statement.

We identified one application for DOJ grant funds submitted by ACORN Housing in FY 2003.  According to the Civil Rights Division's Office of Special Counsel for Immigration-Related Unfair Employment Practices, ACORN Housing in Chicago, Illinois, submitted an application for a FY 2003 Civil Rights Division grant.  The application was denied.  The Civil Rights Division told the OIG that it could not locate the application or provide the amount of the funding request.  We found no further information relating to this application.

**CONCLUSION**

Our review did not find any DOJ direct grants to ACORN.  However, we found that one recipient of DOJ grant funds entered into a sub-agreement with ACORN for program activities.  In addition, we identified one direct grant of DOJ funds to an affiliate of ACORN.  We also identified three

---

[44]  The AISJ received a DOJ sub-award discussed previously in this report.

instances in which a DOJ grantee entered into a sub-award with an ACORN affiliate.  Thus, in total we found that ACORN and its affiliates received one direct grant and four sub-awards totaling approximately $200,000 between FYs 2002 and 2009.  Three of the grants have closed while two others remain open.  For the two open grants, funds have not been disbursed to ACORN as of November 2009.[45]

In addition, we determined that ACORN affiliates submitted five applications for DOJ grant funds from FY 2003 to 2009 that were denied.

We also determined that DOJ did not conduct any audits, financial reviews, or site visits of the five grants that were awarded to ACORN or its affiliates, either directly or as a sub-award recipient.  We identified one Single Audit Act report of ACORN affiliate NYACA that covered calendar years 2005 and 2006.  In addition, the OIG issued an audit report in 2008 of a DOJ grantee that provided a sub-award to an ACORN affiliate – the 2002 sub-award to the American Institute of Social Justice – and found that the DOJ grantee mismanaged the grant and did not properly oversee the sub-award to the ACORN affiliate.

---

[45]  The grantee for one open grant is seeking approval to use the funds for another purpose.  The grantee for the other open grant is awaiting documentation from ACORN to disburse the funds.